# EXHIBIT A

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF TENNESSEE
 2                     AT NASHVILLE

 3     _____

       GLOBAL FORCE ENTERTAINMENT,
 4     INC. and JEFFREY JARRETT,

 5                  Plaintiffs,     CASE NO. 3:18-cv-00749
                                    CHIEF JUDGE WAVERLY D.
 6     vs.                          CRENSHAW, JR.
                                    MAGISTRATE JUDGE
 7     ANTHEM SPORTS & ENTERTAINMENT JOE B. BROWN
       CORP., and ANTHEM WRESTLING
 8     EXHIBITIONS, LLC,

 9                  Defendants.

10     _____

11

12

13                  Deposition of:

14                  JEFFREY JARRETT 30(b)(6)
                    GLOBAL FORCE ENTERTAINMENT, INC.
15
                    Taken on behalf of the Defendants
16                  November 19, 2019

17

18

19

20

21

22     _____

23                  Huseby Nashville
                 Deborah Harris Honeycutt, LCR
24             214 2nd Avenue North, Suite 207
                 Nashville, Tennessee 37201
25                    (615)256-1935
```

1    yes, no, full verbal answers, versus uh-huh, huh-uh.

2    Those things can be unclear or ambiguous.  Do you

3    understand?

4    A.     Yes, sir.

5    Q.     I think with those procedural things out of

6    the way, I wanted to kind of jump into some of the

7    questions I had for you.  And really I want to start

8    with your background in wrestling and just kind of

9    get a little bit of the history of kind of your

10   involvement, not just with wrestling, but also some

11   of the predecessors, TNA, NWA, cover some of that,

12   some of the history of that.

13          So when did you first start professional

14   wrestling?

15   A.     April 6 of 1986 was my first match.  The

16   summers preceding that I worked for my father and my

17   grandmother doing all sorts of odd jobs, from

18   setting up the ring, to putting up posters,

19   promoting.

20   Q.     So that's kind of my next question.  You come

21   from a wrestling family; is that correct?

22   A.     From the 1940s my grandmother started

23   promoting.  She never wrestled but she did

24   everything but wrestle.

25   Q.     And your father, he both promoted and

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 3 of 75 PageID #: 873

1　wrestled; is that correct?

2　A.　　Correct.

3　Q.　　During your father's career, what name did he

4　use when he was wrestling?  Did he use his actual

5　name or did he use some form of, kind of if you want

6　to say, performing name?

7　A.　　Both.

8　Q.　　And what were those?  What was your father's

9　name?

10　A.　　Jerry Jarrett.

11　Q.　　So he wrestled under the name Jerry Jarrett?

12　A.　　Yes.

13　Q.　　And what other names did he wrestle under?

14　A.　　There's probably too many to list but I'll go

15　with the most famous or infamous one.  The Hawaiian

16　Flash.

17　Q.　　The Hawaiian Flash.  Okay.  And so during his

18　career did he wrestle more as Jerry Jarrett or more

19　as The Hawaiian Flash?

20　A.　　Jerry Jarrett.

21　Q.　　And you started wrestling in your first match

22　in April 6, 1986, did you appear as Jeff Jarrett or

23　did you appear with a performing name?

24　A.　　The first match was Jeff Jarrett.

25　Q.　　Okay.  And then since that time, have you

Case 3:18-cv-00749  Document 105-1  Filed 02/14/20  Page 4 of 75 PageID #: 874

1   continued to wrestle under the name Jeff Jarrett?

2   A.    Always Jeff Jarrett but with multiple

3   monikers, personas, catch phrases that may go with

4   it.

5   Q.    Understood.  But your name Jeff Jarrett was

6   always included within whatever name you were using

7   for a performance; is that correct?

8          MR. MILLER:  Objection to form.

9   BY MR. LEE:

10  Q.    I'll rephrase.  Can you give me an example of

11  some of the monikers or nicknames or things like

12  that that you kind of used?

13  A.    The Golden Boy Jeff Jarrett.  The Chosen One

14  Jeff Jarrett.  Simply Irresistible Jeff Jarrett.

15  Those are --

16  Q.    Those are some of the main ones that you

17  used?

18  A.    Yes.

19  Q.    It was always tied in?  It always included

20  Jeff Jarrett as part of the name?

21  A.    Yes.

22  Q.    Okay.  So when you started in 1986, who were

23  you wrestling for?  What promotion or company?  Who

24  were you wrestling with?

25  A.    My father's promotion.

Case 3:18-cv-00749  Document 105-1  Filed 02/14/20  Page 5 of 75 PageID #: 875

1    Q.    And do you remember the name of it?

2    A.    The business entity was Jarrett Enterprises,

3    if I recall correctly.  It went through numerous

4    name changes on the checks that I received, if that

5    makes sense.

6    Q.    Understood.  I should step back.  One of the

7    other instructions I should have given you was today

8    I'm here to ask you questions about things that you

9    know.  If you don't know the answer to something

10    it's perfectly fine to just say you don't know.  We

11    don't want you to guess or speculate.  So if you

12    answer the question, it's going to be based upon

13    information that you know.  Understood?

14    A.    Yes, sir.

15    Q.    Perfect.  So you started wrestling in 1986.

16    And I know fast-forwarding a little bit, at some

17    point you created NWA-TNA with your father; is that

18    correct?

19    A.    Yes.

20    Q.    And when was that?

21    A.    2002.

22    Q.    Can you tell me a little bit about NWA-TNA?

23    What was it?  What did you-all do?

24    A.    It was started -- our first event was

25    June 19th, 2002.  And we were in the business of

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 6 of 75 PageID #: 876

1   once-a-month pay-per-view along with the weekly

2   television show.

3   Q.      Now, with TNA, besides kind of starting with

4   your father, did you also wrestle for TNA?  Did you

5   appear in the pay-per-views and the weekly

6   programming?

7   A.      Yes.

8   Q.      And, generally, how many other wrestlers were

9   there kind of?  I don't need to know individual

10  names but just kind of total number in various time

11  periods.

12  A.      On a two-hour program, approximately 30

13  talents.

14  Q.      Now, it's my understanding at some point TNA

15  became Impact Wrestling?  Is that understanding

16  correct?

17  A.      So --

18  Q.      And if you need to explain that to me, please

19  do.

20  A.      Yeah.  So in 2005, when we went on Fox Sports

21  Net, TNA is we, we created a one-hour television

22  show that I referenced.  The name of that television

23  show was Impact.

24  Q.      Okay.

25  A.      So Impact was the name of the television show

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 7 of 75 PageID #: 877

1    from 2005 approximately until 2011-ish, 2011, 2012

2    where not only was it still the name of the

3    television show, the decision was made to reference

4    the company as Impact Wrestling.

5    Q.      Okay.  So at the beginning when you started

6    creating the one-hour shows called Impact Wrestling

7    it was TNA Impact?

8    A.      It was not Impact Wrestling.  It was called

9    TNA Impact.

10   Q.      So currently for WWE Raw or something like

11   that or similar to that type of concept?

12   A.      Forgive me, I didn't want to start nodding.

13   But, yes, you're correct.

14   Q.      But then you're saying in 2011, 2012, the

15   decision was actually made to brand the entire thing

16   as Impact; is that correct?

17   A.      The -- believe me, I'm sitting here today, it

18   will confusing to you if I try because the powers

19   that be didn't even understand it.  So in that time

20   frame, the mindset was to drop TNA and there were

21   mixed marketing messages sent.  But dropping TNA

22   more or less forced Impact Wrestling as Impact.

23   Yes, it's confusing.

24   Q.      Understood.  And at some point you left TNA;

25   is that correct?

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 8 of 75 PageID #: 878

1   A.      Yes.

2   Q.      And when was that?

3   A.      I resigned in December of 2013.

4   Q.      And when you resigned in December of 2013,

5   what was your kind of official title with TNA if you

6   had one?

7   A.      When I resigned?

8   Q.      Yes.

9   A.      I did not have an official title.  On screen

10  I was called The Founder.  As an on-screen character

11  I was The Founder.  In the office I was an

12  executive.

13  Q.      Just generally labeled as an executive?

14  A.      Yes.

15  Q.      And were there other executives besides you

16  at TNA when you left at that time?

17  A.      Yes.

18  Q.      How many?

19  A.      Approximately seven, eight.

20  Q.      And overall when you left TNA in 2013, how

21  large was the organization, kind of employee head

22  count?

23  A.      Employees, approximately 30.

24  Q.      And then in terms of kind of wrestlers kind

25  of talent, if you will, how many wrestlers did TNA

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 9 of 75 PageID #: 879

1    have at that time?

2    A.    I'll get a little more specific on this.

3    Approximately 30 to 40 contracted full time

4    exclusive talents.

5    Q.    Okay.

6    A.    And probably another 30 to 40 nonexclusive.

7    Q.    Okay.  All right.  And so then after you left

8    TNA in December of 2013, at some point you started

9    Global Force Entertainment; is that correct?

10   A.    Yes.

11   Q.    When did you start Global Force?

12   A.    April 2014.

13   Q.    And besides yourself, were there any other

14   kind of principals that started Global Force

15   Entertainment?

16   A.    No.

17   Q.    And Global Force Entertainment is still

18   around today and you still work for Global Force

19   Entertainment?

20   A.    I still own it.

21   Q.    And are you still the sole owner of Global

22   Force Entertainment?

23   A.    No, sir.

24              MR. MILLER:  Object to the form.

25   ///

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 10 of 75 PageID #: 880

```
 1   BY MR. LEE:

 2   Q.      Go ahead.

 3   A.      No, sir.

 4   Q.      Who are some of the other owners of Global

 5   Force Entertainment?

 6   A.      There's one other.

 7   Q.      Who is that?

 8   A.      Scoot D'Amore, D, apostrophe, capital

 9   A-M-O-R-E.

10   Q.      And when did Mr. D'Amore become an owner of

11   Global Force Entertainment?

12   A.      If I recall correctly, late 2014.  We might

13   have possibly closed on the financing early 2015.

