UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

GLOBAL FORCE ENTERTAINMENT, INC. )
and JEFFREY JARRETT, )
                             )
      Plaintiff, )
                             )
v. )   No. 3:18-cv-00749
                             )
ANTHEM WRESTLING EXHIBITIONS, LLC, )
                             )
      Defendants. )

## MEMORANDUM OPINION

For the second time in less than a year, the Court is called upon to address claims arising out of the failed merger between Global Force Entertainment, Inc. ("GFE" or "Global Force") and Anthem Wrestling Exhibitions, LLC ("Anthem Wrestling"). The first time around, the Court spent 21-pages denying motions to dismiss, except as they pertained to GFE's copyright claims, and Anthem Sports & Entertainment's request to be dismissed for lack of personal jurisdiction. Global Force Entm't, Inc. v. Anthem Sports & Entm't Corp., 385 F. Supp. 3d 576, 579 (M.D. Tenn. 2019).

Notwithstanding exhaustive briefing (Doc. Nos. 104, 110, 120), including the filing of a sur-reply (Doc. No. 131) and a response to the sur-reply (Doc. No. 133), the Court need not spend nearly the same amount of time resolving Anthem Wrestling's pending Motion for Summary Judgment (Doc. No. 103). This is a result of the governing rule itself: the court must grant summary judgment only where (1) the movant has shown "that there is no genuine dispute as to any material fact," and (2) "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Anthem has not made that showing on Plaintiffs' remaining claims for federal trademark infringement, or their state law claims for unjust enrichment, conversion/trover, negligence, or for violation of the Tennessee

Personal Rights Protection Act ("TPRPA") and the Tennessee Consumer Protection Act ("TCPA").

## I.

In support of its motion for summary judgment, Anthem Wrestling has submitted 74 paragraphs of facts running 21-pages, to which GFE has added another 109 paragraphs covering 27-pages. Those statements of fact are not "concise" under Local Rules 56.01(b) and (c), although some dispensation must be allowed for the dozen claims Plaintiffs have chosen to assert. Regardless, they are hardly "undisputed material facts," as each party characterizes them. Otherwise, there would be no need for the parties to spend paragraph after paragraph trying to demonstrate a dispute in their respective responses, and Anthem Wrestling would not have felt compelled to file a reply to GFE's responses in contravention of this Court's Local Rules.

It is tempting to conclude that there are bound to be questions of material fact when 183 statements of supposedly undisputed facts are submitted in a two-plaintiff, one defendant case that raises no exotic claims, particularly when those statement are accompanied by hundreds of pages of exhibits. However, the Court does not rest on what could be a cynical conclusion.

Instead, as this Court stated during the telephone conference on April 15, 2020, it read and considered all of the filings that had been made to date, and tentatively reached the conclusion that summary judgment would be inappropriate because the case would likely turn on the jury's assessment of the credibility of Ed Nordholm, Anthem Wrestling's President, and Jeffrey Jarrett, a longtime professional wrestler and the founder of GFE. The Court's conclusion has now become firm, having had the opportunity to consider the sur-reply and response to the sur-reply filed after the telephone conference.

Those observations alone are sufficient to meet the requirement of Rule 56 of the Federal

Rules of Civil Procedure. Although Rule 56(a) provides that "the court should state on the record the reasons for granting or denying the motion," both "the form and detail of the statement of reasons are left to the court's discretion." Fed. R. Civ. P. 56(a); 2010 Adv. Comm. Notes. Consequently, district courts are not required "to write elaborate essays using talismanic phrase," Jackson v. Fed. Exp., 766 F.3d 189, 197 (2d Cir. 2014), particularly when they are denying summary judgment. What "is required is a record sufficient to allow an informed appellate review," id., and in most cases "a district court's determination that there exists a triable issue of fact cannot be appealed on an interlocutory basis," Gregory v. City of Louisville, 444 F.3d 725, 742 (6th Cir.2006). See, 2010 Adv. Comm. Notes (indicating that "a statement of reasons can facilitate an appeal" and is "particularly important" when summary judgment is granted). On this score, the following observations from veteran District Judge William G. Young are worth repeating:

> I rarely take the time, as I have here, to explain a denial of summary judgment since the case is moving toward trial. After all, as my colleague Judge Joseph L. Tauro famously remarked, "What part of the word DENIED don't you understand?" . . .
>
> Even with the recent amendment to Rule 56, I shall continue to follow my regular practice of but rarely explaining a denial of summary judgment. Summary judgment practice is already markedly overused, unwieldy, and a source of unwarranted delay. . . . To extend a requirement that there be a written judicial opinion on every summary judgment denial is simply unworkable. In fairness, the 2010 revision to Rule 56 does not go this far. It is only hortatory, expressing a view as to what "should" happen. Fed. R. Civ. R. 56(a).