14   Q.      And since that time, late 2014, early 2015,

15   Mr. D'Amore has been an owner since that time

16   continuously?

17   A.      Yes, sir.

18   Q.      Now, when you started Global Force

19   Entertainment, what was y'all's business?

20   A.      In the business of professional wrestling.

21   Q.      And, similarly, were you in the business of

22   having live events or was it producing content for

23   either pay-per-view or television?  What

24   specifically was the business?

25   A.      Both.
```

1    A.    But we created content starting in April of

2    2014.

3    Q.    So that's a very good distinction.  So we're

4    speaking the same vernacular, then, can you explain

5    to me kind of inside of the wrestling business, the

6    various types of -- so I understand that there's

7    content where you have a release.  Then you have a

8    wrestling match.

9         Can you take me through some of the

10   different categories or distinction that in your

11   mind what wrestling production or wrestling content

12   is?

13   A.    Probably the easiest to clarify would be we

14   have content produced inside of a wrestling ring and

15   content produced outside of a wrestling ring and

16   content produced at a performance/event or content

17   produced that you might say would be in a

18   reality-based format.

19   Q.    Okay.

20   A.    Reality-show-based format.

21   Q.    Okay.

22   A.    That can involve physicality and

23   non-physicality.

24   Q.    So when did Global Force Entertainment

25   produce its first inside the wrestling ring content?

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 12 of 75 PageID #: 882

1    A.      In late 2014 and early 2015 we did -- we

2    produced shows in America, as well as in United

3    Kingdom.

4    Q.      And those shows, were they ever aired, either

5    on pay-per-view or television?

6    A.      No.

7    Q.      And what were the name of those shows?

8    A.      The ones in the United Kingdom had some type

9    of British flavor.  Global Force comes to Coventry,

10   a variety of names.  Independent shows don't

11   necessarily have, for example, like an Impact name

12   or an Amped name.  It's -- they're independent,

13   standalone, most of the time city-specific titled.

14   Q.      And do you recall roughly then how many

15   cities you would have had events in in that time

16   frame?

17   A.      I don't recall.

18   Q.      Now, when you were actually producing the

19   inside the wrestling ring content, was that done

20   under the Global Force Entertainment name or was

21   that done under another name?

22   A.      Both.

23   Q.      Please explain.

24   A.      When you -- when you -- when you partner with

25   other promotions, other independent promotions,

```
 1    there's a number of different ways that they can be
 2    not only promoted but produced as well.  It could be
 3    GFW presents Tried and True Promotion.  Which Tried
 4    and True is, to give it some context, it's a local
 5    promotion run here in Clarksville, Tennessee.
 6            So that can be a -- you can call it co-pro.
 7    That's sort of the wrestling jargon.  It's
 8    co-promotion.  And in that, it can be a format
 9    where Global Force provides "X" amount of the
10    talent, 25 percent, 50 percent, 75 percent, or all
11    of it, or more or less they can hire Global Force
12    to be the marketing and promotion side of it and
13    they are the sole producers of the event.  It's
14    commonly done in numerous different ways.
15    Q.    And you mentioned GFW.  That was actually
16    where I was driving at.  So what does GFW stand for?
17    A.    Global Force Wrestling.
18    Q.    And Global Force Entertainment it produces --
19    it operates in producing its wrestling content and
20    promotions underneath GFW or Global Force Wrestling;
21    is that correct?
22    A.    I'm not a lawyer, but Global Force
23    Entertainment is the name of the company on business
24    records.  It does business as Global Force
25    Wrestling.
```

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 14 of 75 PageID #: 884

1    Q.    So in terms of all of the actual -- whatever

2    the content is, whether inside the wrestling ring,

3    outside the wrestling ring, produced, anything like

4    that, the name that would appear on that content

5    would be Global Force Wrestling or GFW; is that

6    correct?

7    A.    Correct.

8    Q.    The name Global Force Wrestling, who came up

9    with that name?

10   A.    I did.

11   Q.    And, similarly, the mark for GFW, who came up

12   with that mark?

13   A.    I did.

14   Q.    And for -- I'm going to step back.  So

15   does -- go ahead.

16   A.    Would you -- when you ask those kind of

17   questions, should I say Jeff Jarrett or I did or me?

18   Q.    I'm fine with the understanding that you did

19   it.

20   A.    Because I don't know if I'm answering for --

21   Q.    There were unanswered questions there.  So

22   when you said I did it, did you do it in your

23   capacity as the owner of Global Force Entertainment?

24   A.    Yes.

25   Q.    And to that point, that's actually my next

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 15 of 75 PageID #: 885

1    A.      Yes.

2    Q.      Can I specifically refer you to paragraph 22,

3    so that each individual paragraph, and that would be

4    on page six, I believe, of the document you're

5    looking at.

6    A.      22?

7    Q.      Yes.

8    A.      Yes, sir.

9    Q.      So you said July 24th.  That's correct.  I

10   wanted to point that out that you were right.

11          So in paragraph 22 -- and I don't want to

12   read it to you.  But there is a definition in the

13   last sentence, collective content was called the

14   GFW Amped.  And when I refer to GFW Amped, that's

15   the definition that I'm referring to.

16          Are you comfortable with, if you read

17   paragraph 22, using that term, GFW Amped, to

18   describe that programming that's described in

19   paragraph 22?

20   A.      Can you clarify your question?

21   Q.      So we're going to refer to GFW Amped and when

22   I refer to that, what I'm referring to is on

23   July 24th, August 21st, October 23rd, 2015, at the

24   Orleans Arena in Las Vegas, Nevada, GFE, which is

25   Global Force Entertainment, under the Global Force

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 16 of 75 PageID #: 886

1   Wrestling and GFW trademarks produced approximately

2   16 hours of wrestling programming to market to

3   television and/or pay-per-view markets.

4          So I'm saying when I use the term GFW Amped,

5   that that's what it means.  Is that an accurate

6   statement?

7   A.     Yes.

8   Q.     And you're comfortable when I say GFW

9   Amped --

10  A.     Yes.

11  Q.     Okay.

12  A.     For my clarification, Amped content included

13  more than just Vegas content.

14  Q.     Okay.  Can you please elaborate on what

15  additional content there was besides the Las Vegas

16  content?

17  A.     Basically, the stuff that I was talking

18  about.  We produced stuff inside the ring and

19  outside the ring.  There was stuff that was shot

20  outside the ring, reality-based content.

21  Q.     And was that content shot separately from the

22  in ring -- inside-the-ring content that's part of

23  what we're describing here as GFW Amped?

24  A.     Clarify your question.

25  Q.     You said there was kind of the

1   A.    Correct.

2   Q.    And the people actually recording weren't

3   Global Force employees?

4   A.    Correct.

5   Q.    So you spend -- actually, when you're

6   shooting in the Orleans Arena for the Amped content,

7   are there people in the arena, fans?

8   A.    Yes.

9   Q.    So this looks like -- when you're actually

10  filming it looks like it's a sporting event?  That's

11  what it looks like.  You have fans -- let me step

12  back.

13        Did the fans have to pay admission to come

14  watch the GFW Amped production?

15  A.    Yes.

16  Q.    And so you have fans coming in.  So this

17  looks like any other sporting event, where you've

18  got a ring, an arena full of people, and you guys

19  are producing the wrestling match right there; is

20  that correct?

21  A.    Yes.

22  Q.    So you shoot for -- so now I want to turn

23  quickly to OTA content.  So you're shooting and you

24  said there's backstage stuff.  You're shooting that

25  on the same days you're shooting in the Orleans

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 18 of 75 PageID #: 888

1   Q.      So you have 16 hours of content.  What did

2   you -- was at that point what you had recorded, was

3   it in a condition where it could be broadcast on

4   television or pay-per-view?

5   A.      Can you clarify condition?

6   Q.      Was it finished?  Was it a finished product

7   that could then be broadcast on television or

8   pay-per-view?

9   A.      Can you define finished?

10  Q.      Was there additional post-production work

11  that needed to occur to the filming after

12  August 23rd, 2015?

13  A.      Yes.  It would be additional post-production

14  work needed.

15  Q.      Can you tell me what that post-production

16  work would be?

17  A.      Final voiceovers would be one element.  And

18  depending upon the network or the format, one-hour

19  shows are generally anywhere from 42 to 48 minutes.

20  So six minutes is a long time potentially.  So you

21  have to have pads and have the ability to

22  specifically format it when it goes to air.

23  Q.      Is there any -- so when you were filming at

24  the Orleans Arena, how many cameras did you have

25  that were filming the event?

```
 1   Q.     Okay.  Who did that?

 2   A.     KSTV.

 3              MR. MILLER:  Counsel, is now a bad time

 4   to take a break?  It's been about an hour.  We can

 5   keep it real short.

 6              MR. LEE:  Yes.  That's fine.

 7              (Break was taken from 10:03 a.m. until

 8   10:08 a.m.)

 9   BY MR. LEE:

10   Q.     We are back on the record.  So right before

11   the break we had just mentioned that Global Force

12   Entertainment had retained KSTV to do kind of -- to

13   convert the GFW Amped from the live cut to the final

14   cut; is that correct?

15   A.     Just for clarification, line, L-I-N -- line

16   cut to -- there's numerous ways.  And the final cut

17   sometimes isn't really final until it airs, if that

18   makes sense.

19   Q.     Understood.  A more finished cut than the

20   line cut?