United States v. Massachusetts, 781 F. Supp. 2d 1, 19–20 (D. Mass. 2011) (footnotes omitted).

Regardless, factual issues abound in this case,[1] even at the most elementary level.

## II.

---

[1] Because the Court is writing only for the benefit of the parties at this point, reciting the factual background is unnecessary. Others who might be interested can find a summary in this Court's prior opinion. 385 F. Supp.2d at 379-80.

This case is now twenty-one months old, and there is still a question as to the citizenship of the only remaining defendant. According to the Answer to the Amended Complaint, which serves as an admission to the extent that it contains "formal statement of facts" that are "intentional, clear, and unambiguous," In re Motors Liquidation Co., 957 F.3d 357 (2d Cir. 2020) (collecting cases), Anthem Wrestling "is a Delaware limited liability company with its principal place of business in Toronto, Canada," (Doc. No. 87 at 2). This is entirely consistent with filings made with the Tennessee Secretary of State, at least until February 27, 2020.

However, in a fifth declaration filed only last month in conjunction with Anthem Wrestling's reply, Nordholm states that Anthem Wrestling has always had its principal place of business in the State of Tennessee. (Doc. No. 121, Nordholm Decl. ¶ 3). In fact, according to him, "Anthem Wrestling's only office is located in Tennessee," and "during the time period relevant to this lawsuit, several of Anthem's executives were located in Tennessee." (Id. ¶¶ 2 & 4). None of those executives, however, made it to the Court-ordered mediation on April 15, 2020, even as a stand-in for Nordholm who apparently was stuck in Toronto as a result of the Canadian travel advisory related to COVID-19. (Doc. No. 139).

It may be, as Anthem Wrestling maintains, that the filing with the Secretary of State which listed Toronto, Canada as its place of business was nothing more than a clerical error.[2] The summary judgment record hardly established that as a fact, however. And, it is more than just material for

---

[2] A declaration from Anthem Wrestling's counsel states that a paralegal at another law firm "mistakenly used the address of one of Anthem Wrestling's companies located in Canada" when filing the paperwork with the Secretary of State. (Doc. No. 136, Mills Decl. ¶ 7). Similar representations relating to fault were made by a different lawyer in another case just a few weeks ago. Hopefully, "blame the paralegal" is not a new trend. A paralegal's error can serve as an explanation, but it is not a defense. Responsibility for mistakes always lie with counsel.

4

purposes of Rule 56(a) because Anthem Wrestling argues "[i]n the absence of federal question jurisdiction, this court lacks jurisdiction to hear Plaintiff's state law claims." (Doc. No. 120 at 11).

"[W]hether a district court has subject matter jurisdiction is a question for the court, not a jury, to decide, even if the determination requires making factual findings[.]" Cameron v. Children's Hosp. Med. Ctr., 131 F.3d 1167, 1170 (6th Cir. 1997). Making that determination at the summary judgment stage rather than early-on can prove problematic. As one appellate court has noted:

> We are not being nitpickers in insisting on the difference between a jurisdictional determination and summary judgment. The purpose of summary judgment is to determine whether a trial can be averted. If the party moving for summary judgment fails to demonstrate that there is no triable issue, the case proceeds to trial. . . . But no case can properly go to trial if the court is not satisfied that it has jurisdiction. The fact that the summary judgment proceeding may not resolve a jurisdictional issue definitively is no ground for assuming jurisdiction and proceeding to trial. The jurisdictional issue must be resolved first.

Crawford v. United States, 796 F.2d 924, 928 (7th Cir. 1986).

Ultimately, Anthem Wrestling's jurisdictional argument hinges on this Court declining to exercise supplement jurisdiction under 28 U.S.C. § 1367 in the absence of a viable federal claim. It argues that "all of Plaintiff's Lanham Act and other trademark related claims[3] fail because Plaintiffs'[sic] gave Anthem Wrestling an implied license to use Plaintiffs' marks because all such use was done under Jeff Jarrett's watch as Chief Creative Officer of Anthem Wrestling." (Doc. No. 103 at 2). Whether an implied license existed, however, itself presents questions of fact.