21   A.     Accurate.

22   Q.     Is KSTV, is that owned by Kevin Sullivan?

23   A.     Yes.

24   Q.     And it's my understanding that KSTV did

25   the -- took the line cut and did work on it and
```

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 20 of 75 PageID #: 890

```
 1   Global Force Entertainment had a contract with KSTV
 2   to do that work and the amount of the contract was
 3   $292,000.  Does that sound right?
 4              MR. MILLER:  Objection to form.
 5              THE WITNESS:  There was no contract.
 6   BY MR. LEE:
 7   Q.     Was there any form of agreement between
 8   Global Force Entertainment and KSTV for them to do
 9   the work on the line cut?
10   A.     Verbal agreement.
11   Q.     And who would that have been on behalf of
12   Global Force Entertainment?  Was that you who had
13   that conversation with KSTV?
14   A.     Yes.
15   Q.     It's also my understanding that KSTV was not
16   in its opinion paid by Global Force Entertainment
17   pursuant to oral agreement for all the work they
18   did.  Is that true?
19              MR. MILLER:  Objection to form.
20              THE WITNESS:  Can you clarify it?
21   BY MR. LEE:
22   Q.     Is it true that KSTV was not paid by Global
23   Force Entertainment for all of the work it did on
24   the Amped content, the GFW Amped content?
25   A.     Did you say wasn't paid?  Was not paid or has
```

 1   the line cut, all of the -- I just want to

 2   understand the process.  This is full disclosure.  I

 3   do not do, in a shocking turn of events, production

 4   of sporting events.

 5   A.      Understood.  And he doesn't either.

 6   Q.      So any time you want to, you can help me kind

 7   of use the correct terminology or explain this

 8   process that will make this go faster.

 9   A.      Sure.

10   Q.      So the line cut is turned over to KSTV to do

11   their work on.  At that point they have possession

12   of the sole copy of that; is that correct?

13   A.      Yes.

14   Q.      And if you're looking back at the second

15   amended complaint, in the complaint there are the 16

16   hours of GFW Amped content that is sometimes

17   referred to as master.  Do you understand that term

18   as it's used in the second amended complaint?  And

19   I'm sure I can...

20   A.      Paragraph 26?

21   Q.      That would be one place where it discusses

22   the master recordings of the 16 hours GFW Amped.

23   A.      Yes.

24   Q.      And so the master recording that's being

25   referenced there, that is what is in the possession

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 22 of 75 PageID #: 892

1　Q.　　Yes.

2　A.　　Okay.　That is when you enter into agreement

3　with a buyer.

4　Q.　　So when you say when you enter into an

5　agreement with the buyer, who are you referencing

6　when you say you?

7　A.　　Collectively, the co-production agreement.

8　Q.　　So in this case Global Force Entertainment

9　and A. Smith Productions, when they enter into an

10　agreement with a buyer?

11　A.　　(Nodding head affirmatively.)

12　Q.　　So stepping back, under the co-production

13　agreement, was there ever a buyer, as you described?

14　Was there ever a buyer?

15　A.　　There were multiple buyers.

16　Q.　　Who were they?

17　A.　　We had discussions with Turner, Fox.　They

18　are defined as the buyer.　Turner.　Fox.　Spike.

19　Viacom.

20　Q.　　Did any of them ultimately result in some

21　form of sale or agreement where they paid money to

22　Global Force Entertainment and A. Smith Productions

23　for the GFW Amped?

24　A.　　When I was introduced to Anthem and started

25　in those discussions.　Up until that point, no.

1    There was not a buyer.

2    Q.    Okay.  In April -- in January of 2017 was

3    there a buyer?

4    A.    January of 2017?

5    Q.    Yes.

6    A.    We were under an exclusive -- it's called a

7    holding deal with Fox.  We were under a holding

8    agreement with Fox Sports.

9    Q.    Did that holding agreement ever actually

10   result in Fox Sports buying the GFW Amped content?

11   A.    No.

12   Q.    Global Force Wrestling -- Global Force

13   Entertainment, Global Force Wrestling, you have a

14   website, correct?

15   A.    Yes.

16   Q.    And do you have the ability -- again, we live

17   in a digital age.  Do you have wrestling content

18   available through your website for customers to

19   purchase?

20   A.    Have we?  Yes.  Yes.

21   Q.    So currently today, if I go on Global Force

22   Wrestling's website, there's wrestling content that

23   I can either for a user fee or a one-time fee I can

24   purchase as a consumer; is that right?

25   A.    As a fee today, as we sit here as a fee on

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 24 of 75 PageID #: 894

1   Exhibitions, LLC, separate and apart from Anthem

2   Sports and Entertainment Corp.  If I'm going to make

3   any reference to Anthem Sports, I will refer to it

4   as Anthem Sports.  So any time I refer to Anthem or

5   Anthem Wrestling, I am referring to Anthem Wrestling

6   Exhibitions, LLC.  Understood?

7   A.      Understood.

8   Q.      Perfect.  So my understanding is that at some

9   point in the fourth quarter of 2016 you were

10  contacted or otherwise got connected with Anthem

11  Sports; is that correct?

12  A.      Correct.

13  Q.      It's also my understanding that in the end of

14  2017 -- end of 2016, early 2017, Anthem Wrestling

15  was created; is that correct?

16  A.      Correct.

17  Q.      So in, I believe, January of 2017, Anthem

18  Wrestling retained you as a consultant; is that

19  correct?

20  A.      Correct.

21  Q.      What type of -- as a consultant, what type of

22  services were you providing to Anthem Wrestling?

23  A.      Due to my background and history, it was to

24  come in and consult Ed on -- Ed Nordholm of Anthem

25  Sports, on all wrestling matters.  I know that's a

1 guess.

2 Q. Let's not guess.  I don't want you to guess.

3 If you say I have to guess, let's not do it.

4 A. Shame on me.

5 Q. When you left -- when you said you resigned

6 from TNA back in --

7 A. December 2013.

8 Q. Did you give up any ownership interest in TNA

9 at that time?  After you resigned you didn't have

10 any further ownership interest in TNA; is that

11 correct?

12 A. When I resigned I still had 14 percent.

13 Q. At some point after you resigned but before

14 you were retained by Anthem Wrestling as a

15 consultant in 2017, whether sale or otherwise, that

16 14 percent interest in TNA you no longer had; is

17 that right?

18 A. I sold my remaining shares back to TNA

19 Entertainment, which was owned by the Carter Family.

20 Q. And when did you sell your remaining interest

21 in TNA?

22 A. Third quarter of 2015.

23 Q. So after call it third quarter of 2015, you

24 were kind of out of TNA completely; is that correct?

25 A. Yes.

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 26 of 75 PageID #: 896

1    Q.    And then fast-forward now, you're talking

2    January of 2017, so a year and a few months later,

3    Anthem Wrestling, who now has some form of in TNA is

4    contacting you again because of your prior

5    experience to help them with things; is that

6    accurate?

7    A.    Yes.

8    Q.    Okay.  But at the same time that they, Anthem

9    Wrestling, hired -- let me take you back.  When I

10   say they hired you as a consultant, they were hiring

11   Jeff Jarrett as a consultant, not Global Force

12   Entertainment as a promoter or marketer; is that

13   correct?

14   A.    Yes.

15   Q.    So they were hiring you individually, not

16   hiring or retaining Global Force Entertainment; is

17   that correct?

18   A.    Yes.

19   Q.    Okay.  So while you were consulting for

20   Anthem Wrestling, you were still the owner of Global

21   Force Entertainment; is that correct?

22   A.    Yes.

23   Q.    And at that time, so in January of 2017, what

24   type of things was Global Force Wrestling -- what

25   did they have going on?  Besides -- we know we had

1    dispute that?

2    A.      I know we have documents here.  So, again,

3    I'm going back -- I don't want to guess.

4    Q.      That's fine.

5    A.      I'm not disputing you or agreeing with you.

6    Q.      Okay.  I understand.  You just don't know as

7    you sit here?

8    A.      Yes.

9    Q.      So you mentioned, Mr. Jarrett, that in the

10   wresting world -- and, again, I want to focus now on

11   the January 2017 time frame when you had actually

12   been hired by Anthem Wrestling as a consultant.

13   They all kind of bleed together because you're

14   working on lots of wrestling -- it's all -- it's all

15   intertwined and connected.

16          But in terms of -- I understand that Anthem

17   Wrestling brought you in because of your experience

18   with Legacy TNA.  They asked you to come in and

19   look at their wrestling, help them with wrestling

20   basic things.

21          Can you give me a detail of what that

22   actually looked like and involved?

23   A.      So there's -- there's three buckets, if you

24   will -- talent, production, and creative.  And when

25   you're working on the talent and the roster, you not

 1   only have to look at what Impact could offer the

 2   talent, but just like any other sporting league.

 3   Are the Titans going to outbid the Redskins?  You

 4   sort of have to know what you are up against in the

 5   industry.

 6          So when you're dealing with talent, you just

 7   have to sort of know in general the entire industry

 8   to negotiate the best deal.  So I worked in talent,

 9   I worked in production, and I worked in creative.

10   Alongside John Gaburick.

11   Q.     And so you were kind of consulting across,

12   basically, all of the buckets when they brought you

13   on?  You weren't isolated to just the creative side?

14   You were all across.  So when you -- let me actually

15   step back.

16   A.     Uh-huh.

17   Q.     So I understand that there was some

18   litigation involving TNA and at some point it was

19   kind of rebranded as Impact to kind of get away from

20   some of that?

21   A.     Uh-huh.

22   Q.     When you got involved with Anthem Wrestling,

23   Impact Wrestling, it was operating; is that correct?

24          MR. MILLER:  Objection to form.

25          THE WITNESS:  What was operating?

```
 1    I'm just going month by month, same set of

 2    questions.  If you recall a specific month if they

 3    did, let me know.  So in March of 2017, do you

 4    recall if they recorded any live wrestling content?

 5    And by they, I mean Anthem Wrestling?

 6    A.    I am -- I could a hundred percent give you

 7    the answer.  I generally feel yes.  I generally

 8    recall a January taping, a late March, early April

 9    taping, and a July taping.