**A.**

"The Sixth Circuit recognizes that implied licenses can arise in the trademark context," and

---

[3] Anthem Wrestling includes in this argument Plaintiffs' claim under the TCPA because it involves misrepresentations regarding goods and services.

5

"[c]ourts in this Circuit have held that '[t]he test for an implied license is objective." Deere & Co. v. FIMCO Inc., 239 F. Supp. 3d 964, 1006 (W.D. Ky. 2017) (collecting cases) (citations omitted). As this Court observed in its ruling on the Motion to Dismiss:

> "There is no precise formula for determining whether an implied license exists, but, rather, the court is to examine the 'intent' of the parties from the 'totality of the circumstances.' Jeffrey A. Grusenmeyer & Associates, Inc. v. Davison, Smith & Certo Architects, Inc., 212 Fed. Appx. 510, 514 (6th Cir. 2007). That is, the court should explore, based on the facts and the circumstances of the individual case, whether the evidence supports the notion that the parties, in essence, made an agreement permitting the defendant to use the work, consistent with certain understandings or terms. Johnson [v. Jones], 149 F.3d [494] at 500–02 [ (6th Cir. 1998) ]. The key issue, again, is intent, and the key question is whether the facts and the circumstances demonstrate that 'the copyright owners intended that their copyrighted works be used in the manner in which they were eventually used.' Id. at 502. Generally, the party claiming the existence of an implied license has the burden of proving the license. See Bourne v. Walt Disney Co., 68 F.3d 621, 631 (2nd Cir. 1995).

Global Force Ent., 385 F. Supp. 2d at 589-90 (quoting, Melanie Howard Music, Inc. v. Warner Bros. Records, No. 3:08-0979, 2009 WL 3784611 (M.D. Tenn. Nov. 10, 2009)).

A jury could conclude that Anthem Wrestling had an implied license to use Global Force's marks in connection with the broadcast of the Amped Content and Impact Wrestling because, as Anthem Wrestling notes, Jarrett was (1) Anthem Wrestling's Chief Creative Officer for which he received as salary when all of the allegedly infringing acts began; (2) directly involved with adding the GFW mark to Impact Wrestling's logo; (3) responsible for Impact Wrestling's creative content, including integrating GFW's wrestlers and championship belts into Impact Wrestling; and (4) involved in choosing the color and text of the logo. (Doc. No. 104 at 14). Further, as it pertained to the Amped content, it was Jarrett's idea to divide it into four pay-per-view segments, three of which aired while Jarrett was Chief Creative Officer. (Id. At 15).

6

However, whether a jury could find for Anthem Wrestling on its implied license defense is really of no concern for present purposes. Rather, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). "On summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).

Viewed with the correct prism, summary judgment is inappropriate because a jury could conclude that any license was contingent on a successful merger, and/or that Anthem Wrestling exceeded the scope of its implied license. This is perhaps best illustrated by what occurred when Nordholm suspended Jarrett and was considering his termination from employment. In response to a query from Nordholm about how Anthem Wrestling should fill its October and December pay-per-view slots under those circumstances, Executive Vice President Scott D'Amore sent what is now a cringe-worthy email suggesting the "Amp'd show" be aired, notwithstanding that Jarrett might "sue if he has the balls" to do so. (Doc. No. 110 at 2-3). D'Amore also proposed alternatives if Anthem Wrestling did not "want a legal battle." (Id. at 3). Arguably, there would be little concern about the possibility of a lawsuit if, in fact, the implied license was as clear as Anthem Wrestling claims.

Furthermore, the Term Sheet for the merger stated that "the rights to the 16-episodes of GFW Amped . . . "will remain with GFE and be included as a part of the merger." (Doc. No. 122 at 2). Perhaps this is why, in an October 23, 2017 email terminating Jarrett and the proposed merger, Anthem Wrestling stated that it "remain[ed] open to a reasonable arrangement with respect to the

7

GFW content that has been broadcast." (Id. At 9). There would be no need for Anthem Wrestling to remain "open" to paying for the content if it had an implied license, or so a reasonable jury could conclude.

The issue of whether an implied license existed also impacts the viability of Plaintiffs' claim for unjust enrichment, which requires proof of "1) [a] benefit conferred upon the defendant by the plaintiff'; 2) 'appreciation by the defendant of such benefit'; and 3) 'acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof." Freeman Indus., LLC v. Eastman Chem. Co., 172 S.W.3d 512, 525 (Tenn. 2005). If Anthem Wrestling did not have an implied license, then it may have been unjustly enriched by the use of Global Force's wrestling marks. This remains so even though Jarrett and his wife were paid annual salaries ($250,000 and $52,000, respectively) because Global Force is the entity bringing the unjust enrichment claim.