10    Q.    Okay.  As you sit here today that's what you

11    remember?  Those are the tapings you can recall?

12    A.    Yes.

13    Q.    That you were involved with?

14    A.    Yes.

15    Q.    Is it -- given your involvement with Anthem

16    Wrestling as a consultant in -- well, let's step

17    back.  At some point my understanding is your

18    relationship with Anthem Wrestling changed and there

19    was negotiations and discussion of you no longer

20    being a consultant for Anthem Wrestling but actually

21    coming on as the chief creative officer in a merger

22    of Anthem Wrestling with Global Force Entertainment;

23    is that correct?

24    A.    Was your question there was talk of a merger?

25    Q.    Yes.
```

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 30 of 75 PageID #: 900

1    A.      Yes.

2    Q.      And there were ongoing negotiations around

3    what the terms of that merger would be; is that

4    correct?

5    A.      Correct.

6    Q.      At some point in time, did you, Jeff Jarrett,

7    and also on behalf of Global Force Entertainment

8    sign a term sheet with Anthem Wrestling around that

9    merger negotiation?

10   A.      Yes.

11   Q.      So this was previously marked as Exhibit 11,

12   so we're not going to remark it.  So I'll hand you a

13   copy of that.

14   A.      Oh, 11, not 111.

15   Q.      Yes.  A hundred ago.  And you weren't here

16   for all hundred.  Neither was I.

17          I'm going to hand you a document titled,

18   Jeff Jarrett executive engagement and acquisition

19   of GFE there on the top of page one.  It says:  The

20   effective date is April 17, 2017.  Do you see that?

21   A.      Yes, sir.

22   Q.      And then if you look, this page is not --

23   this copy is not Bates labeled.  So if you actually

24   look to what I believe is the fourth to the last

25   page, it says:  Signature page summary of terms.

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 31 of 75 PageID #: 901

1    This agreement is -- there's signatures on here, it

2    appears.  Ed Nordholm, as you suggested, is signing

3    on behalf of Anthem Wrestling.  Nordholm is

4    N-O-R-D-H-O-L-M.

5          And then are you signing -- is this your

6    signature?

7    A.     Yes.

8    Q.     And you were signing on behalf of JJ Inc.?

9    A.     Yes.

10   Q.     And Jeffrey Jarrett; is that correct?

11   A.     Yes.

12   Q.     So my question to you is, who is JJ Inc.?

13   A.     My incorporation that I -- that Jeff Jarrett,

14   the professional wrestlers had since 19 -- early

15   '90s.  JJ Inc. is the company that I have -- that's

16   me.  I don't know how to --

17   Q.     It's another one of your companies?

18   A.     Yes.

19   Q.     So is JJ Inc. -- does JJ Inc. own Global

20   Force Entertainment, or do you individually own

21   Global Force Entertainment?

22   A.     I don't know.

23   Q.     So flipping back to the first page, it says:

24   Effective April 17, 2017.  Do you -- were you acting

25   as the chief creative officer on April 17, 2017?  Is

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 32 of 75 PageID #: 902

```
 1   Q.     And then dependent upon what this document
 2   actually says, it's a legal document.  We don't have
 3   to get into that.  On or about April 17, 2017 is
 4   when you became the chief creative officer of Anthem
 5   Wrestling?
 6                 MR. MILLER:  Objection to form.
 7                 THE WITNESS:  It's when I signed the
 8   document.
 9   BY MR. LEE:
10   Q.     Well, I think the document is --
11   A.     Yeah.
12   Q.     -- unfortunately, the date is not there.
13   A.     Yeah.
14   Q.     So -- but sometime in that time frame, April,
15   May of 2017, you became -- you officially became the
16   chief creative officer of Anthem Wrestling?
17   A.     Could you clarify became?
18   Q.     You were hired by Anthem Wrestling to be its
19   chief creative officer?
20   A.     That was my understanding when I signed the
21   document that I was to be hired as the chief
22   creative officer.
23   Q.     And in terms of dealing with the company and
24   acting with employees that we talked about, in that
25   time frame that is how you were portrayed to those
```

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 33 of 75 PageID #: 903

1    first chief creative officer.

2    Q.    Unlike John Gaburick whose role at TNA was

3    kind of transitioned over to Anthem Wrestling, you

4    were the first chief creative officer of Anthem

5    Wrestling?

6    A.    Yes.

7    Q.    If you look on page two of this document,

8    under compensation, it says your base compensation

9    will be $250,000 per year and that it commences on

10    the week of April 17, 2017.  Do you see that?

11    A.    Yes.

12    Q.    Did you receive -- commencing on April 17,

13    2017, did you receive that compensation from Anthem

14    Wrestling?

15    A.    To the best of my knowledge, yes.

16    Q.    On the next paragraph, it references Karen

17    Jarrett.  Karen Jarrett is your wife; is that

18    correct?

19    A.    Yes.

20    Q.    It says that she will also be hired on the

21    company on the effective date, which is on the front

22    page as April 17th.  We talked earlier we weren't

23    sure when she started.  Does that seem about the

24    time your wife started with Anthem Wrestling?

25    A.    To the best of my recollection, she started

1    in April of 2017.

2    Q.    So close to this?

3    A.    Yes.

4    Q.    And then at the bottom of the paragraph, it

5    says she -- her pay will be based on a $52,000 per

6    annual payable bi-monthly.  Did your -- so your wife

7    started working sometime in April for Anthem

8    Wrestling.

9          Did she receive her salary, the compensation

10   that's listed here in this agreement?  The $52,000

11   on an annual basis, did she receive that salary?

12   A.    Yes.

13   Q.    If you'll flip to a little farther back in

14   the agreement, there is a -- there's a -- it's

15   actually exhibit, yeah, Exhibit 3 to that exhibit.

16   It's the last page.  So this has to do with -- so

17   you were hired as chief creative officer and the

18   document also had components for merging Global

19   Force Entertainment with Anthem Wrestling, correct?

20   A.    Correct.

21   Q.    So this last page of this document is titled,

22   Global Force Entertainment, Inc., listing of

23   payables and other debts updated April 2017.  Do you

24   see the page that I'm on?

25   A.    Yes, sir.

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 35 of 75 PageID #: 905

 1    A.       Yes.

 2    Q.       The next line, it says:  Kevin Sullivan 16

 3    episodes Amped $200,000.  Do you see that?

 4    A.       Yes.

 5    Q.       And we kind of talked earlier that you hired

 6    KSTV which that's Kevin Sullivan's company?

 7    A.       Yes.

 8    Q.       And that's for the post-production work that

 9    he was doing on the GFW Amped content?

10    A.       Yes.

11    Q.       And as of April 11, 2017, Global Force

12    Entertainment is recognizing that they owed

13    Mr. Sullivan $200,000 for his work; is that right?

14    A.       Yes.

15    Q.       And at this time on April 11, 2017,

16    Mr. Sullivan is in possession and has not released

17    the master copies of the GFW Amped content; is that

18    correct?

19    A.       They are on -- the masters, not they.  The

20    masters are on KSTV's hard drives.  I do not -- when

21    I say I, Global Force did not own hard drives.

22    Q.       Okay.  And Mr. Sullivan, because he was

23    saying he was owed money, would not release those

24    master recordings to Global Force Entertainment; is

25    that correct?  Would not turn them over to you?

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 36 of 75 PageID #: 906

1    biweekly, your $250,000 salary, you did receive

2    that. You were paid that by Anthem Wrestling in

3    April, May, June, and July each month; is that

4    correct?

5    A.    Can you clarify the term of those -- the

6    length? When? I want to make sure I'm answering

7    your question right.

8    Q.    Sure. You were terminated by Anthem

9    Wrestling, I believe, October 23rd, 2017; is that

10    correct?

11    A.    Correct.

12    Q.    Between when -- the agreement says that the

13    payments are going to start being made on April 17,

14    2017, and that as we discussed seems about right?

15    A.    Yes.

16    Q.    So between April 17, 2017, and October 23,

17    2017, did you receive your compensation?

18          MR. MILLER: Objection to form.

19    BY MR. LEE:

20    Q.    Your salary compensation from Anthem

21    Wrestling?

22          MR. MILLER: Objection to form.

23    BY MR. LEE:

24    Q.    When I say you, Jeff Jarrett received his

25    salary from Anthem Wrestling?

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 37 of 75 PageID #: 907

1    description that my job description had.

2    Q.      So did you -- as the chief creative officer,

3    did you work with John Gaburick?

4    A.      Yes.

5    Q.      And kind of going back to the three

6    buckets -- talent, production, and creative -- as

7    chief creative officer, were you involved in all

8    three of those aspects or were you only involved in

9    the creative aspect?

10   A.      Generally speaking, I was involved in all

11   three.

12   Q.      Were you responsible for any -- so we

13   mentioned that Anthem Wrestling had some employees.

14   Nine, ten, something like that.

15           Were you responsible for hiring or firing

16   any employees of Anthem Wrestling?

17   A.      No.

18   Q.      Were you responsible for assigning work to

19   any employees of Anthem Wrestling?

20   A.      I could make suggestions.

21   Q.      Who at Anthem Wrestling had the authority to

22   direct the work of employees at Anthem Wrestling?

23   A.      Ed Nordholm.

24   Q.      So Mr. Nordholm, he directed all the

25   employees including yourself?

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 38 of 75 PageID #: 908