**B.**

Genuine issue of material fact regarding the existence of an implied license aside, Anthem Wrestling argues that Plaintiffs' request for trademark cancellation fails because they cannot show that Anthem Wrestling has abandoned the JEFF JARRETT ("JJ") mark. After all, Anthem Wrestling registered the mark and it is therefore entitled to a presumption that the mark is valid, enforceable and incontestible under 15 U.S.C. § 1065.

Notwithstanding registration, a trademark can be abandoned if either of the following occurs:

> (1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark. (2) When any course of conduct of the owner, including acts of

> omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark. . . .

15 U.S.C. § 1127. A claim for abandonment must be supported by "substantial evidence." Crash Dummy Movie, LLC v. Mattel, Inc., 601 F.3d 1387, 1390 (Fed. Cir. 2010); see also Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc., 304 F.3d 1167, 1175 (11th Cir. 2002) (stating that "federal courts uniformly agree that defendants asserting an abandonment defense face a 'stringent,' 'heavy,' or 'strict burden of proof'"). However, on summary judgment the party seeking abandonment bears a "relatively low burden" and need only "'com[e] forth with some evidence of abandonment.'" Enoch v. Enoch, No. 3:04-0920, 2006 WL 1006648, at *8 (M.D. Tenn. Apr. 14, 2006) (quoting W. Fla. Seafood, Inc. v. Jet Restaurants, Inc., 31 F.3d 1122, 1128 (Fed. Cir. 1994)).

In support of Anthem Wrestling's motion, Nordholm has filed a declaration (his fourth no less) in which he claims that the JJ mark has been in continuous use and Anthem Wrestling has no intention of abandoning it. (Doc. No. 106, Nordholm Decl. ¶ 9). This may in fact be true, but under the statute use or intent to use a mark must be "bona fide" and "not made merely to reserve a right in a mark." 15 U.S.C. § 1127(1). Furthermore, "[t]his determination must be made on a 'case-by-case basis considering the totality of the circumstances,' [and] as a general rule, the factual question of intent is particularly unsuited to disposition on summary judgment.'" Kelly Servs., Inc. v. Creative Harbor, LLC, 846 F.3d 857, 864 (6th Cir. 2017) (discussing intent to use in the context of a trademark application).

Nordholm's declaration is obviously self-serving (elsewise why file it?), and it will be for the jury to determine his credibility. This is particularly necessary here because Plaintiffs contend the JJ mark has long been used by World Wrestling Entertainment, and Jarrett has used the JJ mark

9

since his termination by Anthem Wrestling, without objection. (Doc. No. 111 at 14-15). At a minimum, this calls into question whether Anthem Wrestling truly intends to use and protect the mark.

The issue of abandonment also impacts Plaintiffs' TPRPA claim. If Plaintiffs prove abandonment, Anthem Wrestling will no longer own valid and enforceable rights in the JJ mark, meaning that the consent Jarrett signed for Anthem Wrestling's predecessor to register and use the mark in 2006 would be largely irrelevant. Regardless, summary judgment on the TPRPA claim is inappropriate for yet another reason discussed below.

## C.

Plaintiffs' claims for negligence and conversion/trover differ from the others because they relate to the possession and destruction of the only set of masters of the sixteen one-hour episodes of GFW Amped. Anthem Wrestling argues both claims fail because it was required to pay KSTV (Plaintiffs' creditor) $40,000 to obtain the masters, and it would not have returned Plaintiffs' tapes absent repayment of that money. As a consequence, Plaintiffs cannot show (1) "a right to immediate possession of the item converted at the time of the alleged conversion," Mammoth Cave Prod. Credit Assen, 569 S.W.2d 833, 836-37 (Tenn. Ct. App. 1997) for purposes of their conversion/trover claim; or (2) a duty that required Anthem Wrestling to maintain the master on its servers for purposes of their negligence claim.

However, Anthem Wrestling has pointed to no oral or verbal agreement between the parties that permitted it to destroy the tapes or hold them hostage. Indeed, under the Term Sheet, Plaintiffs owned the masters, and a jury could conclude that once Jarrett was terminated and the merger was dead, GFE was entitled to the return of the masters. It could also conclude that the $40,000 paid to

10

KSTV (assuming GFE owed that sum) was for Anthem Wrestling's benefit because it would not have to produce its own wrestling content at a significant cost.