```
 1    Kevin Sullivan.  Andrew was an employee.  Jim Morris
 2    was an employee.  J. Seeman was not.  James Long
 3    was.  Eric Tompkins was.  Ben Coile was.  Kenny
 4    Smith was.  Leslie Fawsett (phonetic) was.
 5    Q.     Okay.  After April 7, 2017, I want to go
 6    through quickly, Len Asper I know never became an
 7    employee of --
 8    A.     Would you like me to go through who became
 9    employees?
10    Q.     Yes.  That was exactly what I was going to
11    do.
12    A.     Post the attempted merger?
13    Q.     Just after -- at any point after April 7,
14    2017, until when you were no longer employed by
15    Anthem Wrestling.
16    A.     So the employees?
17    Q.     Yes.
18    A.     Kevin Sullivan.  I do not recall if J. Seeman
19    ever converted to an employee.
20    Q.     Okay.  And then what about yourself?
21    A.     Yes.  The time frame, general time frame
22    we're talking about, April, May, 2017.
23    Q.     Okay.  All of these other individuals, Kevin
24    Mitchell, David Sahadi, Rick Fancher, Greg Warner
25    (phonetic), Matt Mitchell, and Dale Oliver, they
```

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 39 of 75 PageID #: 909

1  were all employed by basically contractors; is that

2  right?

3  A.  1099.  Hired by Anthem Wrestling Exhibitions.

4  Q.  Were you involved with hiring any of the

5  individuals on this list?  And by involved with, did

6  you recommend any of them?

7  A.  So to clarify my answer, in 2002 --

8  Q.  And by 2002, you're talking about when you

9  started TNA?

10  A.  The starting of TNA.  I hired Keith Mitchell.

11  I hired David Sahadi in 2004.  Rich Fancher, Greg

12  Warner, Matt Mitchell, Dale Oliver were all a part,

13  for lack of a better word here, the original TNA

14  production team.

15  Q.  Understood.  When they were part of the

16  original TNA production team, back you mentioned --

17  A.  Through all iteration.

18  Q.  They've always been around.  So they've

19  always been there.  So you've worked with, for

20  instance, those individuals for years and years; is

21  that correct?

22  A.  Correct.  Prior to the start of TNA.

23  Q.  When you came on as chief creative officer,

24  for instance, Kevin Mitchell, David Sahadi, Rick

25  Fancher, Greg Warner, Matt Mitchell, Dale Oliver,

Case 3:18-cv-00749  Document 105-1  Filed 02/14/20  Page 40 of 75 PageID #: 910

1  they were all used to working with you when you were

2  the creator and kind of owner of TNA; is that

3  correct?

4  A.    We had worked together in the past.

5  Q.    Okay.  This has been previously marked as

6  Exhibit 36.  I don't want to -- this is an email

7  string which you have emails contained inside of.

8  If you go to the end of the document, which is an

9  email you sent on July 10th, 2017, which the date is

10  on page two, the body of the email is on page three.

11       So you're sending this email in July of

12  2017.  At this point you are the chief creative

13  officer of Anthem Wrestling?

14            MR. MILLER:  Objection to form.

15            THE WITNESS:  I signed the document and

16  the dates.

17  BY MR. LEE:

18  Q.    And you were being paid a salary as the chief

19  creative officer of Anthem Wrestling?

20  A.    I was being paid a salary.

21  Q.    By Anthem Wrestling?

22  A.    By Anthem Wrestling.

23  Q.    And in this email you're talking about Global

24  Force Wrestling's existing social media; is that

25  right?

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 41 of 75 PageID #: 911

 1   Q.      Do you recall, were any of those
 2   recommendations enacted?
 3   A.      I don't recall specifics.
 4   Q.      By as your role as chief creative officer,
 5   Mr. Nordholm was soliciting your input on budgets
 6   and costs; is that correct?
 7   A.      He did solicit my suggestions on occasion,
 8   yes.
 9   Q.      So one of your roles as the chief creative
10   officer, even if it wasn't necessarily defined in
11   the document, was to provide suggestions to
12   Mr. Nordholm --
13   A.      N-O-R-D-H-O-L-M.
14   Q.      -- as you suggested who was your superior.  I
15   believe he was the president, is that correct, of
16   Anthem Wrestling?  I'm not sure it's in --
17   A.      The boss.
18   Q.      The boss.  If you can refer back to
19   Exhibit 11 in the signature block, it's by Edwin
20   Nordholm as president?
21   A.      Yes, sir.
22   Q.      So part of your job responsibilities at least
23   were to make suggestions to Mr. Nordholm about
24   budgets and cost and production; is that correct?
25   A.      Yes.

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 42 of 75 PageID #: 912

1    Q.     Okay.  As the chief creative officer, did you

2    have occasion to speak to the media on behalf of

3    Anthem Wrestling?

4    A.     Yes.

5    Q.     Was that something that you were told to do

6    by Mr. Nordholm or was it something that just kind

7    of occurred as part of your day-to-day job function?

8    A.     You would have to give me a specific --

9    Q.     Let's do that.  I'm now handing you what's

10   previously been marked as Exhibit 30.  What I'm

11   showing you is a press release from the City of

12   Orlando, Florida honors Impact Wrestling as the

13   company who celebrates 15 years.  To your

14   recollection, have you ever seen -- and it's dated

15   June 27, 2017.  To your recollection, have you ever

16   seen this press release?

17   A.     Yes.

18   Q.     And is it your understanding that you were --

19   did Mr. Nordholm specifically instruct you to speak

20   with the author of this press release?

21   A.     Re-ask the question.

22   Q.     Did Mr. Nordholm specifically instruct you to

23   speak with the author of this press release?

24   A.     I don't recall.

25   Q.     If you look at the actual press release

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 43 of 75 PageID #: 913

1 A.  Okay.

2 Q.  It says there:  In or around October 2017,

3 Defendants launched a new subscription service known

4 as Global Wrestling Network which features archived

5 content from TNA or Impact, as well as footage from

6 other providers.

7    So Global Wrestling Network, is that

8 basically an app; is that correct?

9 A.  Correct.

10 Q.  But it's -- as we said, the newspaper article

11 was from June.  And so in June 2017, GWN hadn't been

12 rolled out yet; is that correct?

13 A.  Correct.

14 Q.  Okay.  If you'd turn to the next page, there

15 is -- in the middle of the page on 63, there is a

16 mark that says Defendants Global Wrestling Network.

17 And there's this mark that is GWN.  Do you see that

18 in the middle of the page?

19 A.  Yes.

20 Q.  Are you familiar with that mark?

21 A.  Yes.

22 Q.  Okay.

23 A.  I am familiar with paragraph 63 pictures.

24 Q.  Okay.  Was that mark for Global Wrestling

25 Network that's in paragraph 63, was that developed

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 44 of 75 PageID #: 914

1   when you were employed by Anthem Wrestling?

2   A.      Yes.

3   Q.      Did you have any involvement with the

4   development of the GWN mark that's in paragraph 63?

5   A.      Yes.

6   Q.      What involvement did you have with the mark

7   for GWN that is in paragraph 63?

8   A.      That's a pretty broad statement because of

9   the -- if you're talking about a logo or if you're

10  talking about the actual app development.

11  Q.      I'm just talking about the logo.

12  A.      Okay.  The -- the color scheme is obviously

13  mirrored to the two marks, Global Force Wrestling

14  and GFW.

15  Q.      And did you have input in terms of color of

16  the GWN mark?

17  A.      Yes.

18  Q.      Did you have input as to the font or style of

19  the GWN mark?

20  A.      Input, yes.

21  Q.      The actual overall final approval of the mark

22  was not your responsibility; is that correct?

23  A.      Correct.

24  Q.      But you did have input into the process of

25  the final development of this mark?

```
 1   A.      Yes.

 2   Q.      And you did that while you were employed by

 3   Anthem Wrestling, correct?

 4   A.      Yes.

 5   Q.      Do you know whether -- do you recall, were

 6   there other colors besides the green suggested for

 7   the GWN mark?

 8   A.      I don't recall.

 9   Q.      Let me show you what's been previously marked

10   as Exhibit 66.  And it really -- this is an email

11   string that was forwarded to you.  The date is

12   June -- the top email was June 8, 2017, at 12 noon,

13   I mean 12 a.m., from Ed Nordholm to you.  And it

14   says:  I like the green W version.  Hate the font.

15   And if you flip to the second page, there are what

16   appear to be other potential GWN marks.

17           Do you see that?

18   A.      Yes.

19   Q.      And so at least in June 2017, it looks like

20   maybe there were -- in addition to the green, there

21   was a red and blue that was considered?

22   A.      Who considered?

23   Q.      Anthem Wrestling.

24   A.      That would be incorrect.

25   Q.      Okay.  Why is that incorrect?
```

```
 1   A.      Chad works for Anthem Sports.

 2   Q.      Understood.  But --

 3   A.      And James as well.

 4   Q.      But Ed Nordholm is sending this to you

 5   because he's your, a sense of your boss at Anthem

 6   Wrestling, correct?  He's sending it to you because

 7   you work for Anthem Wrestling?

 8   A.      Correct.

 9   Q.      The GWN mark, do you know, is it owned by

10   Anthem Wrestling or owned by Anthem Sports and

11   Entertainment?

12               MR. MILLER:  Objection to form.

13               THE WITNESS:  My assumption would be

14   Anthem Sports.

15   BY MR. LEE:

16   Q.      As you sit here, you don't know which entity,

17   whether it's Anthem Wrestling or Anthem Sports

18   Entertainment owns the GWN mark?

19   A.      Correct.

20   Q.      Okay.  Another email.  It's previously marked

21   Exhibit 65.  And I want to direct your attention, if

22   you look at the bottom of the email, is an email

23   from Kevin Sullivan and he's sending it from Anthem

24   Wrestling Exhibitions.  Do you see that?

25   A.      I don't.  Oh, at the bottom?
```

1   Q.      At the bottom, June 7, 2017.

2   A.      From Impact Wrestling?

3   Q.      Right.  If you look at a signature block, it

4   actually says vice president in production, Anthem

5   Wrestling Exhibition.  Do you see that?

6   A.      Now I do, yes, sir.

7   Q.      And he says:  Guys, here are some more

8   options.  We can match up likes and dislikes, change

9   notes, et cetera.  Do you see that?

10  A.      Yes.

11  Q.      And then you responded later that day at

12  7:49 p.m. saying:  I'm positive there is a reason

13  behind these colors.  I'm just not in the loop.  But

14  as a wrestling fan, these are AAA and Noah colors.

15  If that is where we want to go, understood, but it

16  has zero branding synergy to Impact for GFW.

17  Thoughts?  Do you see that email?

18  A.      I do see it.  Who is this to?

19  Q.      I do -- I don't know everyone who it was sent

20  to because the way the emails were produced.  But it

21  was clearly sent to Ed Nordholm.

22  A.      I'm confused.  I'm positive this -- who am I

23  telling I'm positive there is -- I'm responding to

24  someone.  I'm just not sure.

25  Q.      Yes.  Well, obviously --

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 48 of 75 PageID #: 918

1    A.    It doesn't say I'm responding to Kevin.

2    Q.    All I know is that upstream it made its way

3    to Ed Nordholm and Ed Nordholm responded to you.  Do

4    you see that at the top, where he is responding back

5    to you?  So I do not know if you had responded just

6    to Ed and then Ed responded to you or not.

7    A.    Gotcha.

8    Q.    We know at a minimum you responded to Ed and

9    Ed responded to you.  Do you see that?

10   A.    Yes.

11   Q.    For the rest of the communications.  When you

12   say AAA and Noah colors, what are AAA and Noah

13   colors?

14   A.    AAA is the largest Mexican wrestling

15   promotion based in Mexico City.  And Noah is a

16   Japanese wrestling promotion.

17   Q.    What are their colors that are associated

18   with them?

19   A.    AAA's colors are red, black, and green, I

20   believe.

21   Q.    Okay.

22   A.    And Noah is red and black.

23   Q.    So they both have red in them?

24   A.    Yes.

25   Q.    Okay.  And then ed is responding to you at

1    the top, saying -- talking about the green, that the

2    green popped.  But still hated the font.  Sent the

3    selection to them.  But definitely preferring green

4    over anything I have seen with reds.  Do you see

5    that?

6    A.     Yes.

7    Q.     He is echoing your statement in your email

8    that -- because when you're referring to AAA and

9    Noah colors, those would be the reds?  Is that what

10   you were referencing there?

11   A.     I don't know.  I'm positive there's a reason

12   behind these colors.  I don't know what that

13   question is in reference to.

14   Q.     Okay.  Going back to your email, it says:

15   But it has zero branding synergy to Impact or GFW.

16          You're stating here that you think that the

17   GWN mark should have synergy, branding synergy with

18   Impact or GFW?

19   A.     Yes.

20   Q.     Okay.  In the complaint, going back to that,

21   there are allegations in here that the only

22   remaining defendant is Anthem Wrestling.  I'm not

23   sure you're aware that Anthem Sports Entertainment

24   has been dismissed from the lawsuit.  Are you aware

25   of that?

1    A.       -- was -- the Amped content was a part of the

2    merger.  So from the point that we were

3    transitioning from consultant to merger as a part of

4    the merger, the trademarks and the content were a

5    part of that.

6    Q.       Understood.  So as part of that also it's my

7    understanding at one point the Impact -- or I should

8    say the mark for GFW was embedded in the Impact

9    logo; is that correct?

10   A.       Yes.

11   Q.       Along with the Anthem logo as well, so you

12   had kind of a joint merged logo; is that correct?

13   A.       Yes.

14   Q.       Did you have involvement with that design in

15   adding the GFW mark into the Impact logo?

16   A.       Yes, I had input/involvement.  Yes.

17   Q.       And while you were employed with Anthem

18   Wrestling as the chief creative officer, did you

19   object to them putting the GFW mark in the Impact

20   Wrestling logo?

21   A.       No.  It was under the --

22   Q.       I understood.  No.  No is no.

23   A.       Yeah.

24   Q.       So, as you said, the GFW Amped content was

25   kind of part of the merger and while the merger

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 51 of 75 PageID #: 921

```
 1   wasn't finalized as part of the integration and
 2   working on things, ultimately the decision was made
 3   to use the Amped content on my understanding is a
 4   four-part pay-per-view series through Impact; is
 5   that correct?
 6   A.      Clarify your question, please.
 7   Q.      Ultimately it was decided that the Anthem --
 8   the GFW Amped content would be broken into 16
 9   one-hour episodes.  It would be broken into a
10   four-part four-hour pay-per-view series; is that
11   correct?
12   A.      It was decided which was driven by the
13   deliverable schedule that 16 one-hour episodes would
14   be packaged and delivered into four three-hour
15   programs.
16   Q.      Okay.  Because as we said before, because of
17   cutting and those types of things?
18   A.      Again, back to the deliverable schedule.
19   Q.      Do you know who initiated those discussions
20   or where they emanated from?
21   A.      Like I said, me and Ed from the transition --
22   from consultant to merger, me and Ed jointly had the
23   discussions.
24   Q.      Okay.  And so when it was decided that those
25   were going to being packaged four three-hour
```

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 52 of 75 PageID #: 922

1   A.     I want to make my answer succinct.  In the

2   Echo promotional system, these are broadcasted on

3   all pay-per-view providers in the United States and

4   North America, as well as around the world.  So most

5   pay-per-views in North America, the advertising

6   begins -- so if it's -- on or July 19th -- this

7   would have been probably for the August event, so

8   about a ten-day lead-up promotional window and it's

9   promoted anywhere from TV, website.  This day and

10  age, all forms of digital, social media, YouTube,

11  everything.

12  Q.     Were you involved with the advertising of the

13  Amped pay-per-view as part of your employment with

14  Anthem Wrestling?

15  A.     Define involved in this context.  Day to day,

16  no.  I didn't work in the marketing department if

17  that -- in short.

18  Q.     You would have been aware that they had

19  started marketing on July 19, 2017?

20  A.     Yes.

21  Q.     And at that time you didn't object, again, to

22  them advertising it -- the GFW -- the Amped

23  pay-per-view as a four-part series that was coming

24  out, right?

25  A.     No.

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 53 of 75 PageID #: 923

1   Q.     And my understanding is that the -- if we go

2   to paragraph 55.  Take a quick run through these.

3   Paragraph 55, it says the first part of the GFW

4   Amped Anthology, it aired on a one-night-only series

5   pay-per-view on August 11, 2017; is that -- is that

6   accurate?

7   A.     Yes.

8   Q.     You were still employed by Anthem Wrestling

9   on August 11, 2017, correct?

10  A.     Yes.

11  Q.     And then the second part of the series was

12  aired on September -- so go to paragraph 56.  It was

13  aired on September 15, 2017.  Do you see that

14  paragraph?

15  A.     Yes.

16  Q.     And you -- that statement is accurate?  That

17  paragraph is accurate?

18  A.     Yes.

19  Q.     And you were still an employee of Anthem

20  Wrestling on September 15, 2017?

21  A.     Yes.

22          MR. MILLER:  Objection to form.

23  BY MR. LEE:

24  Q.     On October 13, 2017, it says:  Defendant

25  aired Part 3 of the pay-per-view series One and

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 54 of 75 PageID #: 924

1   Only.  Paragraph 57, is that an accurate statement?

2   A.     Yes.

3   Q.     And as of October 13, 2017, you Jeff Jarrett

4   were still an employee of Anthem Wrestling; is that

5   correct?

6              MR. MILLER:  Objection to form.

7              THE WITNESS:  On administrative leave.

8   BY MR. LEE:

9   Q.     But you were employed?

10  A.     Yes.

11  Q.     Okay.  And then the last one is on

12  December 18, 2017, defendants aired GFW Amped

13  Anthology Part 4 as part of pay-per-view One and

14  Only series which contained the material from the

15  GFW Amped content.  Is paragraph 58 an accurate

16  statement?

17  A.     58 is accurate, yes.

18  Q.     And as of December 8, 2017, you were no

19  longer employed by Anthem Wrestling; is that

20  correct?

21  A.     Correct.

22  Q.     You mentioned that the GFW Amped content,

23  when we were talking about going back to paragraph

24  53, when it's going to be broadcast as a

25  pay-per-view, they were starting the advertising ten

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 55 of 75 PageID #: 925

1  days or so to kind of ramp up before the first show.

2  But at that point, it was advertised that it was a

3  four-part series; is that right?

4  A.     What date?

5  Q.     On July 19, 2017, it would have been

6  advertised that this is a four-part series?

7  A.     Yes.

8  Q.     And Anthem Wrestling would have been

9  contractually obligated at that point to deliver a

10 four-part series; is that correct?

11              MR. MILLER:  Objection to form.

12              THE WITNESS:  Incorrect.

13 BY MR. LEE:

14 Q.     Why is that incorrect?

15 A.     Part 1 is a creative subjective title.  The

16 broadcasters want a three-hour piece of programming.

17 Q.     Understood.  The GFW Amped content is 16

18 one-hour episodes.  Do they build off of each other?

19 A.     Can you define build?

20 Q.     They are based off of a script, correct?

21 A.     Correct.

22 Q.     Or multiple scripts?

23 A.     Correct.

24 Q.     Things that occur in episode one through four

25 will be relevant to things that occur in episodes 12

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 56 of 75 PageID #: 926

1   through 16; is that correct?

2   A.     In our business of episodic programming, for

3   example, the WWE is 52 weeks a year.  The program

4   that follows WrestleMania the Monday night after,

5   which in this example would be episode one, it's

6   relevant to episode 52.

7   Q.     And that we're talking about 52 kind of type

8   series?

9   A.     Yes.

10  Q.     Here we're talking about 16.  So the last

11  four are going to involve and relate to the first

12  four -- the first four episodes and the last four

13  episodes of the Amped content are going to be

14  related to each other?  The storyline is going to

15  progress throughout all 16 episodes; is that

16  correct?

17  A.     Correct.

18  Q.     Looking at paragraph 54.

19  A.     Uh-huh.

20  Q.     It says:  Defendants promoted and continue to

21  promote the Amped pay-per-view on Fight Network and

22  then it has a website listed.  If I told you that

23  the Amped pay-per-view is no longer available on the

24  Fight Network, would you be aware of that?

25  A.     Which Fight Network?

```
 1    Just a couple examples would be...

 2    A.    Cricket Wireless.

 3    Q.    And was that here in the Nashville area?

 4    A.    No.

 5    Q.    Where was that at?

 6    A.    It was when I worked for the Turner

 7    organization.  World Championship Wrestling.

 8    Q.    So your likeness appeared on Cricket Wireless

 9    advertising?

10    A.    Yes.

11    Q.    So when you formed TNA -- NWA-TNA, let's call

12    it TNA back in 2002, do you recall registering for a

13    trademark --

14    A.    No.

15    Q.    -- in your name?

16    A.    No.

17          MR. LEE:  So I'm going to mark as

18    Exhibit 114.  Just label over the exhibit sticker

19    that's already on there.

20          (WHEREUPON, a document was marked as

21    Exhibit Number 114.)

22    BY MR. LEE:

23    Q.    Mr. Jarrett, have you ever seen this document

24    before?

25    A.    No, sir.
```

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 58 of 75 PageID #: 928

1　Q.　　In big, all capital letters, kind of the

2　middle top of that page, what appears?

3　A.　　United States of America.  United States

4　Patent and Trademark Office, Jeff Jarrett.

5　Q.　　There you go.  And if you take a moment to

6　review this document or if you already have, do you

7　understand it to be a trademark registration for the

8　mark Jeff Jarrett?

9　A.　　Yes.

10　Q.　　And do you have any reason to dispute -- and

11　if you'll look, the registrant is listed as TNA

12　Entertainment, LLC, a Delaware limited liability

13　company.  Address 1404 51st Avenue North, Nashville,

14　Tennessee 37209.  Do you see that?

15　A.　　Yes.

16　Q.　　Was that TNA Entertainment, LLC, is that the

17　TNA that you created?

18　A.　　That address was the warehouse that they

19　moved in after I left.  It was a merch warehouse.

20　We were at 209 10th Avenue South, Cummins Station.

21　That's irrelevant here.  They assigned -- the patent

22　office, like everything else, change of address.

23　Q.　　Okay.  And if you look, it says first use and

24　commerce.  If you look, there's different types of

25　classes.  I'm more interested in class what's called

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 59 of 75 PageID #: 929

```
 1    41 entertainment services, namely, wrestling --
 2    performance by a professional wrestler/entertainer?
 3    A.    Uh-huh.
 4    Q.    The next line, it says first use was
 5    10/01/2002.  Do you see that?
 6    A.    Yes.
 7    Q.    Did you provide any of the information that
 8    is in this document, to your knowledge?
 9    A.    No.
10    Q.    Do you know who prepared this document -- do
11    you know who would have prepared an application for
12    this trademark on behalf of TNA Entertainment, LLC?
13    A.    Yes.
14    Q.    Who?
15    A.    Panda Energy International, based out of
16    Dallas, Texas.
17    Q.    And who is Panda Energy?
18    A.    They became the majority owners in 9 of 2002.
19    September of 2002.  The Carter Family -- Bob Carter,
20    his daughter Dixie Carter.  The Carter Family
21    obtained majority interest of TNA Entertainment
22    September of 2002.  And as a part of their business
23    practices, they thought it was obviously in their
24    best interest to -- something that Vince McMahon
25    never did -- trademark my God-given name.
```

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 60 of 75 PageID #: 930

1    Q.      -- you didn't prepare anything that would be

2    in that part.  So what I'd like you to do is turn to

3    this document page two of eight.  The way this is

4    filed with the court.  It says, consent.  This says:

5    I Jeff Jarrett hereby give consent to the

6    registration of the trademark Jeff Jarrett.  And it

7    says Serial Number 78-534,102 for costumes, namely,

8    wrestling costumes and masks for children and

9    teenagers in International Class 25.  Toy action

10   figures and accessories.

11   A.      I see that.

12   Q.      The last one is entertainment services.  And

13   then it is signed and it authorized the reg- -- last

14   part -- authorized the registration of the name as a

15   trademark for such goods and services with United

16   States Patent and Trademark Office.  Do you see all

17   that?

18   A.      Yes.

19   Q.      And then there is a signature on this

20   document.  Is that your signature?

21   A.      Yes.

22   Q.      So at some point you gave a consent to the

23   registration of your name as a trademark; is that

24   correct?

25   A.      As a minority partner, I absolutely did.

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 61 of 75 PageID #: 931

1    A.    Yes.

2    Q.    Okay.  So in paragraph seven, you say:

3    Anthem Wrestling is not currently using Jeff Jarrett

4    in connection with entertainment services, namely,

5    wrestling exhibits and performances by a

6    professional wrestler.  That's not necessarily

7    accurate, correct?

8              MR. MILLER:  Objection to form.

9              THE WITNESS:  What's your question?

10   BY MR. LEE:

11   Q.     That statement that Anthem Wrestling is not

12   currently using Jeff Jarrett in connection with

13   entertainment services, namely, wrestling exhibits

14   and performances by a professional wrestler is not

15   true or is not accurate?

16             MR. MILLER:  Objection to form.

17             THE WITNESS:  Anthem Wrestling is not

18   currently using Jeff -- I don't know.

19   BY MR. LEE:

20   Q.     But we just said that the old TNA programming

21   where you appear and your name is on things is

22   available through Anthem Wrestling's various

23   distribution library, right?

24   A.    Yes.

25   Q.     So they are using that content, right?

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 62 of 75 PageID #: 932

```
 1    A.      Yes.

 2    Q.      And your likeness and your name appear in

 3    that content?

 4    A.      In connection -- correct.

 5    Q.      For wrestling exhibits and performances?

 6                 MR. MILLER:  Objection to form.

 7                 THE WITNESS:  Past wrestling ex- -- yes.

 8    BY MR. LEE:

 9    Q.      This doesn't have a component of live or

10    current?  It just says what it says?

11    A.      Yes.

12    Q.      Okay.  Are you aware that currently Anthem

13    Wrestling is selling a DVD with your -- called Jeff

14    Jarrett?  And I think it's Top of the Mountain?

15    A.      King of the Mountain.

16    Q.      King of the Mountain.  Even better.

17            So are you aware that Anthem Wrestling is

18    currently selling a DVD titled, Jeff Jarrett, King

19    of the Mountain?

20    A.      Yes.

21    Q.      Isn't it correct, then, that they are still

22    using the Jeff Jarrett in connection with

23    entertainment services, namely, wresting exhibits

24    and performances?

25                 MR. MILLER:  Objection to form.
```

```
 1              THE WITNESS:  Yes.
 2    BY MR. LEE:
 3    Q.    Let's flip to paragraph 112.  Here the
 4    allegation says that defendants have used in
 5    commerce a reproduction, counterfeit copy, colorable
 6    imitation of the Global Force Wrestling and GFW
 7    trademarks, both words and logo, in connection with
 8    the sale, offering for sale, distribution, or
 9    advertising of Defendant's good or services or in
10    connection with which such use is likely to cause
11    confusion, to cause mistake, or to deceive.
12              Do you see that paragraph?
13    A.    Yes.
14    Q.    I just wanted to kind of -- that's a big bite
15    and I want to kind of delve into it a little bit
16    there.
17              We talked about the GFW Amped content.  Is
18    that part of the use of the Global Force and GFW
19    trademarks that you're referencing there?
20    A.    Can you ask that question again?
21    Q.    Really what I want to know is how, as you sit
22    here today, have Anthem Wrestling used Global Force
23    Wrestling and the GFW trademarks?  How have they --
24    what have they actually used them with?
25    A.    To go back to 2017, they never closed the
```

```
 1    A.      Involved?

 2    Q.      You are aware?

 3    A.      Aware, yes.

 4    Q.      And while you were -- again, because this was

 5    all part of the merger, you didn't object or tell

 6    anyone at Anthem Wrestling at that time they

 7    couldn't do that; is that correct?

 8                   MR. MILLER:  Objection to form.

 9                   THE WITNESS:  Ask your question again.

10    BY MR. LEE:

11    Q.      In the time frame, so July of 2017 and the

12    other times when the logo was being changed to

13    include the GFW mark, you were aware that that was

14    occurring, correct?

15    A.      Yes.

16    Q.      And at that time you did not tell anyone else

17    at Anthem Wrestling that they could not do that;

18    they could not add the GFW mark to the logo or use

19    it on the Amped content?

20    A.      Correct.

21    Q.      Prior to the merger discussions and the term

22    sheet with Anthem Wrestling, had Global Force

23    Wrestling licensed the mark for the Global Force

24    Wrestling name to any other producers?

25    A.      Can you clarify that, when you say licensed?
```

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 65 of 75 PageID #: 935

1    Q.      You talked about co-producers, for instance.

2    Just give me an example of one of your other

3    co-producers that you had prior to April of 2017.

4    Just one.  Just for an example, make this a little

5    cleaner.

6    A.      Gosh.  Tried and True.

7    Q.      Tried and True.  Okay.  Did you ever enter

8    into an agreement with Tried and True and said Tried

9    and True you can use the GFW mark or the Global

10   Force Wrestling name for this period of time?  And

11   you licensed, go ahead and use it on your

12   advertising or use it in marketing and you're going

13   to pay me a royalty or make some other payment for

14   using my marks?

15                MR. MILLER:  Objection to form.

16   BY MR. LEE:

17   Q.      For using the Global Force Entertainment

18   mark?  When I say my marks, I should say the

19   company's marks.

20                MR. MILLER:  Objection to form.

21                THE WITNESS:  On co-promotions I

22   understood that both logos are utilized.

23   BY MR. LEE:

24   Q.      Instances where it's not a co-promotion,

25   where they are basically using the GFW name or mark

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 66 of 75 PageID #: 936

1    for their own purposes?

2    A.      I never ran into an agreement like that.

3    Q.      I just want -- I want you to compare -- there

4    is two different paragraphs in the four documents.

5    But the first one is, if you look at paragraph 14,

6    and it says:  Anthem Wrestling paid -- well, let's

7    go back to paragraph 13.

8            Are you aware that Anthem Wrestling paid

9    Kevin Sullivan $40,000 to get him to turn over the

10   master recording of the GFW Amped content to Anthem

11   Wrestling?

12   A.      I am aware now.

13   Q.      When did you become aware?

14   A.      A while back.

15   Q.      Before the litigation was filed or after the

16   litigation was filed?

17   A.      Before.

18   Q.      So you don't dispute -- you haven't seen the

19   check or the money actually change hands but it is

20   your understanding that Anthem Wrestling did pay

21   Kevin Sullivan $40,000 to release the masters of the

22   GFW Amped content?

23   A.      Yes.

24   Q.      I just want to make -- so in paragraph 13, if

25   you look at your answer, you deny all of paragraph

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 67 of 75 PageID #: 937

1   credit card.

2   Q.      And, similarly, is he a signatory on the

3   company's bank account?

4   A.      No.

5   Q.      Okay.  So he doesn't have access to Global

6   Force Entertainment's bank accounts or credit cards

7   or any other type of access to funds, the corporate

8   funds?

9   A.      Correct.

10  Q.      Okay.  For Global Force Entertainment, have

11  there been any other officers of -- so I believe --

12  for Global Force Entertainment, what's your title?

13  A.      President/CEO.

14  Q.      What is Mr. D'Amore's title for Global Force

15  Entertainment?

16  A.      Owner.  Part owner.

17  Q.      Are there any other officers of Global Force

18  Entertainment currently?

19  A.      Curt Meyers (phonetic.)

20  Q.      And what is his title?

21  A.      I believe he's the treasurer.

22  Q.      How long has Mr. Meyers been the treasurer?

23  A.      Since inception.  Since 2014.

24  Q.      Similar to Mr. D'Amore, does Mr. Meyers have

25  authority to -- or I should say does Mr. Meyers have

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 68 of 75 PageID #: 938

1    Correct.  They put an Impact logo over the Global

2    Force.

3    Q.      Immediately above there, this again we talked

4    about at a certain point in time where the GFW mark,

5    do you see the Impact logo above there, that had the

6    GFW mark, as well as the Anthem mark inside the

7    logo?

8            Do you know when or do you know if Anthem

9    Wrestling stopped using that particular logo?

10   A.      Logos have multiple homes.  Print, digital

11   television.  Some places are easier to change than

12   another.  I believe the phase-out of the logos

13   probably started October 23rd-ish.

14   Q.      Okay.

15   A.      They did not get in a rush to change.  It

16   took them quite sometime, surprisingly.

17   Q.      So when you say rush to change, was that --

18   are you on new content or are you saying changing it

19   on Legacy type --

20   A.      No.  They chose to air the December content.

21   Q.      So the December content had this particular

22   logo on it?

23   A.      I don't recall if this actual specific.

24   Obviously, it had the GFW Amped logo.

25   Q.      Correct.  I meant the Impact logo with the

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 69 of 75 PageID #: 939

```
 1   Miller.  Obviously, I represent you along with my
 2   colleagues in this case.  You were describing your
 3   employment history very early today with WWE.
 4        Do you remember the years that you wrestled
 5   with WWE?
 6   A.    I did -- yes, I do.
 7   Q.    What years did you wrestle with WWE?
 8   A.    I started what we call one-offs in 1991 and
 9   '92 signed my first contract that was in October of
10   1993 that ran through October of 1996.  I returned
11   October of 1997 and stayed until October of 1999.
12   And that was my WWF at the time run.
13   Q.    The WWF is now the WWE?
14   A.    Correct.
15   Q.    They changed names from the World Wrestling
16   Federation to World Wrestling Entertainment?
17   A.    Correct.
18   Q.    During your time with the WWF, did you
19   wrestle under the Jeff Jarrett name?
20   A.    Yes.
21   Q.    Was that the first time the Jeff Jarrett name
22   had been used in connection with a wrestler?
23   A.    No.
24   Q.    When was the first time?
25   A.    To my knowledge, April 6 of 1986 was the date
```

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 70 of 75 PageID #: 940

```
 1    information that was offered under the Jeff Jarrett

 2    trademark?

 3    A.     Not to my knowledge.

 4    Q.     Do you know if Anthem Wrestling ever

 5    provided -- has ever provided toy action figures and

 6    accessories under the Jeff Jarrett name or

 7    trademark?

 8    A.     Can you restate that?

 9    Q.     Do you know whether Anthem Wrestling has ever

10    provided toy action figure and accessories using the

11    Jeff Jarrett trademark?

12    A.     Not to my knowledge.

13    Q.     Are you aware of Anthem Wrestling -- well,

14    you don't currently wrestle for Anthem Wrestling, do

15    you?

16    A.     No.

17    Q.     When was the last time you actually got into

18    the ring for Anthem Wrestling?

19    A.     For Anthem Wrestling?

20    Q.     Correct.

21    A.     To my recollection, I never wrestled or was

22    an on-screen performer for Anthem Wrestling.

23    Q.     So you never did an exhibit -- a wrestling

24    exhibit for Anthem Wrestling under the -- using the

25    Jeff Jarrett trademark?
```

**GLOBAL FORCE ENTMT., INC., ET AL. vs ANTHEM SPORTS & ENTMT. CORP., ET AL.**
30(b)(6)          Jeffrey Jarrett on 11/19/2019          Page 248


```
 1    the concept that for the Amped GFW Amped four-part
 2    series, that there was no requirement that a
 3    customer buy -- if they bought one, they have to buy
 4    number four.  Do you remember that line of
 5    questioning?
 6    A.     Yes.
 7    Q.     In your experience, because the story is
 8    important, if someone watches the first part and the
 9    second part and the third part of a series, are they
10    more likely to want to watch the fourth part than
11    someone who hadn't watched any of the prior three?
12    A.     With a very broad stroke.  If they've watched
13    the first three, I think a general term would be
14    yes, they would be likely to watch the fourth
15    component.
16    Q.     And also hypothetically, is there -- while it
17    may not require someone to buy all four, there are
18    concepts such as bundling where if you buy all four
19    you will get a discount in pricing versus if you
20    just buy one.  Is that a concept you're familiar
21    with?
22    A.     Definitely familiar with the concept.
23    Q.     Do you know if for the GFW Amped a
24    bundling-type option was offered for purchasing?
25    A.     Not to my knowledge.
```

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 72 of 75 PageID #: 942

1    Q.    But they still have the content?

2    A.    WW [sic] acquired the assets and it became a

3    part of the royalty program.

4    Q.    So there wasn't an adjustment -- was there an

5    adjustment to your WWF royalties when they acquired

6    WCW?

7    A.    Not in my agreement.

8    Q.    Real quick, I just want to step back, kind of

9    generally big picture.  Professional wrestling it's

10   a sport, right?

11   A.    Define sport.

12   Q.    People pay -- pay money for a ticket to show

13   up at a live event where athletes engage in some

14   form of contest?

15   A.    We call it sports entertainment because

16   the -- the outcomes are predetermined.  So true

17   sport -- and I use that term loosely.

18   Q.    I thought you were going to -- but, for

19   instance, the -- the fan does not know the outcome

20   beforehand?

21   A.    We hope so.

22   Q.    If you're doing your job they don't know the

23   outcome?

24   A.    Correct.

25   Q.    Similar to another sporting event; they show

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 73 of 75 PageID #: 943

1   up, watch a contest, and the ultimate determination

2   is in question, correct?

3   A.      Correct.

4   Q.      Now, you said that for professional wrestling

5   the value -- the real value is in the story.  Do you

6   remember testifying that to Mr. Miller?

7   A.      Yes.

8   Q.      But isn't what sets professional wrestling

9   apart is that it's not just a story; it's not a

10  book?  It is -- has performance and athletes

11  engaging in a lot of respects highly dangerous and

12  feats of just athletic display; is that a fair

13  statement?

14  A.      What's the statement?

15  Q.      That you can't untether -- that a real --

16  that without the live performance by athletes, that

17  all you're left with is a story which would be

18  similar to a book; is that correct?

19              MR. MILLER:  Object to form.  You can

20  answer.

21              THE WITNESS:  We tell -- sports

22  entertainment is a physical soap opera and the

23  stories are told inside and outside of the ring.

24  You can tell a story exclusively outside the ring

25  and you can tell a story exclusively inside the

```
 1                    REPORTER'S CERTIFICATE

 2

 3              I, Deborah Harris Honeycutt, LCR, Notary

 4     Public and Court Reporter, do hereby certify that I

 5     recorded to the best of my skill and ability by

 6     machine shorthand all the proceedings in the

 7     foregoing transcript, and that said transcript is a

 8     true, accurate, and complete transcript to the best

 9     of my ability.

10              I further certify that I am not an

11     attorney or counsel of any of the parties, nor a

12     relative or employee of any attorney or counsel

13     connected with the action, nor financially

14     interested in the action.

15              SIGNED this 2nd day of December, 2019.

16

17

18     _____

19     Deborah Harris Honeycutt, LCR

20

21     My Notary commission expires:  5/05/2020

22     Tennessee LCR No. 472
       Expires:  6/30/2020
23

24

25
```

Case 3:18-cv-00749   Document 105-1   Filed 02/14/20   Page 75 of 75 PageID #: 945