**D.**

The Court has saved for last what may be the most interesting genuine issue of material fact: Is professional wrestling a sport for spectators, or is it entertainment for audiences? If it is a sport then, irrespective of the existence of an implied contract, Anthem Wrestling's use of the Amped Content did not violate the TPRPA because "sport broadcasts" are exempt under Tenn. Code Ann. § 47-25-1105.

Some courts have stated that professional wrestling is a sport, with little or no further discussion. See e.g., Roll v. Dimension Films, L.L.C., No. C 1 05 387, 2006 WL 181993, at *1 (S.D. Ohio Jan. 23, 2006) ("Roll is engaged in the sport of professional wrestling."); Titan Sports, Inc. v. Comics World Corp., 690 F. Supp. 1315, 1317 (S.D.N.Y. 1988) ("The sport of professional wrestling has enjoyed an enormous growth in popularity in recent years."). Others have described it as entertainment, also with little discussion. See e.g., Mason v. City of Lincoln, 665 N.W.2d 600, 606 (Neb. 2003) (stating that professional wrestling is "a form of entertainment"); Tattrie v. Com., Pennsylvania State Athletic Comm'n, 521 A.2d 970, 973 (Pa. Cmwlth. 1987)("It must be noted that professional wrestling contests and exhibitions are a form of entertainment."). Still other courts have intentionally left the question open. See e.g. Somerson v. World Wrestling Entm't, Inc., 956 F. Supp. 2d 1360, 1371 (N.D. Ga. 2013) ("If not a sport in the true sense of the word, then professional wrestling and the historical information about it is at least a form of entertainment[.]"); Underwriters at Lloyds London v. Yale, No. CV044002004S, 2007 WL 1976033, at *5 (Conn. Super. Ct. June 12, 2007) (stating that there "is a genuine issue of material fact as to whether or not professional

11

wrestling is an athletic or sports event versus being classified as an entertainment event"). For its part, the Court has no hesitation in concluding that Greco-Roman wrestling – as reintroduced in Athens, Greece at the first modern Olympics in 1896, and as practiced by high school and college athletes in gymnasiums and auditoriums across the country – is a "sport."

Professional wrestling is different, of that there can be little doubt. Some of its mystery over the years has been due to professional wrestling's penchant for "kayfabe":

> In the world of wrestling, the portrayal of staged events as real – the suspension of disbelief that is central to the proceedings – is known as kayfabe. For decades, maintaining kayfabe was *de rigueur*: "babyfaces" (or "faces") [good guys] and heels [villians] didn't ride together or associate in public, and reporters got slapped for suggesting that wrestling was fake. The line between kayfabe and reality began to blur during pro wrestling's popularity boom during the late '90s, and these days – thanks to the omnipresence of social media, the sunshine of the internet, and the WWE's forays into reality TV – kayfabe is effectively dead.

https://slate.com/news-and-politics/2017/07/trumps-wrestling-tweet-broke-kayfabe.html; see also, https://www.merriam-webster.com/words-at-play/word-origin-kayfabe ("In the 1980s, wrestlers began using the code word kayfabe in reference to the staged performance presented as authentic as well as to the act of maintaining the fiction by staying in character.") (both websites last visited 5/27/2020).

While "kayfabe" may now be dead, the staged performances and elaborate personas are not. In fact Plaintiffs proclaim that "professional wrestling involves a script, a predetermined outcome, and 'out-of-arena' content that involves storytelling and drama" that is "akin to live action theatre where the audiences does not know the outcome of the event, but the actors and actresses do." (Doc. No. 122 at 18). Whether that is the case, or whether professional wrestlers are "athletes engaging in highly dangerous feats of athletic display" as Anthem Wrestling contends (id.), will be

for the jury to decide.

### III.

The Court could write a veritable treatise on trademark law given all of the arguments and counter-argument that have been made in this case. However, district courts exist to try cases, not to write elaborately and exhaustively when it is not necessary. Suffice it to say that, in denying summary judgment, the Court has fully considered all of the arguments raised and, therefore, Anthem Wrestling need not waste any time or effort contemplating a motion to reconsider.

In preparing for the trial that begins on June 30, 2020, Plaintiffs should rethink whether a dozen causes of action are necessary, lest the jury be overwhelmed (or underwhelmed) by the evidence presented. Better yet, as a part of trial preparations, the parties should reconsider their respective positions on settlement because the summary judgment record suggests to the Court that either party could be pinned to a count of three.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE