IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE


GLOBAL FORCE
ENTERTAINMENT, INC. and
JEFFREY JARRETT

                                    CIVIL ACTION NO.3:18-cv-00749
Plaintiffs/Counter-Defendants,
                                    CHIEF JUDGE CRENSHAW
v.
                                    MAGISTRATE JUDGE JOE BROWN

ANTHEM WRESTLING            JURY DEMAND
EXHIBITIONS, LLC,

Defendant/Counterclaim-Plaintiff

            ........................

    DEPOSITION of SCOTT D'AMORE, a witness in the above-
noted action, taken before Sharon L. Masse, in her Chambers
at 267 Pelissier Street, Eighth Floor, Windsor, Ontario,
and taken by electronic recording by Sandy L. Breitenstein,
Court Reporter, on the 18th day of December, 2019.

            ........................

A P P E A R A N C E S :

Mr. Samuel F. Miller:      Counsel for the Plaintiffs/
Ms. Hayley Baker:               Counter-Defendants,
                                via teleconference.

Mr. Ryan A. Lee:           Counsel for the Defendant/
                                Counterclaim-Plaintiff,
                                via teleconference.

Mr. Steven Pickard:        Counsel for the Witness.


            ........................

# T A B L E   O F   C O N T E N T S

Title of Proceedings                                1

Table of Contents                                  2

EXHIBITS                                           3

UNDERTAKINGS                                      3-4

DEPOSITION OF:

    SCOTT D'AMORE                               4-101

REPORTER'S CERTIFICATION PAGE                    102

WITNESS'S CERTIFICATION PAGE                     103

ERRATA SHEET                                     104

E. Beryl MacMillan-Court Reporting
267 Pelissier Street, Eighth Floor
Windsor, Ontario N9A 4K4
(519) 252-1134

## EXHIBITS

NO.     DESCRIPTION                                    PAGE NO.

182.    An e-mail from Mr. D'Amore to Mr. Nordholm, dated
        9/4/2017........................................  54

183.    An e-mail from Mr. Nordholm to Mr. D'Amore, dated
        9/10/2017.......................................  75

184.    A spreadsheet attached to the exhibit...........  77

185.    An e-mail from Mr. D'Amore to Mr. Nordholm, dated
        September 11th, 2017, that responds to the prior
        e-mail that was shown to Mr. D'Amore............  79

186.    An e-mail from Mr. D'Amore to Ed Nordholm, dated
        September 11th, 2017, at 12:45 p.m..............  82

187.    An e-mail from Ed Nordholm to Ariel Schnerer and
        others, dated 9/19/2017.........................  90

188.    A true and correct copy of at least the Twitter
        account.......................................92,93

189.    An e-mail from Mr. Adam McKeown to Mr. Nordholm
        and others, dated January 10th, 2018............  98

## UNDERTAKINGS

### and/or

### REQUESTS FOR UNDERTAKINGS

There were no undertakings and/or requests given during this examination.

E. & O.E.

PLEASE NOTE:

The list of undertakings and refusals, and those taken under

advisement, is provided only as a service to counsel and does

not purport to be complete or binding upon the parties herein.

1    SCOTT D'AMORE, SWORN, SAID:

2    EXAMINED BY MR. MILLER:

3    Q.    Alright.  Mr. D'Amore, my name is Sam Miller.  I

4    represent Global Force Entertainment, Inc. and

5    Mr. Jarrett.  You have been noticed in the deposition of

6    this case today of Global Force Entertainment, Inc. and

7    Jeffrey Jarrett versus Anthem Wrestling Exhibitions, LLC,

8    in the United States District Court for the Middle

9    District of Tennessee.  Have you ever been deposed before

10   under U.S. law?

11   A.    No.

12   Q.    Okay.  During the deposition today, I will be

13   asking you questions under penalty of perjury under U.S.

14   law, and your job today is to answer those questions.  We

15   ask that you be as honest as you can because you are

16   under oath, and the court reporter next to you is

17   recording everything you say.  This is likely my only

18   opportunity to ask you questions before trial, so it is

19   important that you answer my questions fully and

20   truthfully.  Do you understand that?

21   A.    Yes.

22   Q.    Mr. D'Amore, I want to make sure there's not a lag

23   and I appreciate you pausing to give an opportunity for

24   your counsel to respond.  Unfortunately, I am unable to

25   see you due to the fact of your counsel's objection to

1    using Skype technology.  Can you confirm for me that you

2    are not asking or receiving any indications from your

3    counsel as to how to answer questions today?

4    A.    Correct.

5    Q.    Alright.  As the court reporter indicated, you'll

6    need to answer orally because if you say mm-hmm or uh-uh,

7    it can and may be misunderstood by the court reporter.

8    Do you understand that?

9    A.    Yes.

10   Q.    If you do not understand a question today, will

11   you tell me?

12   A.    Yes.

13   Q.    If you don't hear a question today, will you tell

14   me?

15   A.    Yes.

16   Q.    If a question today is confusing, will you tell

17   me?

18   A.    Yes.

19   Q.    If you answer a question today, we're going to

20   understand that to mean that you heard and understood the

21   question.  Is that okay?

22   A.    Sorry, repeat that, please.

23   Q.    If you answer a question today, it will mean that

24   you heard it and understood it.  Is that okay?

25   MR. PICKARD:    Well, hold on counsel.  I'm going to

1    object to that.  You're asking him to state that if

2    there's any misunderstanding, that the misunderstanding

3    falls on your interpretation of the question and we're

4    not agreeing to that.

5    MR. MILLER:    Alright.  Well, counsel, I'd ask you to

6    refrain from speaking objections.  This deposition is

7    being taken pursuant to U.S. law, and this particular

8    court does not allow objections other than the words

9    objection to form.  So if you would please refrain from

10   long-speaking objections, we would appreciate that.

11   MR. PICKARD:    Okay.

12   Q.    If you want to speak with your attorney today,

13   well, we'll take that back.  Is there anything about your

14   physical, mental, or emotional condition today that will

15   not allow you to understand my question?

16   A.    No.

17   Q.    If that changes, will you tell me?

18   A.    Yes.

19   Q.    Is there anything about your physical, mental, or

20   emotional condition today that will not allow you to

21   answer my questions fully and completely?

22   A.    No.

23   Q.    If that changes, will you tell me?

24   A.    Yes.

25   Q.    Is there anything about your physical, mental, or

1    emotional condition today that would not allow you to

2    answer my questions honestly?

3    A.      No.

4    Q.      If that changes, will you tell me?

5    A.      Yes.

6    Q.      Are you taking any medications or drugs of any

7    kind that might make it difficult for you to understand

8    and answer my questions fully, completely, and honestly

9    today?

10   A.      No.

11   Q.      Have you had anything alcoholic to drink in the

12   last eight hours?

13   A.      No.

14   Q.      Have you reviewed any documents in preparation for

15   your deposition today?

16   A.      No.

17   Q.      How long did you spend preparing for your

18   deposition today?

19   A.      Zero.  I have nothing to prepare.

20   Q.      Who have you spoken with, if anyone, in

21   preparation for this deposition?

22   A.      Mr. Pickard.

23   MR. LEE:      Objection.

24   Q.      Sure.  I'm not asking for what your counsel said.

25   I'm asking who you've spoken with, which is not

1    priviledged.

2    A.    Mr. Pickard.

3    Q.    Okay, anyone else?

4    A.    No.

5    Q.    Have you spoken with Mr. Asper regarding your

6    deposition today?

7    A.    No.

8    Q.    Have you spoken with Mr. Nordholm?

9    MR. MILLER:    N-O-R-D-H-O-L-M.

10   A.    I informed Mr. Nordholm I would be being deposed

11   today.

12   Q.    What, if anything, did he say to you when you

13   informed him that you were being deposed?

14   A.    He was happy to hear that I was going to agree to

15   be deposed.

16   Q.    How do you know that he was happy to hear that you

17   were agreeing to be deposed?

18   A.    Because he said he was glad to hear that I was

19   going to be deposed.

20   Q.    Have you ever been convicted of a crime other than

21   a minor traffic violation?

22   A.    Sorry, please repeat the question.

23   Q.    Have you ever been convicted of a crime besides a

24   minor traffic violation?

25   A.    No.

1    Q.    What, if any, e-mail addresses have you used in

2    connection with your work with Anthem Wrestling

3    Exhibitions?

4    A.    Please repeat the question.

5    Q.    Sure.  Let me take a step back.  Are you familiar

6    with a company known as Anthem Wrestling Exhibitions,

7    LLC?

8    A.    Yes.

9    Q.    For purposes of our deposition today, I'm going to

10   refer to Anthem Wrestling Exhibitions, LLC as Anthem

11   Wrestling.  Is that okay?

12   A.    Yes.

13   Q.    What e-mail address do you have, if any, for your

14   work with Anthem Wrestling?

15   A.    sdamore@impactwrestling.com.

16   Q.    Alright.  Are you currently employed?

17   A.    Please repeat the question.

18   Q.    Are you currently employed?

19   A.    Currently, I receive compensation as an employee

20   from the estate of Patrick D'Amore.

21   Q.    What is your relationship, if any, with Anthem

22   Wrestling?

23   A.    Please repeat the question.

24   Q.    Are you able to hear me okay?

25   A.    Yes.

1    Q.     What relationship, if any, do you have with Anthem

2    Wrestling?

3    A.     I provide services under contract.

4    Q.     How long have you provided services under contract

5    to Anthem Wrestling?

6    A.     I'd have to look it up.

7    Q.     Based on your best guess, how long?

8    A.     I think it'd be effective, probably January 1st,

9    2018 for those services under contract.  Previous to

10   that, and I said-- as I said, subject to checking the

11   actual date.  But previous to that, I would have been

12   providing services for Anthem Wrestling in a non-contract

13   relationship.  Would have started that first part of

14   2017, I believe.

15   Q.     What services did you provide to Anthem Wrestling

16   in 2017?

17   A.     Sorry, please repeat that.

18   Q.     What services did you provide to Anthem Wrestling

19   in 2017?

20   A.     Consulting services.

21   Q.     What type of consulting services?

22   A.     Watched and sat in on their business operations

23   and gave them my thoughts on what they were doing, how

24   they were doing it.

25   Q.     How much were you paid by Anthem in 2017, Anthem

1    Wrestling?

2    A.    No idea.

3    Q.    Did your compensation or the amount that you were

4    charging or being paid by Anthem Wrestling change at any

5    point during 2017?

6    A.    I'd have to go back and look.

7    Q.    What is your current title, if any, with Anthem

8    Wrestling?

9    A.    I do not believe I hold an official title with

10   Anthem Wrestling.  The title that is used when

11   referencing me is executive vice president.  That's as of

12   2018.  Prior to that, it was vice president.

13   Q.    When you say you don't have an official title, I

14   don't understand what that means.  So what do you mean

15   by, "an official title"?

16   A.    I'm not an officer of the company.

17   Q.    Why do you have an officer title then?

18   A.    Ask your client.  He first gave it to me.

19   Q.    Was my client with Anthem Wrestling in 2018?

20   A.    Your client was with Anthem Wrestling in 2017,

21   when I got my original vice president title.

22   Q.    So who gave you the title of executive vice

23   president in 2018?

24   A.    Myself.

25   Q.    So you just decided that's the title you wanted to

Case 3:18-cv-00749   Document 167-7   Filed 06/12/20   Page 12 of 105 PageID #: 2502

1    give yourself?

2    A.    I suggested the title to Ed Nordholm.

3    Q.    Why did you suggest changing your title from vice

4    president to executive vice president?

5    A.    Scope of work change.

6    Q.    What was the scope of work change?

7    A.    Had to take on additional duties and time.

8    Q.    What additional duties did you take on?

9    A.    Originally, was engaged to report to Jeff Jarrett,

10   and with Jeff's departure, I had to assume some of Jeff's

11   duties.

12   Q.    What duties did you have as vice president of

13   Anthem Wrestling in 2017?

14   A.    Sat in creative meetings; production meetings; was

15   involved in the-- in the production of the t.v. broad-

16   casts; consulted with senior members on business

17   decisions or direction; negotiated on behalf of Anthem

18   Wrestling with partners, both in the wrestling business,

19   and I'd have to go back and look, but I believe some

20   third party vendors.

21   Q.    Are you an owner of Anthem Wrestling?

22   A.    Repeat the question, please.

23   Q.    Are you an owner of Anthem Wrestling?

24   A.    Can I get clarification on the term, "owner"?

25   Q.    Do you hold any membership interest in Anthem

Case 3:18-cv-00749   Document 167-7   Filed 06/12/20   Page 13 of 105 PageID #: 2503

1    Wrestling?

2    A.    I do have some shares in-- sorry.  Pardon-- I do

3    not have shares in Anthem Wrestling.

4    Q.    Have you ever had shares in Anthem Wrestling?

5    A.    I did have shares in Anthem Wrestling.

6    Q.    When did you have shares in Anthem Wrestling?

7    A.    Acquired them in 2018.

8    Q.    Alright.  How much did you pay to acquire those

9    shares?

10   A.    I honestly don't know if I can disclose the terms.

11   Q.    Well, we'll designate this portion subject to the

12   protective order which is in place, which means it can't

13   be shared with anyone outside this lawsuit.  If you

14   believe it is highly confidential, we can designate the

15   portion of this transcript as attorney's eyes only, in

16   which case, my clients won't be able to see this.  Which

17   of those designations would you like to apply to your

18   testimony?

19   A.    I think if we go down this-- I think if we go down

20   this route, I need to step down and get a U.S. attorney

21   to represent me.

22   Q.    Are you refusing to answer this question?

23   A.    I'm saying I don't know if I'm allowed to or-- or

24   should answer this question.

25   MR. LEE:    On behalf of Anthem Wrestling, I believe you

1    can proceed and we'll designate it as highly

2    confidential.

3    MR. MILLER:      That was Mr. Lee speaking.

4    MR. LEE:     Yes, Mr. Lee speaking.

5    Q.     So, Mr. D'Amore, how much did you pay for your

6    shares in 2018?

7    A.     Can I have a moment to speak with my counsel?

8    Q.     I'm sorry, you cannot, unless you are asserting

9    privilege over this information, and so, I don't know how

10   this would ever be privileged, so I need you to answer

11   the question.

12   A.     Please repeat the question.

13   Q.     How much did you pay for your shares in Anthem

14   Wrestling Exhibitions, LLC in 2018?

15   MR. LEE:     Objection to form.  Just, we're referring to

16   them as shares, but it's membership interest, is that

17   correct?  Just for--

18   MR. MILLER:     I would--

19   MR. LEE:     --clarity.

20   MR. MILLER:     --assume it is the membership interest.

21   MR. LEE:     Right.  I just want to make sure we're

22   being...

23   MR. MILLER:     Your client said, "shares".  He--

24   MR. LEE:     (Interposing) Yes, I understood.  I just

25   wanted to clean that up.

1    <u>EXAMINED BY MR. MILLER</u>:

2    Q.    This is Mr. Miller speaking.  Mr. D'Amore, how

3    much did you pay for your membership interest in Anthem

4    Wrestling Exhibitions, LLC in 2018?

5    A.    I don't believe I paid anything.

6    Q.    Okay.  How many shares did you receive of Anthem--

7    or how many membership interests did you receive from

8    Anthem Wrestling, LLC-- strike the question.  How many

9    shares-- how many membership interests in Anthem

10   Wrestling Exhibitions, LLC did you own in 2018?

11   A.    Don't know.

12   Q.    How did you come to own the membership interests

13   in Anthem Wresting Exhibitions, LLC in 2018?

14   A.    I believe that I first received-- sorry, what's

15   the proper term?

16   Q.    Membership interest.

17   A.    I believe I first received membership interests as

18   part of signing my contractor agreement with Anthem

19   Wrestling, and then I received subsequent shares as part

20   of financing arrangement.

21   Q.    When you say, "subsequent shares", what do you

22   mean by subsequent shares?

23   MR. LEE:    Objection to form.  Ryan Lee, objection to

24   form.  Continue.

25   Q.    You can answer.  Go ahead.

1    MR. PICKARD:    Object to form.

2    A.     Sorry, can you repeat the question?

3    Q.     Sure.  What did you mean by subsequent-- I think

4    you said, "subsequent shares"?  Mr. Lee may object

5    periodically through this and that's to preserve his

6    evidentiary objections.  So you need to answer the

7    question despite his objection.  So my question to you

8    is, when you said, "subsequent shares", what did you mean

9    by subsequent shares?

10   A.     What's the proper term, membership interest?

11   Q.     Sure.  Did you mean subsequent membership

12   interest?

13   A.     Can you read back what I said, please?  No.

14   Q.     So here's my question, and let me make it very

15   simple, and it's going to be *inarfling. (phonetic

16   spelling)  You acquired shares-- or you acquired

17   membership interest in Anthem Wrestling Exhibitions, LLC.

18   You said later you received subsequent shares in some-

19   thing.  What did you receive subsequent shares in?

20   A.     I believe subsequent membership units, as part of

21   a financing arrangement with Anthem Wrestling.

22   Q.     So you attained subsequent membership-- you

23   attained additional membership units in Anthem Wrestling

24   Exhibitions, LLC, is that right?

25   A.     Yes.

1    Q.    And you said you no longer own those membership

2    units in Anthem Wrestling.  Did you sell those membership

3    units?

4    A.    No.

5    Q.    Where did the membership units go, if anywhere?

6    A.    I don't-- I don't know the particular logistics of

7    it, but I-- for lack of a more proper term, I swapped the

8    membership interest in Anthem Wrestling out, I believe

9    to-- for membership interest in a-- the parent company,

10   or a different company or entity.

11   Q.    Thank you.  So during this deposition today, we're

12   going to be using AgileLaw to show you electronic

13   documents.  You should be able to use your laptop in

14   front of you to scroll through the pages and to zoom in

15   and enlarge the type if you need to see it if you have

16   any vision issues, so that you can see it better.  On the

17   screen before you should be, "Plaintiff's second amended

18   notice to take deposition of Scott D'Amore".  Do you have

19   that before you?

20   MR. PICKARD:    Counsel, I apologize, but I'm using the

21   software to show the client the document and it might be

22   an issue with the document, but I'm not able to scroll

23   it, it seems, unless I make it-- I don't know if you know

24   what I'm talking about but...

25   MR. MILLER:    I do.  You're unable to move it on the

1    screen?

2    MR. PICKARD:    Exactly.  I can zoom in and out of the

3    document, but not able to control what part of the page

4    I'm looking at.

5    MR. MILLER:    There's no button in the top that

6    allows-- has arrows up and down?

7    MR. PICKARD:    Now my document just got taken away.

8    Okay, we're able to do it now.

9    <u>EXAMINED BY MR. MILLER</u>:

10   Q.    Do you recognize this deposition notice, as in,

11   have you seen it before?

12   A.    I'm just reading it right now.  Where's the top

13   half of it?

14   MR. PICKARD:    Once again, counsel, I'm having

15   difficulty with the software.  I'm able to zoom in on the

16   document, and I can use the up and down arrows to get to

17   a second page of your document.  But for example, if I'm

18   zooming in on this document such that it's readable on

19   the screen, saying at the top in the middle, "United

20   States District Court For the Middle District Of

21   Tennessee At Nashville", I'm unable to scroll down to see

22   past the parties.  If I hit the down arrow, it jumps me

23   to the second page.  There's no scroll bar.

24   MR. MILLER:    Yes.  How big is your laptop?  What's

25   the--

1    MR. PICKARD:      It's--

2    MR. MILLER:      --screen size of your laptop?

3    MR. PICKARD:      It's 15 inches, 16 inches.  It's

4    regular--

5    MR. MILLER:      (Interposing) It should be-- sorry.

6    MR. PICKARD:      There does not seem--

7    MR. MILLER:      (Interposing) It should be significant.

8    It should be of a large enough size that your client can

9    see.

10   MR. PICKARD:     Yes, we can read the document.  I'm just

11   unable to scroll it.  I'm unable to go down the page to

12   see the second half of a page, for example, unless I zoom

13   out so the entire page is on the screen and it makes it

14   too small to read.

15   MR. MILLER:      Counsel, I'm able to see what is on your

16   screen.

17   MR. PICKARD:      Okay.

18   MR. MILLER:      And the size of which you're blowing it

19   up is an irregularly large amount.

20   MR. PICKARD:      Well if I move to 50 percent, that is

21   not readable.

22   MR. MILLER:      Well,--

23   MR. PICKARD:      And--

24   MR. MILLER:      --you currently have it blown up to 191

25   or-- now you have it at 72 percent.  There is a fit-to-

1    width and fit-to-length button that should--

2    MR. PICKARD:    Okay.  I've just hit the fit--

3    MR. MILLER:    --enable you to scroll.  Next to the zoom

4    in buttons there's an arrow, right to left.

5    MR. PICKARD:    Okay.  Alright.  Just for the record,

6    the percentages that you're siting are not the ones that

7    are on my screen.  However, I've hit fit-to-width, and

8    the last thing I can see on the page is, "Defendant

9    plaintiff-counterclaim", half that word, and there is no

10   mechanism to scroll down this page to see the rest of it.

11   MR. MILLER:    Is that the fit-to-width or fit-to-

12   length,--

13   MR. PICKARD:    If I hit fit--

14   MR. MILLER:    --the height?

15   MR. PICKARD:    Fit-to-height?  I see it all the way

16   down to Exhibit 181, stamped in the bottom right corner,

17   but the text is not readable.

18   MR. MILLER:    It you put it at 100 percent, it is

19   readable.

20   MR. PICKARD:    I'm at 100 percent, and the last thing I

21   can see is "Plaintiff second amended notice taking

22   deposition of Scott D'Amore", and there's no mechanism to

23   scroll down to see the rest of the page.

24   MR. MILLER:    Counsel, you now have it at 144 percent,

25   is what you've blown it up to.

1    MR. PICKARD:     Okay.  I'm just--

2    MR. MILLER:     (Interposing) You're telling me you can't

3    read it, the normal size--

4    MR. PICKARD:     Mr. Miller--

5    MR. MILLER:     --on a 15 inch screen.  Is that what

6    you're saying?

7    MR. PICKARD:    I'm not sure.  You're not in this room.

8    I am zoomed at 100 percent.  The witness can testify to

9    that, and the court reporter can look at the screen as

10   well.

11   MR. MILLER:     I can see exactly what's on your screen

12   and it is very, very large.  I am able to see what is on

13   your screen and see what you're scrolling through.

14   MR. PICKARD:    I'm showing the screen to the court

15   reporter so that she may take note of what is in the

16   room.  I don't know what you're seeing.  Okay.  But it

17   still remains that whatever zoom level I choose, no one

18   is telling me how to scroll down a page in the software.

19   MR. MILLER:     There is a scroll bar on the right side--

20   MR. PICKARD:     (Interposing) There is--

21   MR. MILLER:     --to enable you to--

22   MR. PICKARD:    --no scroll bar on the right side, and

23   all I have is a-- my mouse turns to a, kind of a stop

24   sign whenever I go over the document.

25   MR. MILLER:    And you're not able to-- it currently

1    looks like you're zoomed at 144 percent.  Is that not

2    accurate?  Is it 100 percent?

3    MR. PICKARD:     It's at 100 percent.  And when I'm

4    looking at, again, as soon as the mouse gets overtop of

5    the document, it turns to kind of a no smoking symbol or

6    something like that.

7    MR. MILLER:     Well here's what we're going to do.

8    We're going to send copies of these exhibits to Sharon.

9    Hayley's going to go send those to Sharon right now and

10   have them print it out.  I--

11   MR. PICKARD:     Okay.

12   MR. MILLER:     --have significant doubts as to the

13   inability to use this.  You are the first of several

14   hundred people that I've used this deposition software

15   with in this type of case.

16   MR. PICKARD:     Alright, well...

17   MR. MILLER:     And this is the first situation that has

18   ever had a problem.

19   MR. PICKARD:     Well I'm--

20   MR. MILLER:     (Interposing) And I find it frankly to be

21   consistent with the overall lack of cooperation that has

22   occurred.  So we'll go print that out so that you have a

23   hand copy of that.  If that extends beyond the three

24   hours and causes us to extend beyond the three hours, so

25   be it.  But I'm going to continue with my deposition

1    without these type of obstacles.

2    MR. PICKARD:     That's quite fine.

3    EXAMINED BY MR. MILLER:

4    Q.    Have you received a litigation hold notice from

5    Anthem Wrestling in this case?

6    MR. LEE:     Objection.  The extent calls for attorney/

7    client communication.

8    Q.    The existence of a litigation hold notice is not

9    privileged communication so that's not-- and the notice

10   itself is not privileged.  The existence of it certainly,

11   and cannot be disputed.  It is not privileged.  Have you

12   received a litigation hold notice in this case?

13   A.    I don't even know what that is.

14   Q.    Have you received any document from Anthem

15   Wrestling telling you not to destroy any e-mails related

16   to this lawsuit?

17   A.    I don't recall.

18   Q.    Have you taken any steps to preserve any e-mails

19   that mentioned Jeff Jarrett during the time period of

20   2017 to 2018?

21   A.    I don't delete e-mails, so I wouldn't have taken

22   any specific steps that I know of.  I wouldn't even know

23   how to preserve, but I also don't delete e-mails.  So

24   they should still be on the server.

25   Q.    Have you taken any-- have you been asked by any-

Case 3:18-cv-00749   Document 167-7   Filed 06/12/20   Page 24 of 105 PageID #: 2514

1    one at Anthem Wrestling to collect your e-mails for

2    producing to counsel?

3    MR. LEE:     Objection to the extent it requires

4    attorney/client communication.  Proceed to answer.

5    A.     Sorry, can Mr. Lee repeat that, please?

6    MR. PICKARD:     Certainly.

7    MR. LEE:     It's our objection to the extent it calls

8    for attorney/client communications, but otherwise you can

9    answer.

10   A.     Mr. Miller, can you repeat the question, please?

11   Q.     Has anyone at Anthem asked you to collect e-mails

12   to produce to counsel in this case?

13   A.     No.

14   Q.     What are your current responsibilities and duties

15   as the executive vice president of Anthem Wrestling?

16   A.     My contracted duties are to help prepare a

17   business plan; to oversee the creative process; and to

18   oversee the production scheduling in process for Anthem

19   Wrestling.

20   Q.     What job title, if any, do you have with Anthem

21   Sports & Entertainment, LLC?

22   A.     None.

23   Q.     You said you have a contract to be the executive

24   vice president of Anthem Wrestling.  Who is that contract

25   with?

1    A.    I don't have it here.  I'd have to look at-- I

2    believe, to the best of my recollection, that it's with

3    Anthem Wrestling.

4    Q.    Are you paid by cheque by Anthem Wrestling?

5    A.    I believe so.  I'd have to ask my bookkeeper.

6    Q.    What job title do you have, if any, with Fight

7    Network?

8    A.    None.

9    Q.    What relationship do you have, if any, with Fight

10   Media Group?

11   A.    I'm not exactly sure what Fight Media Group is, so

12   I-- I have no title with a Fight Media Group.

13   Q.    Who do you report to at Anthem Wrestling?

14   A.    Ed Nordholm.

15   Q.    Anyone else?

16   A.    No.

17   Q.    Are you familiar with a management committee for

18   Anthem Wrestling?

19   A.    I've heard the term.

20   Q.    Are you a member of the management committee for

21   Anthem Wrestling?

22   A.    I-- I made-- clarity.  I know that there's a

23   three-member committee of myself; Ed Nordholm; and Don

24   Callis that oversee the business for Anthem Wrestling,

25   but I don't know specifically what that's called.

1    Q.    How do you refer to that committee when you talk

2    with Ed?  What do you call it?

3    A.    The Golden Trio.

4    Q.    The Golden Trio.  Does Mr. Nordholm report to the

5    Golden Trio?

6    A.    Sorry, that was a bit of a joke, but that is a

7    term.  I-- we-- we just have calls and meetings together.

8    We don't officially refer by any title, and I report to

9    Ed Nordholm, and I can't comment on who Ed reports to

10   after that.  Ed's the president of Impact Wrestling.

11   Sorry, Anthem Wrestling.

12   Q.    Thank you.  Who, if anyone, reports to you at

13   Anthem Wrestling?

14   A.    I mean, I'm not exactly sure on the term, "reports

15   to", but Josh Lomberger, I would say probably reports, at

16   least through-- communicates the majority with me.  Greg

17   Bagarozy.  I mean, it's hard because we-- we basically

18   manage by committee with myself; Don; and Ed.  But I

19   would say anything that deals with production or live

20   events, mainly is something that I deal with.

21   Q.    When did you begin managing by committee or

22   participating in managing by committee?

23   A.    I'd have to look.  It'd be-- it'd be right around

24   the-- it would be right around the beginning of January

25   of 2018.

1    Q.     In September of 2017, were you part of the

2    managing my (sic) committee?

3    A.     Sorry, just repeat the date?

4    Q.     September 2017.

5    A.     In-- and I'm not exactly sure on the dates.  But

6    in August or September of 2017, Jeff Jarrett-- and if any

7    of the words are incorrect, I'm happy to discuss

8    correcting them-- but either stepped down, or was-- was

9    relieved, or whatever temporary, to seek treatment for

10   his drug and alcohol issues.  At that point in time, Ed

11   Nordholm had asked myself; John Gaburick, who was a-- an

12   employee of Anthem Wrestling, and Sonjay Dutt.  Pardon

13   me.  Legal name, Retish Bhalla.  Ed Nordholm asked if in

14   Jeff's absence, if the three of us would oversee the--

15   the creative process and the production.  In essence,

16   keep things moving while Jeff Jarrett was off dealing

17   with his issues.

18   Q.     How, if any, did your duties and responsibilities

19   change when Mr. Jarrett went on leave?

20   A.     Well previous to his leave, myself and Mr. Bhalla,

21   certainly-- we had both been brought in by Mr. Jarrett,

22   and I believe, although not absolute, that John Gaburick

23   also reported to Jeff.  So, the basic arrangement was

24   that the three of us would kind of oversee what had

25   previously been parts of Jeff's role, at least, on the

Case 3:18-cv-00749   Document 167-7   Filed 06/12/20   Page 28 of 105 PageID #: 2518

1    creative and production side of things until further

2    notice.

3    Q.    When you took over that portion of Mr. Jarrett's

4    responsibility, did your compensation change?

5    A.    I'd have to go back and look.  But the-- I believe

6    the terms of the compensation changed, but if you broke

7    it out, it was-- wasn't really a substantial change in

8    the-- the pay, the earning, etcetera.  Under Mr. Jarrett,

9    my compensation was set up in a loose configuration of a

10   quasi per diem, quasi billed hours-type of situation,

11   which I always thought was respectfully, not the greatest

12   way to set it up, and it led to a lot more billable hours

13   than I think anybody ever anticipated.  So in

14   Mr. Jarrett's leave, I basically agreed to a-- a set

15   figure 'til the end of the year.

16   Q.    Okay.  How often, if at all, do you travel to

17   Nashville for your work with Anthem Wrestling?

18   A.    I mean, it can vary.  I think probably-- I don't--

19   I don't know if I was in Nashville at all between-- after

20   our January events.  We held-- we have pay per view and a

21   television taping in Nashville in January, and then I

22   don't-- I don't know if I visited Nashville again, and if

23   I did, I don't recall, but I-- I'd have to go look at my

24   travel records.  But I don't know if I-- if I visited

25   Nashville again until the-- and I'd have to look up when

1    it happened, but in the fall of this year, Kevin

2    Sullivan, who was our-- his title was vice president of

3    production.  Although I don't think he was an officer

4    either.  He departed and took a good amount of the post-

5    production team that was in Nashville with him.  So when

6    that happened, I had to get a little more involved in

7    the-- in the production or more post-production aspect of

8    our-- of our broadcasts and our production model.  So--

9    and again, I'd have to, subject to me going and looking

10   at my-- my travel logs, I think it would-- probably in

11   the last three or four months, I would say that I've been

12   to Nashville, my estimate is three, three times in the

13   last three or four months, which is probably

14   substantially higher than I'd previously been post-2018.

15   Or sorry, by the end of-- in 2017, to clarify.  In 2017,

16   and the system under Mr. Jarrett, who was the chief

17   creative officer and oversaw most aspects-- most aspects

18   of the company, and to whom I reported directly to, we

19   had our creative meetings and other meetings in

20   Nashville.  But-- so my travel there was probably in '17.

21   It was probably at least once or twice a month.  In '18,

22   it was sporadic.  It was-- like I said, I don't know if I

23   made a trip at all in '19, after our events, and before

24   Kevin Sullivan's departure.  And since his departure,

25   which I think was in September-- as I said, I think I've

1   made three trips to Nashville.

2   Q.    When you made the last three trips to Nashville,

3   who paid for your hotel in Nashville?

4   A.    I did.

5   Q.    Were you reimbursed by the company-- or I mean, by

6   Anthem Wrestling?

7   A.    I'd have to look and see, because I'm notoriously

8   tardy.  I'm-- if I haven't been reimbursed, I would be

9   reimbursed by Anthem Wrestling for, I'll say two of the

10  trips, but certainly all of the trips but one.  The

11  normal course would be for-- as a consultant, I usually

12  book my own flights.  I book my own hotels.  I handle my

13  own expenses.  It's part of my invoicing, which, as I

14  said, I get tardy with-- I file my expenses.

15  Q.    So it's your understanding that whether they have

16  in the past, if you submit these-- it's your under-

17  standing that Anthem is going to reimburse you for the

18  cost of your travel and hotel when you come to Nashville,

19  if they haven't already?

20  A.    Yes, standard-- standard procedure for anybody I

21  provide services for is for my fees and expenses.  I

22  like--

23  Q.    (Interposing) How much of your working hours do

24  you spend working on Anthem Wrestling projects or

25  consulting?

 1    A.      I don't-- I don't keep a docket anymore 'cause I'm

 2    on a fixed rate.

 3    Q.      Would you say you spend most of your working hours

 4    now working for Anthem Wrestling?

 5    A.      I would say that I-- I spend substantial time

 6    working on-- on Anthem Wrestling projects, and-- and

 7    business.  To say-- and I'm-- I forget the term you used,

 8    but I run multiple projects; multiple clients, including

 9    my own.  And so I would not say that all my time-- or I

10    couldn't say the majority of the time, but I would say

11    that substantial time is spent on Anthem Wrestling

12    business, and probably by what the standards of what a

13    normal full-time commitment would be, I would say that

14    I-- I certainly probably put in those type of hours, but

15    I'm-- would not say that they make up the-- and I don't

16    remember the term, whether it was majority, or what it

17    was, but it's-- it's substantial time, but it's not all

18    or most of my time.

19    Q.      And so, you had said more or less than 50 percent

20    of your time, your working time?

21    A.      I don't break down my hours, so it would be a

22    total guess.  Varies from day-to-day and week-to-week.

23    And what needs to get done, I prioritize and get done,

24    and if that means it's a 10 hour day or a 12 hour day or

25    an 18 hour day or 20 hour day, frankly, then it-- it gets

1    done.

2    Q.    You previously mentioned Jeff Jarrett.  Who's Jeff

3    Jarrett?

4    A.    Well Jeff Jarrett, I believe is your client in the

5    matter.  Jeff is a well-known professional wrestler.  So

6    I think Wikipedia or Google would cover who Jeff is,

7    broadly.  Who Jeff is in relation to me, friend; some-

8    times boss.  I guess, technically, still a business

9    partner in Global Force Entertainment.

10   Q.    Thank you for sharing that.  The reason I'm asking

11   this, a jury or a judge is going to read this in the

12   future and I'm just trying to be clear in our testimony.

13   So I apologize if that seems like an obvious answer.  Did

14   Jeff Jarrett introduce you to Mr. Nordholm?

15   A.    Yeah, I had-- I don't know when I first met Jeff.

16   My guess would be, sometime probably through the 90's as

17   we realized our paths have crossed so much.  We never

18   actually know when we first met.  First met Jeff in early

19   2000's, working with a different organization.  He then

20   brought me to TNA, which was the predecessor to Impact

21   Wrestling or Anthem Wrestling, and I spent years there

22   working with him on that.  Left the industry, for the

23   most part, until Jeff's formation of Global Force

24   Wrestling or Global Force Inc.  Helped him on some stuff

25   there.  Provided some-- some equity for him to try to

```
 1   start up.  Project subsequently never really got off the

 2   ground, unfortunately.  Jeff took a position with-- and I

 3   apologize.  I don't know if it was Anthem Wrestling or if

 4   it was one of the predecessors, but it was a-- whatever

 5   corporate entity was overseeing the Impact Wrestling

 6   brand at the time.  I think that was in January of 2017,

 7   'cause I recall him calling me to tell me that he was

 8   going back to Impact, which was a shock to me, as he knew

 9   it would be.  And he had asked me if I would come down

10   and as he said, "Come in for a couple of days", and kind

11   of see what they were doing, and just kind of give him

12   my-- my thoughts and opinions, evaluation of how they

13   were doing things.  So I originally said, "no".  Jeff's

14   very persuasive.  He convinced me to come down, and as he

15   said, "Spend a couple days and have some laughs" with him

16   and Dutch, a long time associate of ours, and I did that.

17   And, you know, as persuasive people do, Jeff was able to

18   convince me to continue to come down on a somewhat

19   regular basis.  Somewhere, I don't know where-- oh, I

20   first met Ed Nordholm, I was flying back from Toyko,

21   Japan, 'cause previous to Jeff getting me involved in the

22   Impact or Anthem Wrestling business, I had been working

23   at a deal for Global Force for Jeff to partner with a

24   Japanese promotion, Pro-Wrestling Noah, and then Jeff

25   went to Impact or Anthem.  He asked me to kind of try to
```

1    put the deal together.  I, at that time, was wearing

2    almost more of a Pro-Wrestling Noah hat, 'cause I do

3    business with them, and Jeff was on the Impact or Anthem

4    side and was able to put a deal together, and when-- when

5    it came time to finalize it, the Japanese company, Noah,

6    wanted to have Jeff fly over to be part of a press

7    conference and a contract signing and everything else for

8    the announcement of the agreement between Pro-Wrestling

9    Noah and Impact, and Jeff said there was no way with

10   family and work commitments that he could-- he could make

11   it, so I-- he asked me if I would-- if I would go.  He

12   said that-- that he-- he said he would.  By, "he", I

13   presume he meant Impact or Anthem would pay-- would pay

14   my expenses to go to Japan as Impact Wrestling's

15   representative in Jeff's place.  So it was odd because I

16   had negotiated on behalf of Pro-Wrestling Noah with Jeff,

17   but after getting the sign-off from the Japanese, I

18   agreed.  I went over to Japan for the press conference

19   and-- and the signing.  The contract signing was

20   ceremonial.  The contract looked very legitimate but

21   added a clause in it saying everything in the contract

22   is-- is null and void and it forms no official partner-

23   ship.  But it was more for the pomp and circumstance of

24   the press conference and the-- the PR of it.  So, I

25   remember reaching out to Jeff because they wanted to know

1    what to list me as, which is when Jeff said to-- he goes,

2    "Well, list-- list yourself as vice president". And I

3    go-- I go, "Okay". And we kind of had a chuckle,

4    proceeded with the press conference that way. I flew

5    back from Japan and I remember landing in Minneapolis,

6    St. Paul, turning my phone on, and it starts-- starts

7    blowing up with "Congratulations" text messages, and

8    "Welcome back" text messages and everything else. And it

9    was because apparently it had gotten out that I had

10   signed this-- this contract as executive vice-- no,

11   sorry, pardon me. As vice president, excuse me, at the

12   time, of Impact Wrestling. So I was flying right to

13   Nashville, and when I flew in, me and Jeff were kind of

14   chuckling as we walked to his office. We got to his

15   office, and he-- Ed Nordholm was sitting in Jeff's

16   office. They used to share an office in the main part of

17   the facility that housed Impact or Anthem, and again, I

18   don't know when exactly it switched. I think it was

19   Anthem at this point. But he was sitting there, and Jeff

20   basically said, "Oh". He's like, "Hey, have you guys

21   met? Scotty "D", this is-- this is Ed Nordholm. And Ed

22   spun around with a big smile on his face. Goes, "Oh,

23   there's my new vice president". And me and Jeff just

24   belly laughed and Ed didn't know what was so funny,

25   because Ed was removed from the operations. Ed had seen

1    the-- the pictures on Twitter, and I guess it included my

2    joining the company as a vice president in his quarterly

3    talent and industry, you know, communication that he

4    does.

5    Q.    That's a good place to stop.  I'll stop you right

6    there, just because there's a lot to unpack with every-

7    thing you just said, and I didn't want to interrupt you,

8    but can I pause you there?  Would that be okay?

9    A.    Yes.

10   Q.    Thank you.  Alright.  So my question then, did

11   Jeff Jarrett introduce you to Ed Nordholm?  The answer is

12   yes, right?

13   A.    Yes.

14   Q.    Right.  And so you're saying that Mr. Nordholm--

15   your announcement as vice president was before you ever

16   met Mr. Nordholm, is that right?

17   A.    I believe so, yes.

18   Q.    Okay.  And so, is it your testimony today that

19   Mr. Jarrett helped you get a job with Anthem Wrestling,

20   or establish a relationship with Anthem Wrestling?

21   A.    He didn't get me a job.

22   Q.    Okay.

23   A.    He-- he asked for-- and I would borderline say

24   pleaded with me-- to come down and consult for him,

25   although I was paid by-- by Impact, but for him in trying

1    to restructure the Impact business.

2    Q.    Okay.  So I'd like to know a little bit about your

3    consulting background.  You said that you have consulted.

4    Were you a professional wrestler at one point?

5    A.    Yes.

6    Q.    What was your primary persona?  And I don't mean

7    by your attitude, I mean the character or name that you

8    went by.

9    A.    I tried to, through the majority of my career--

10   unless it was completely frowned upon or not wanted, I

11   tried to use my-- my legal name.

12   Q.    Alright.  Is it your understanding by using your

13   legal name that you gave up the right to use-- is it your

14   understanding that by using your legal name with one

15   wrestling purveyor, that you gave up your right to use

16   your legal name with some other purveyor of wrestling?

17   MR. PICKARD:      Objection.

18   MR. MILLER:      He can answer.

19   MR. PICKARD:      Well you're asking him to give his legal

20   opinion.

21   MR. MILLER:      I'm not asking for his legal opinion, and

22   thank you for that.  He can still answer.  Even if it's

23   ultimately not admissible, he can still answer.

24   EXAMINED BY MR. MILLER:

25   Q.    So I'd like the answer to the question, please.

1   A.    I have no idea.

2   Q.    Tell me all the companies that you have wrestled

3   under the Scott D'Amore name, or whom you have wrestled

4   under the Scott D'Amore name.

5   A.    Well I think I-- I would neither remember, and we

6   would use up the balance of our three hours going through

7   that.

8   Q.    How about a number?  Give me a number of

9   companies, an estimated number of companies, which you

10  wrestled under that name for.

11  A.    Don't know.  Dozens.  No way to pin it.

12  Q.    So, more than 10?

13  A.    I'd say, yes.

14  Q.    That's right.  More than 20?

15  A.    Probably.

16  Q.    Do you currently wrestle, professionally wrestle?

17  A.    Not usually.  Last many years I'm still-- still

18  say that-- I think I've had a handful of matches in the

19  last many years, so.  And none, I think, well over a

20  year.

21  Q.    Alright.  Are you familiar with the term,

22  "Kayfabe"?

23  A.    Kayfabe?

24  Q.    Yes.  Am I saying it wrong?

25  A.    Kayfabe.

1    Q.     Kayfabe.  Are you familiar with the term,

2    "Kayfabe"?

3    A.     I am.

4    Q.     What is Kayfabe?

5    A.     I mean, you ask 10 people in the industry and you

6    might get 10-- 10 different answers.  It's an industry

7    term for wrestling.  I believe came from its carnival

8    roots, and it's basically-- it's how we protect or at

9    least used to protect our secrets in the industry.

10   Q.     What do you mean protect your secrets?  What does

11   that mean?

12   A.     Well there was a-- there was a day in time where

13   wrestling existed and you-- or at least the industry that

14   I was brought into originally, there was no-- there was

15   no such thing as writers.  There was no talks about

16   scripting or formatting or-- or planned finishes.  You

17   presented professional wrestling as if it was a-- a

18   contest, and the prevailing theory was that our industry

19   works best when the fans-- you know, at least we can--

20   either they believe it's real, or we allow them to have

21   questions about-- you know, at least-- like, even if they

22   think it may not be completely on the up-and-up, you

23   know, you're protected to the point where there's always

24   little things where they go, "Whoa".  You know, I mean,

25   "Shit, maybe"-- pardon my language.  You know, "Maybe

1   that was real".  So, the prevailing belief for many years

2   was that for the good of the industry and everybody in

3   its well-being, you had to do everything you could to--

4   to try to-- and I don't know the proper term, but protect

5   the "legitimacy" of pro wrestling.

6   Q.    So it's essentially protecting or blurring the

7   lines between reality and performance.  Is that...

8   A.    Well somebody may say that.  That's not what I

9   said.  And it's a protective philosophy to where we--

10  where we don't share what or how we do what we do with

11  anybody outside of the industry, and you had to be

12  accepted inside of the industry in order to-- to be part

13  of it, and you were-- you were expected, keep and hold

14  those-- those secrets.

15  Q.    So it's a way-- a means of protecting the illusion

16  that professional wrestling might be real.  Is that how

17  you would describe it?

18  A.    Yeah, somewhat.  I mean, I think that's-- like I

19  said, it's a pretty hard term to describe because it

20  covers everything from, you know, me not showing you,

21  Mr. Miller how we-- we throw a punch that hopefully looks

22  good and doesn't harm you in any way, and that may go to

23  the extent equally of, you know, if I'm-- if I'm a good

24  guy and Mr. Pickard is a bad guy, or as we call them in

25  the industry, good guys are Baby Faces, and the bad guys

Case 3:18-cv-00749   Document 167-7   Filed 06/12/20   Page 41 of 105 PageID #: 2531

1    are Villains or Heels.  Me and Mr. Pickard may be the

2    best of friends, but if me and you, Mr. Miller, are Baby

3    Faces and Mr. Pickard is a Heel, then me and you are

4    going to travel together.  Me and you are going to eat

5    together, and we'll make sure that even if we're all the

6    best of friends, that nobody in public sees us talking or

7    socializing with Mr. Pickard or any of the other Heels.

8    Q.    Thank you for that explanation.  That helps.  I'd

9    like to talk a little bit about the Amp'd content.  Are

10   you familiar with the Amp'd content?

11   A.    You're referencing the GFW Amp'd tapings?

12   Q.    Correct.

13   A.    Yes.

14   Q.    What involvement, if any, did you have in events

15   that were taped and became the Amp'd content?

16   REPORTER:    Sorry, can you repeat that?  There was a

17   cough.

18   MR. MILLER:    Sure.

19   Q.    What, if any, involvement did you have in the

20   event that was taped to create the Amp'd content?

21   A.    Well by that point in time, I was-- whatever the

22   proper term is.  I apologize if it's shareholder or

23   participating member or whatever.  I had a-- an ownership

24   interest of some type in GFW.  Also had been working on--

25   working with Mr. Jarrett on deals, you know, to try to

1   establish relationships in the industry to be able to get

2   the-- our business off the ground.  One of the things

3   that we struggled with with Global Force, was that we--

4   there was nothing to touch.  There was nothing that was--

5   we couldn't prove to people that we could produce a

6   product because we had it.  You know, the wrestling

7   industry in this day and age is very television-based,

8   and although we had a good management team together with,

9   you know, Mr. Jarrett; Mr. Sullivan; myself; Mr. Bhalla;

10  we hadn't, as Global Force, produced anything and

11  Mr. Jarrett in-- I say respectfully, somewhat of a last

12  ditch effort, decided that we should try to produce

13  content to show people that we could produce and deliver,

14  'cause that was, according to Mr. Jarrett, one of the big

15  concerns, and it had been expressed by-- I forget who our

16  agent was at the time, working on the television deals,

17  'cause I did everything I could to assist Mr. Jarrett,

18  both as an investor, which I did in good part to try to

19  help him, and-- and also for-- like, I gave him my CV and

20  let him use it freely, and that's where I first became

21  a-- and I-- I don't understand the-- the U.S.

22  connotation, but in Canada I would say, "Well, I had a

23  vice president title with GFW or GFE".  I was not

24  actually an officer of the company, but I leant my-- my

25  credibility, as it was, to Jeff and to Global Force, and

Case 3:18-cv-00749   Document 167-7   Filed 06/12/20   Page 43 of 105 PageID #: 2533

1    I tried to work with him on, you know, putting the stuff

2    together, and then when the Amp'd events came along, Jeff

3    asked me to-- to go to Las Vegas to, you know, to be part

4    of producing the content.  So I, you know, reviewed the--

5    the formats and took part in the production meetings and

6    helped produce, and ran the-- the go-position, per se.

7    As we call it in the industry, the person who tells

8    everybody when to go out.  The person who gives cues on

9    what to do, you know, times, etcetera.  So I performed a

10   lot of the same duties that I had in the past when I--

11   when I worked in the industry in a-- in a backstage or

12   behind the scenes role.

13   Q.    So based on-- and you've got a lot there I'd like

14   to go through.  You said this was a last ditch effort to

15   put together the content.  As I understand your

16   testimony, it's that, for people in the industry to get

17   a t.v. deal, they really wanted a proof of concept, or

18   they wanted the actual concept.  Is that what you're

19   saying today?

20   A.    Yeah, what I'm saying, if last ditched-- sorry, it

21   was the echoing.  The phone was echoing there for a

22   second.  I-- I'm relaying what Mr. Jarrett relayed to me

23   at the time, which was that we had been pitching, you

24   know, the concept around in multiple places and had used

25   a-- a couple of pretty well thought of Hollywood people

1  to try to get the-- the show greenlit with a network for

2  broadcast, and we were not-- we were onto our second--

3  second, and I don't know what their-- their role was,

4  what the proper term is, but I'll say agent, for lack of

5  a better term at the time.  The second one was A. Smith

6  & Company, and very well respected industry people,

7  people in the-- in the television industry.  And we still

8  weren't able to get anybody to-- to pick it up.  So, the

9  idea, you know, as best I understand it, was to-- to go

10  there, produce this content to show that we could deliver

11  what we were saying we could deliver product-wise, both

12  as far as for being able to just deliver the content, and

13  also, deliver the content at a level that would be deemed

14  acceptable, appropriate, "good", for cable network home.

15  Q.    Alright.  So the purpose of this was to create

16  essentially a pilot of 16 episodes for a t.v. deal.  Is

17  that right?

18  A.    Yeah, I-- and I mean, again, I'm going-- a lot of

19  my dealings were directly with Mr. Jarrett.  He-- he

20  originally was hoping that we could-- you know, he

21  thought we might be able to take this "series".  I don't

22  recall how many episodes.  But take it and get it aired-

23  some-- but I thought-- was hoping we could make a deal

24  with that content.  And I mean, ultimately, we weren't

25  able to, but I-- the idea was, we could show that we-- we

1   could produce the content, deliver the content, you know,

2   and package together so that we could, in essence, you

3   know, meet our deliverables.

4   Q.    So, is it your testimony today that the Amp'd

5   content was significant and important to Global Force

6   Entertainment?

7   A.    I would say that the production of the Global

8   Force Amp'd content was us taking a shot at-- at going in

9   and trying to produce a "series" to show that we could.

10  The-- it not getting picked up, to me, was the near death

11  blow to Global Force.  I own one of the largest wrestling

12  content libraries outside of Vince McMahon in the entire

13  world, and I've acquired hundreds, or probably if I go

14  through it, thousands of hours of content, and content

15  has value in two ways.  If it's new, current, original

16  content, it has the value of being now.  And then if it

17  doesn't have that, then the value-- the only value that

18  it has of any real merit is the significant importance of

19  it in history.  Like my library contains the only film

20  footage of certain world title changes.  My-- my library

21  contains Shawn Michaels' third match.  You know, my

22  library contains full rights to the original Star Cage

23  Super event.  So, I would say that the production of the

24  Amp'd series was-- was important in the sense that it

25  was-- it was us taking our shot for the fences, 'cause I

1    think we had pretty much exhausted our opportunities or

2    options as far as for getting somebody to pick us up as a

3    series without producing it, and there was many at the

4    time who even questioned the idea of spending the

5    resources to produce it.  Mr. Jarrett talked to me in

6    advance.  I think one out of, not obligation, but out of

7    respect, as the person who was providing a good chunk, if

8    not the majority of his funding, but like I said, more

9    respect than obligation.  And then I think also to-- to

10   get my thoughts on it.  And my opinion at the time, and

11   is still today, that our options at that time were to

12   take a shot at it and see if we could get picked up, or

13   you know, we were potentially dead in the water.

14   Q.    How long did GFE shop the 16 hours of content to

15   television network?

16   A.    I'm not sure.  We're going back quite a few years.

17   It was a--

18   Q.    How long did--

19   A.    --pretty significant amount of time.

20   Q.    Would six months be a significant amount of time?

21   A.    I mean, it could be.  It could be.  I mean, if

22   you're talking from inception to-- to completion, six

23   months wouldn't be, but by the time we shot Amp'd, we had

24   already been shopping for, I think, it was well over a

25   year and-- and it may-- I think it might have been well

1    into two.  So we were far down the road.  We had already

2    gotten multiple rejections.

3    Q.    Alright.  Are you aware that the production-- the

4    completion of Kevin Sullivan's production of the Amp'd

5    content wasn't completed until nearly the fourth quarter

6    of 2016?

7    A.    My understanding is that the completion of the--

8    the work wasn't-- wasn't done until it was-- it was

9    prepared for-- for air through Anthem Wrestling.

10   Q.    Okay.  How was it prepared through airing-- let's

11   talk a little bit about that.  You said it was aired

12   through Anthem Wrestling.  How did that come to occur?

13   A.    Mr. Jarrett, who, at the time, was the chief

14   creative officer, and as Mr. Jarrett said to me, as one

15   of the pitches for why I should-- I should consider

16   coming and working with him on the Impact Wrestling

17   project, was that he had-- he was-- the term they used,

18   which I hadn't heard previously, was chief creative

19   officer.  But Jeff basically said that he had--

20   ultimately had the final decision on everything product-

21   wise as far as for what made air; how we did the

22   creative; who we hired.  And through that process, there

23   was deliverables that we had to-- to meet, content

24   requirements internationally.  These-- these contents

25   were baked into our international deals, as best as I

1    understood it then and still do today, as--

2    Q.     (Interposing) Let me just pause you there.

3    A.     Yeah.

4    Q.     When you say, "we", you're referring to Anthem

5    Wrestling?

6    A.     Yes, sir.

7    Q.     Okay.

8    A.     So I-- so Anthem Wrestling or Impact Wrestling or

9    TNA, or whatever the entity was at the time, had broad-

10   cast deals in other countries, and part of it was

11   domestically, we had our 52 week a year episodical

12   television show.  And back in the original days when I

13   worked with Jeff on TNA wrestling, which was the

14   predecessor to-- to Impact, we did monthly live pay per

15   views.  So our international agents had taken, you know,

16   our properties.  When they shopped them, they basically

17   said, "You get a weekly two hour episodical show, and

18   you-- you also-- we can sell you this premium content,

19   which is a three hour pay per view every month as well".

20   So at some point in time, and I don't know when, but

21   Impact Wrestling, I-- I think it-- the decision predated

22   Anthem by quite a while.  Made the decision to stop doing

23   monthly pay per views, 'cause domestically they were--

24   they were not doing good business, and that left them in

25   a position where they needed to still deliver a three

1    hour show to meet the-- the contractual requirements

2    internationally.  So what, to my knowledge they did,

3    predating when I went down to work with Jeff Jarrett on

4    Impact or Anthem Wrestling, they would do block tapings,

5    and they would basically, in a sound stage, they would as

6    quickly and cheaply produce the additional content in the

7    times when they were already at the studio to shoot the--

8    the main content for the weekly episodical.  And at that

9    time, at least when I came to work with Mr. Jarrett and--

10   and Impact/Anthem, we were using-- we were back to using

11   Universal Studios Orlando, and we would go down there and

12   we would shoot contents in blocks.  So we-- we would go

13   down.  We wouldn't shoot one episode, or two episodes,

14   we'd go, and over the course of multiple days-- like over

15   the course of four days, we might shoot six episodes.

16   Over the course of five days, we might shoot eight or

17   nine episodes, whatever we could get out content-wise.

18   Usually those-- those mainline content, the weekly

19   episodical shows, were filmed in the evening.  So at some

20   point in time, and this predates my rejoining, the

21   decision was made, while we have everybody here, we have

22   everything set up in the sound stage, we can go in in the

23   afternoon, and we can shoot these monthly shows that we

24   have to deliver.  At that point in time, they were-- they

25   were a series-- a monthly series titled, "One Night

1    Only".  And that way you-- they didn't have any story

2    line connection because we'd be shooting them so far in

3    advance and you didn't have to factor them into the-- the

4    story arcs or anything.  It was basically just a way to

5    meet the contract requirements of the international t.v.

6    contracts.  So the idea was, while you have everything

7    there; you have all the talent there; you've already flew

8    them there; you're already paying their fees; you already

9    have a crew; you have everything paid for.  The only

10   addition is bringing in some additional crew to actually

11   shoot a matinee, in addition to the evening show, and

12   the-- and some of the additional talent that was on a-- a

13   day rate.  So you might have some-- some mid to lower

14   card talent that you had to pay additionally, but all of

15   your key players were on guarantees.  So I think the

16   thought was that was the-- the cheapest way to-- to meet

17   the content requirements, and they had certainly done

18   that successfully for-- for a handful of years, I

19   believe, with TNA, and then Impact Wrestling.

20   Q.    So the Amp'd content was intended to replace the

21   need for that additional time of producing the pay per

22   view, correct?

23   A.     Yeah, but the idea first came to me about using

24   the Amp'd content from Jeff Jarrett.  It was a-- it was

25   a situation where the-- producing those One Night Only

Case 3:18-cv-00749   Document 167-7   Filed 06/12/20   Page 51 of 105 PageID #: 2541

1    events were a-- were a drain on us as a very small group

2    working on the creative and production of the-- of the

3    Impact or Anthem shows.  They were not well attended.

4    You know, the crowds could be sparse.  But the main thing

5    was, we just darkened the arena, like old boxing looks.

6    But the main thing was, we-- it would save us from having

7    to shoot those matinee events.  And Jeff Jarrett brought

8    the idea forward of taking those episodes and using them

9    to fulfil some of the requirements for the-- the One

10   Night Only series.

11   Q.    Okay.  So, Mr. Jarrett suggested that.  That was

12   after Mr. Jarrett had signed the letter of intent, right?

13   A.    I-- I don't know what letter of intent you're

14   referencing.

15   Q.    Alright.  Did Mr. Jarrett, to your knowledge,

16   provide authorization for-- well why don't we do this?

17   Mr. D'Amore, we've been going an hour and a half.  Do you

18   need a five minute restroom break or other break before

19   we proceed?

20   A.    I-- I mean I'm fine taking a break now or a break

21   in a half hour, whatever's most convenient.

22   Q.    Let's take a five minute break now.  No longer

23   than a five minute break, and then we'll continue for the

24   remaining one and a half hours of the deposition.

25   A.    Okay.

Case 3:18-cv-00749   Document 167-7   Filed 06/12/20   Page 52 of 105 PageID #: 2542

1    MR. PICKARD:     Okay, that's fine.

2    MR. MILLER:     Go off the record.

3    12:25--DEPOSITION ADJOURNED.

4    12:40--DEPOSITION RESUMED.

5    EXAMINED BY MR. MILLER:

6    Q.    Mr. D'Amore, this is Mr. Miller again.  We took a

7    short break there.  I hope to finish this up in the

8    remaining hour and a half without another break, so we're

9    going to move pretty swiftly.  I will remind you that you

10   are under oath and you're still under the obligation to

11   fully, completely, and honestly answer my questions.  Do

12   you understand that?

13   A.    Yes.

14   Q.    I'm now showing you on the screen, what has been

15   previously marked as Exhibit 60.  I thought we'd start

16   off by us starting at 60.  In this case, we number

17   exhibits consecutively.  All this means is that this

18   exhibit has previously been shown in another deposition.

19   I'll direct your attention to the e-mail at the Exhibit

20   60 from Amy Zach to you; Mr. Jarrett; Dirty Dutch; and

21   others.  Do you recognize that e-mail?

22   A.    I mean, I-- I don't remember the e-mail, but it

23   looks like it was sent to-- that's Amy's old e-mail.

24   It's not the e-mail I had for Jeff.  It has my old Global

25   Force Wrestling e-mail address, which I-- which I was

1    still using well into '17.  That's different-- Dutch.

2    Yeah, I don't-- I don't recall the e-mail, but I'm

3    looking at it right now.

4    Q.    Okay.  Were you working for Anthem Wrestling at

5    the time of this e-mail on March-- sorry, on May 8th,

6    2017?

7    A.    I was providing services in a non-contract

8    consultant basis to-- to Jeff.  So I guess Anthem, I

9    guess, through Jeff, since he was the chief creative

10   officer.

11   Q.    Alright?

12   A.    Yes.

13   Q.    So I'm now going to move onto another area.  One

14   thing I neglected, for the record, let me apologize to

15   Mr. Pickard and Mr. D'Amore.  It appears there was a

16   software glitch.  When we logged back in with Mr. D'Amore

17   as the witness, that solved the issue, and so Mr. D'Amore

18   is using the electronic version at this point in time.

19   I'm now going to show you what we'll mark as Exhibit 182,

20   which is an e-mail from Mr. D'Amore to Mr. Nordholm,

21   dated 9/4/2017.

22   <u>EXHIBIT NO. 182</u>:    An e-mail from Mr. D'Amore to

23   Mr. Nordholm, dated 9/4/2017.

24   Q.    Do you have that before you, Mr. D'Amore?

25   A.    Yes.  Yes, I do.

1    Q.    And do you recognize this e-mail?

2    A.    I mean, I don't particularly recall it, but I have

3    it in front of me.  I'm reading it right now.

4    Q.    Alright.  Do you have any reason to believe that

5    this is not a true and correct copy of an e-mail from you

6    to Mr. Nordholm dated 9/4/2017?

7    A.    I mean, I don't-- I don't recall it, but I-- it's

8    showing from my Impact Wrestling e-mail, which-- when is

9    this from?  Yeah, 'cause it was probably sometime in the

10   summer I switched because Jeff and, I believe more so

11   Karen Jarrett, Jeff's wife, wanted me working out of my

12   Impact account.

13   Q.    Alright.  At the bottom of that e-mail it mentions

14   the Triple Mania XXV appearance, where there was an issue

15   with Mr. Jarrett backstage.  Do you recall that event

16   occurring?

17   A.    Sorry, just let me read the e-mail.

18   Q.    It's at the very bottom.

19   A.    Got it.  Okay, I've read it.

20   Q.    Do you recall having discussions regarding Jeff's

21   role with Anthem Wrestling with Mr. Nordholm around the

22   time of this e-mail?

23   A.    I don't recall the specific dates, but I-- I do

24   recall post-Triple Mania having a discussion with Ed

25   Nordholm about Jeff taking a leave and-- and seeking help

1    with his issues.

2    Q.     What, if anything, was said during those

3    conversations with Mr. Nordholm?

4    A.     Question, and I apologize, and it's because I'm

5    not familiar with U.S. law.  This deposition and the

6    specific answers stay within the use of the parties and

7    isn't a public document?  Is-- is my question.

8    Q.     Well, okay, there's no limitations on its use.

9    The purpose of it is for this deposition, but there's no

10   limitations on its use.  So, that's the best I can answer

11   for you.  That's the law.  So my question is the same.

12   What, if anything, was said during those conversations

13   with Mr. Nordholm regarding Mr. Jarrett's role with

14   Anthem Wrestling post-Triple Mania XXV?

15   A.     In and around this time frame, and I-- I don't

16   have dates.  I had-- I was in Toronto, another business.

17   I requested to-- I actually asked Mr. Nordholm to come by

18   an event I was at.  He couldn't.  He had suggested that I

19   come by the next morning to-- to the-- I don't know if

20   it's the Fight Network office, or the Anthem office, or

21   whatever office, to an office in Toronto for a coffee,

22   and said we could chat there.  My intent was to let

23   Mr. Nordholm know that I had informed Mr. Jarrett in

24   Orlando at the last set of t.v. tapings, which was at

25   some point in August, that I did not plan on continuing

1    to-- to work with-- with Impact Wrestling or Anthem

2    Wrestling.  And then I had told Mr. Jarrett that I

3    would-- didn't want to cause trouble, but I wanted to, as

4    quickly as possible, wrap up my-- my engagement as a

5    consultant.  Mr. Nordholm brought up the issues of Triple

6    Mania, which were several.  Involved Mr. Jarrett being

7    extremely intoxicated, throwing tacos at the Mexican

8    nationals backstage in catering.  'Cause when I first

9    heard he was throwing tacos, I was like, "Yeah, that's

10   his stick.  When he goes out, he throws them at the

11   crowd.  It's-- it's old fashioned, you know, Heel

12   behaviour, but it's-- it's not uncommon down there".  And

13   I was told, "No", he was doing it in the back.  He--

14   Q.    Now, Mr.--

15   A.    --tried to start a fight.

16   Q.    Mr. D'Amore,--

17   A.    Oh, go ahead.

18   Q.    --was it tacos or just the shell of the tacos?

19   Were they full tacos?

20   A.    I'm going off of what I was-- heard.  I was not

21   in-- in Mexico, but from multiple people, I was told

22   tacos.  Now that could well mean the-- the shells.

23   Q.    Alright.  So I'm asking you today just about what

24   you have firsthand knowledge of.  So my question is for

25   you, what, if anything, was said during your

1    conversations with Mr. Nordholm pertaining to Jeff's role

2    with Anthem Wrestling after Triple Mania XXV?  That's my

3    question.  So I'd--

4    A.    Okay.

5    Q.    --like to know what in those conversations.

6    A.    I'm sorry, I-- I stepped over your-- the end of

7    your question.  I apologize.

8    Q.    I'd like to know what was in your conversations

9    with Mr. Nordholm regarding Mr. Jarrett's role after

10   Triple Mania XXV?  That's my question.

11   A.    Okay.  Mr. Nordholm had asked me if I was aware of

12   what had happened at Triple Mania.  I said I had-- I had

13   heard secondhand stuff.  He-- he kind of chatted with me

14   a little bit about that.  He informed me that they had

15   became aware, or it was clear, I don't recall the words,

16   that Mr. Jarrett had a substance issue.  Mr. Nordholm

17   then just asked me about some other instances-- or

18   incidents might be the better term-- that he had heard

19   about with Mr. Jarrett's behaviour.  So I answered his

20   questions.  They were in relation to whipping crew with

21   his belts; exposing himself; verbally abusive personally,

22   like in-person and via text messages; getting verbally

23   and physically abusive with an employee battling cancer.

24   Q.    Alright.  Do you have any firsthand knowledge of

25   any of this?

1    A.    I have firsthand knowledge of all of those.

2    Q.    Of those, okay.

3    A.    I was present when he exposed himself multiple

4    times.  I was present when he screamed at people.  I was

5    present when he and Mrs. Jarrett both screamed and cussed

6    at Bob Ryder and called him many names and pushed him and

7    many, many issues.  So I was-- the reason why I had-- I

8    had told Mr. Jarrett that I was going to discontinue is

9    because, while I have an abundance of respect,-- and I'll

10   use the term appreciation to try to avoid using the term

11   love-- I have a longstanding relation with Mr. Jarrett,

12   but he was in-- not-- he was impossible to work with at

13   this point where he was in his life.  So I answered

14   Mr. Nordholm's questions.  I answered to what I had

15   personal knowledge of.  I didn't exactly look to

16   volunteer information but he had heard rumblings.  He had

17   obviously looked at-- or heard things, and looked into

18   what was going on.  I answered him honestly, as my duty

19   is to-- as a consultant, is to the company, and not who I

20   report to, friend or not.  I gave him the information I

21   had.  Mr. Nordholm informed me that it was Impact or

22   Anthem's position or belief that they would like to send

23   Mr. Jarrett on leave, and he was concerned to hear that I

24   had-- I had given my notice and was finishing up, 'cause

25   he was concerned with how things would continue in Jeff's

Case 3:18-cv-00749   Document 167-7   Filed 06/12/20   Page 59 of 105 PageID #: 2549

1    absence while he seeked help.  Mr. Nordholm was also

2    concerned because many key people in the company; Sonjay

3    Dutt, or legal name, Retish Bhalla; Kevin Sullivan; my-

4    self; all came in as-- as hired, in their cases

5    employees, mine retained as a consultant.  And many of

6    the previous employees that were there predating Jeff are

7    people that Jeff originally brought in; Dutch Mantell;

8    Jeremy Borash.  And Ed's concern was how people would

9    react to Mr. Jarrett being put on leave, and his concern

10   was that everybody would abandon ship.  So I told

11   Mr. Nordholm that I don't think, in my opinion, that he

12   should have a concern about the majority of people

13   leaving.  I thought that it was two-fold.  One, I thought

14   that everybody who knew Jeff and whether they--

15   regardless of their relationship with him, would see that

16   he-- he needed help, and if they were people who were

17   fond of him, they would want him to receive help.  And

18   also I said, quite frankly, in my opinion to

19   Mr. Nordholm, that everybody else that's there-- the--

20   you know, the Abyss'; the Sonjays; the J.B.'s; the--

21   these people, this was a job to them, and they would--

22   regardless of any thoughts, they would-- they would stay

23   on the job.  I didn't think he was going to see everybody

24   abandon, one, out of a necessity for them to continue to

25   earn, and two, because as I said, if they were fond of

Case 3:18-cv-00749   Document 167-7   Filed 06/12/20   Page 60 of 105 PageID #: 2550

1    Mr. Jarrett, then anybody could clearly see that what

2    Mr. Nordholm was looking to do was-- was in the best

3    interest of the health and well-being of Mr. Jarrett.

4    Q.    So based on your conversation, why did it appear

5    that Mr. Nordholm was concerned with all of these

6    employees leaving if Mr. Jarrett was simply going on a

7    temporary leave of absence?

8    A.    Mr. Nordholm was concerned to-- if Mr. Jarrett

9    would accept going on leave and would seek help.  He-- he

10   probably, like a lot of us, probably-- I mean, I can say

11   I've had experience, unfortunately, with many friends and

12   family with substance addiction, and as anyone who's

13   dealt with it knows, if the individual who has the

14   problem isn't willing to confront it, it can-- it can go

15   quite badly.  And Mr. Nordholm's concern, and I think

16   it's a valid one is, as somebody who's headed up

17   companies and projects, was concerned, and he stated-- so

18   this part-- this portion I'm about to say isn't

19   speculation but is what Mr. Nordholm said to me.  His

20   concern was if Jeff refused help and he had to be forced

21   on leave and he was not amenable to it; if he was upset;

22   if he was going to go on the offensive; his concern was

23   that Jeff could get everybody there, or majority of the

24   people working there at Impact or Anthem Wrestling to

25   stop working; quit; to show their allegiance or support

1     of Mr. Jarrett.

2     Q.     Okay.  That's very helpful.  Thank you.  I'd like

3     to move onto a different exhibit.  I'm going to show you

4     what we have previously marked as Exhibit 50.  This

5     should be on your screen.  And it is an e-mail from you

6     to Mr. Nordholm; Mr. Dutt; and Mr. Gaburick.

7     MR. MILLER:     G-A-B-U-R-I-C-K.

8     Q.     Dated 9/17/2017.  Do you have that before you?

9     A.     I do.

10    Q.     Alright.  At the time Mr. Jarrett went on leave,

11    are you aware of any permission Mr. Jarrett or Global

12    Force Entertainment, Inc. gave Anthem Wrestling to air

13    the Amp'd content?

14    A.     Sorry, if I can have a-- do I need-- can I read

15    this e-mail?

16    Q.     Sure.

17    A.     Clearly there's a spell check mistake here.  A

18    correction.  I'm just trying to figure out what I was

19    saying.  Give me one minute.  Okay, thank you,

20    Mr. Miller.  I've read the e-mail.

21    Q.     Okay.  So, let me go back to my question.  My

22    question was, are you aware of any authorization that

23    Mr. Jarrett or Global Force Entertainment had given

24    Anthem Wrestling to air the Amp'd content as pay per

25    views?

1    A.    It's my understanding, as per my discussion with

2    Mr. Jarrett before it happened, Mr. Jarrett had came to

3    me to talk about the idea.  It was Mr. Jarrett's idea to

4    use the Amp'd content, rather than tape One Night Only

5    events in August, at our August tapings.  So Mr. Jarrett

6    came to me.  I think both, out of respect, as I said, for

7    the fact that I had an interest in Global Force

8    Entertainment and provided the majority of the funding.

9    Also, I think to get my thoughts on the idea, 'cause it

10   was something he had came up with.  And he talked to me

11   about it.  I, at that time, you know-- we chatted briefly

12   about it.  I thought it was a reasonable idea.  The Amp'd

13   content was-- was decent content production value-wise,

14   but as I've stated, you know, was-- was older footage,

15   which I didn't see a lot of use for, and if we could make

16   use for it and it saved us having to do One Night Only's,

17   I told Jeff that I-- Jeff-- sorry, Mr. Jarrett, that I

18   thought his idea was a good one.  I then know that Jeff

19   came into the creative meeting, which would have all

20   creative team members present, which I can state if you

21   need them, that we would not be shooting One Night Only

22   content at the August taping, and that we would be

23   airing-- the Amp'd footage would be repackaged for a

24   number of months to cover off the One Night Only

25   requirements.

Case 3:18-cv-00749   Document 167-7   Filed 06/12/20   Page 63 of 105 PageID #: 2553

1    Q.    So I'm going to direct your attention back to

2    Exhibit 50.  So, Exhibit 50 is a true and correct copy of

3    an e-mail from you to Ed Nordholm and Sonjay Dutt and

4    John Gaburick, dated 9/17/2017, correct?

5    A.    It's a document that I'm looking at.

6    Q.    Do you have any reason to believe this is not a

7    true and correct copy of that e-mail?

8    A.    I would have to go into my e-mails and-- and

9    compare it word for word.  Having read it, I would say

10   that I'm-- I'm comfortable to say that if it's not an

11   original, I think it-- it, you know, for the most part.

12   And if you want to go through it, it echos my thoughts on

13   the situation.

14   Q.    Great, thank you.  My question is, if you look at

15   the second paragraph at the top of the first page of

16   Exhibit 50, in your e-mail you write, "Do we have

17   possession of the Amp'd shows?  If so, then let J.J. sue

18   if he has the balls".  In that sentence, J.J. is Jeff

19   Jarrett, right?

20   A.    Correct.

21   Q.    And you said, "Do we have possession of Amp'd

22   shows?  If so, then let J.J. sue if he has the balls".

23   What did you mean by, "Let J.J. sue if he has the balls"?

24   A.    Jeff had made the decision for us not to capture

25   content.  Us, Anthem Wrestling/Impact Wresting.  To

 1   capture content at the August tapings, which had clearly

 2   obviously passed by this point, and we didn't have

 3   content.  I was personally aware of the fact that Jeff's

 4   intent and decision was to use the Amp'd content in its

 5   place.  So, with his being on leave and any concerns as

 6   far as for-- and I don't have the e-mail that

 7   Mr. Nordholm must have, at some point, sent me or

 8   conversation we had.  So this is my opinion, that Jeff

 9   had total-- sorry, Mr. Jarrett had total control over the

10   creative production and content for Impact or Anthem

11   Wrestling, made a decision, his decision, with the

12   authority, as I understood to do so, to use the Amp'd

13   content instead of capturing content as we would have at

14   Universal, and if he wanted to backtrack on that, it left

15   us-- us, Anthem Wrestling/ Impact Wrestling, in a very

16   bad position where we could potentially breach our

17   contractural obligations to our broadcast partners over-

18   seas, which could result in, to me, in my opinion, and

19   I'm not a lawyer, but my business opinion, that that

20   could cause irreputable harm because it could cancel

21   contracts that were ultimately worth tens of millions of

22   dollars when you add them up over the life of the

23   contracts, and that the most logical thing for me to do--

24   and again, solely in my opinion on it-- was to, if we had

25   the Amp'd shows, to follow through with the direction

1    that Jeff had set as chief creative officer, and to air

2    the Amp'd shows.  And that if Mr. Jarrett had a problem

3    with that, then he could-- he could pursue whatever he

4    felt he, or Global Force was owed through legal means.

5    It certainly was a less-- was the lesser of two evils

6    between if it's-- if it's that versus the-- the idea of

7    Impact or Anthem Wrestling breaching tens of millions of

8    dollars in international obligations.  And frankly, at a

9    point in time where I'd watched Mr. Jarrett deteriorate

10   in his actions over the last few months.  As I told his

11   wife, I hoped and prayed that he would get better and we

12   would stay friends, but I also was not very happy that he

13   dragged me into a situation where I was now dealing with

14   the clean-up of the-- of the mess that he had caused.

15   Q.    Alright.  Are you aware there's the financial

16   terms that Mr. Jarrett allowed-- let me try to rephrase

17   this.  Did Mr. Jarrett and Global Force Entertainment

18   allow Anthem Wrestling to use the Amp'd content for free?

19   A.    At the time, when he was making the decision and

20   he spoke with me about it, Jeff had said that this was an

21   opportunity for us to maybe regain a little something

22   back on the use of the tapes, and it also was going to

23   give Global Force Entertainment potentially a-- well we

24   were-- he was rebranding.  Mr. Jarrett had made the

25   decision to rebrand Impact Wrestling/Global Force, and

1    we had already started that process on-screen.  And as

2    part of the overall deal he was working on, he thought it

3    gave us the chance to potentially look at doing something

4    long term and to preserve the Global Force name and

5    hopefully have some-- some value for us down the road,

6    although the initial recoup was going to be not a lot off

7    of the airing of the tapes.  Because when we chatted,

8    Mr. Jarrett and myself discussed the cost of the

9    production of the One Night Only events, and it was not

10   substantial.  So what I mean, is for us to go in and to

11   produce those One Night Only events, as had been the

12   previous protocol before Jeff made this decision to use

13   Amp'd instead, there wasn't a lot of money in saying, we

14   provided you these Amp'd shows and saved you a ton of

15   money.  What Jeff said, we could reasonably expect, is

16   what the cost of producing the One Night Only's would

17   have been, we can recoup on the Amp'd shows, and we can

18   continue towards a larger relationship, hopefully, that

19   would allow us to-- to recoup over time.

20   Q.    Okay.  Well let's stop there for a second and

21   break this down.  So, in your e-mail you said, "Do we

22   have possession of the Amp'd shows?  If so, then let J.J.

23   sue us if he has the balls".  If Mr. Jarrett had

24   authorized the use of the Amp'd shows, why were you

25   concerned about him having the balls to sue?  Why did you

1    think he was going to sue?

2    A.    At that time, I was not in communication with

3    Mr. Jarrett, but I-- I did have firsthand knowledge that

4    Mr. Jarrett had leaked out to internet reporters, that

5    the intended Impact Wrestling/Global Force Wrestling

6    merger was not complete, and was in jeopardy with his

7    being on leave.  I'm going back a ways here, but I know

8    that Mr. Nordholm had expressed some concerns about Jeff

9    potentially suing over the use, or being upset over the

10   use of the Amp'd content.  Do not have firsthand

11   knowledge on how the shows were delivered.  Wasn't part

12   of my scope of work at the time, so it's a simple-- as I

13   flush out my thoughts here and give my opinion.  If we

14   have the tapes, then we should go ahead and air them.

15   You'll also see--

16   Q.    So--

17   A.    --I continue on to provide Mr. Nordholm some

18   alternatives, which I don't think are ideal if he chooses

19   not to do this, 'cause it wasn't my job to make the

20   decision, my job to provide opinion, which I-- which I

21   do, giving both my thoughts on what the preferred avenue,

22   or most logical best avenue is to pursue, and then

23   provide alternatives for the clients to make the

24   decision.

25   Q.    At the time you sent this e-mail, Exhibit 50,

1  Mr. Nordholm had told you the merger wasn't going to

2  happen, right?

3  A.    It's a long time ago and I don't remember the

4  particulars, but somewhere in and around the fall of

5  '17-- and I don't know if Mr. Nordholm said it wasn't

6  happening.  I know that I became aware that it's-- it was

7  certainly a possibility that it would not happen.

8  Q.    Alright.  Mr. Jarrett was terminated on October

9  23rd, 2017, correct?

10  A.    I-- I don't know what day he was terminated, but

11  the-- the time frame seems in the-- in the area of

12  accurate.

13  Q.    Right.  And your recommendation, knowing that the

14  merger was likely not going to close, was to go ahead and

15  air the last two Amp'd One Night Only pay per views

16  regardless, correct?

17  MR. LEE:     Objection to form.

18  Q.    You can answer.

19  A.    Sorry, repeat the question again.  My apologies.

20  Q.    So you knew-- let's take this back.  Your

21  recommendation, knowing that the merger was not likely to

22  go through, was to go ahead and air the One Night Only

23  Amp'd content part three and part four, correct?

24  A.    My recommendation to Mr. Nordholm was-- and I

25  believe there was discussions going around this time.  I

Case 3:18-cv-00749   Document 167-7   Filed 06/12/20   Page 69 of 105 PageID #: 2559

1    believe that I had told Mr. Nordholm-- I don't recall if

2    it was in writing or over the phone.  But I remember

3    saying or writing, that if the door said D'Amore Group

4    and not Impact Wrestling, that I would be airing the

5    tapes, because respectfully, somebody, Mr. Jarrett, who

6    Mr. Nordholm had turned over pretty much complete control

7    of the creative and production obligations of a multi-

8    million company, had in his sole discretion, made a

9    decision to cancel affordable production alternatives to

10   gain the-- to capture the content needed and choose to

11   use the Amp'd content that he owned, or that Global Force

12   Entertainment owned in its place, and that I would feel

13   comfortable in front of a judge, if this again, was a

14   D'Amore Group or D'Amore matter, going there and saying

15   that this individual made all of these decisions in his

16   sole discretion and right to do this, and that at this

17   point in time, through his own doing, we're now in a

18   position where we are-- his own, Mr. Jarrett's doing,

19   where we're scrambling to stay alive, and the last thing

20   that we need is to breach our obligations, and my--

21   Q.    (Interposing) You left part of that-- you left

22   something off from there, right?  Mr. Jarrett gave that

23   permission to use it.  In exchange, he would be receiving

24   ownership of the company, or some other type of

25   compensation for letting Anthem Wrestling use that Amp'd

Case 3:18-cv-00749   Document 167-7   Filed 06/12/20   Page 70 of 105 PageID #: 2560

1    content, correct?  You've left that off your answer,

2    right?

3    A.    Well I would say that I wasn't part of the direct

4    negotiations between Mr. Jarrett and Mr. Nordholm, but

5    that Mr. Jarrett had said we would use the Amp'd content,

6    and that it could role into a larger scope of work or

7    agreement between the parties.  And as I said, we had

8    already started using the Global Force branding on air on

9    the broadcasts.

10   Q.    Right.  So you don't have any firsthand knowledge

11   of the terms by which Mr. Jarrett or Global Force

12   Entertainment permitted Anthem Wrestling to use the Amp'd

13   content, do you?

14   A.    My opinion was based--

15   Q.    (Interposing) Not your opinion.  That wasn't my

16   opinion (sic).  I asked, do you have any firsthand

17   knowledge of the terms by which Mr. Jarrett or Global

18   Force Entertainment permitted Anthem Wrestling to use the

19   Amp'd content?

20   A.    My discussions with Mr. Jarrett, were that we were

21   going to provide the Amp'd content, and we were going to

22   look for a larger scoping deal.  And my belief still is,

23   that you can't cancel the events that are meant to

24   capture the footage and then back out and say, "Well,

25   screw you", in essence.

1    Q.    I'm going to object as non-responsive.  So I'm

2    going to ask you the question again.  You don't have any

3    firsthand knowledge of the terms by which Mr. Jarrett or

4    Global Force Entertainment permitted Anthem Wrestling to

5    use the Amp'd content, correct?

6    A.    My firsthand knowledge comes through my

7    discussions with Mr. Jarrett.

8    Q.    Alright.  So you don't have any knowledge of the

9    term sheet.  You don't know what the terms were on the

10   term sheet, correct?

11   A.    I believe that Mr. Jarrett may have shown me the

12   term sheet, but I didn't really read through it.  He kind

13   of discussed it with me and made his decision.

14   Q.    They don't know the terms-- you don't know the

15   terms that were on the term sheet, correct?

16   A.    I do not know the specific terms of the term

17   sheets other than the knowledge given to me from

18   Mr. Jarrett.

19   Q.    Alright.  So you advised Mr. Nordholm to press

20   ahead and use the Amp'd content, even though you didn't

21   know what the terms of permission to use that content

22   were.  Is that correct?

23   A.    I gave my opinion based off the fact that a senior

24   officer in the company made the decision to cancel the

25   events that would have provided the footage in a cost-

1   effective manner and replaced them with this arrangement.

2   Q.      Alright.  And so you expected Mr. Jarrett and

3   Global Force Entertainment to simply let Anthem Wrestling

4   use the content for free.  Is that your testimony today?

5   A.      I think if you read my e-mail, you'll say that I'm

6   certainly acknowledging that Mr. Jarrett and Global Force

7   Entertainment, to which you know I'm still an interested

8   party in, have their rights to come forward and push

9   forward their claim.  When you're looking at a situation

10  where all the factors come together, including

11  Mr. Jarrett's false statement that the shows were air-

12  ready, and it actually cost us more in post-production to

13  get the shows ready, including having to re-voice them

14  all.  I'm quite-- I was quite comfortable in stating my

15  opinion to air the footage, and then to go through and

16  let the situation play out, and be as it be.

17  Q.      So you were betting on the fact in your experience

18  of Mr. Jarrett that he wouldn't have the balls to sue.

19  He'd just let it happen.  Is that correct?

20  A.      No, I would-- I would actually never say that

21  Mr. Jarrett necessarily doesn't have the balls to sue.

22  He certainly is-- he's a pretty proud man.  I was-- I was

23  looking at it from an approach from business level of

24  saying, with all of the ways that Mr. Jarrett had

25  breached his engagement with Anthem, and all of the

Case 3:18-cv-00749   Document 167-7   Filed 06/12/20   Page 73 of 105 PageID #: 2563

1    issues that arose out of it, including the fact that

2    Anthem had to pay more for the Amp'd shows than it would

3    have to just capture the content at Universal, that if

4    Mr. Jarrett decides to sue, then he can bring it, as he

5    obviously has, and it can play out as it plays, but my

6    opinion and strictly my opinion as engaged as a

7    consultant, was that I found the claim to be weak, and as

8    I said, if the door said D'Amore, we would air the

9    content.

10   Q.    Right.  You're not a lawyer in Canada, are you?

11   A.    I'm not a lawyer.  I'm a businessman.

12   Q.    Right.  You're not a lawyer in the U.S.?

13   A.    I'm not a lawyer in Canada, the U.S., or any other

14   jurisdiction.

15   Q.    Do you have a law degree of any kind?

16   A.    I do not have a law degree.

17   Q.    At the time you sent this e-mail on 9/17/2017,

18   Mr. Nordholm had already told you that Mr. Jarrett was

19   not going to come back from leave with the same level of

20   responsibility that he had when he was placed on leave,

21   correct?

22   MR. LEE:    Objection to form.

23   MR. MILLER:    He can answer.

24   A.    And again, I don't know all the particular dates

25   in the exact order, but I would say at some point in the

1    fall there, and I-- in and around September, certainly,

2    Mr. Nordholm stated that there was a good probability

3    that Mr. Jarrett would not return in the same capacity,

4    and stated that partly that was for the stress level on--

5    on Mr. Jarrett.

6    Q.    The truth here is, that Mr. Nordholm told you that

7    Mr. Jarrett was not going to come back as chief creative

8    officer.  He told you that in 2017, correct?

9    A.    And again, the dates are all mixed together, but I

10   do-- the problem is, I don't know what I knew on

11   September 17th, and I know that I was told at some point

12   in the fall, that he would most likely not return in the

13   same capacity, and then subsequently, I was told that he

14   would potentially be returning in a-- more of an advisory

15   capacity, but I don't know when that was.

16   Q.    So you don't know whether that was in September of

17   2017?

18   A.    I don't exactly know, sir.

19   Q.    I'm now going to show what we'll mark as Exhibit

20   183, which is an e-mail from Mr. Nordholm to you, dated

21   9/10/2017.

22   EXHIBIT NO. 183:    An e-mail from Mr. Nordholm to

23   Mr. D'Amore, dated 9/10/2017.

24   Q.    Do you have that before you?

25   A.    Yes, I do.

1    Q.    Alright.  This is a true and correct copy of an

2    e-mail from Mr. Nordholm to you dated 9/10/2017, correct?

3    A.    This is a produced e-mail from-- it appears to be

4    from Mr. Nordholm to me.

5    Q.    Do you have any reason to believe this is not a

6    true and correct copy?

7    A.    As I say, it's-- it looks like an e-mail from

8    Mr. Nordholm to me.

9    Q.    This was sent on September 10th, 2017, correct?

10   A.    That's the date listed on the e-mail, yes.

11   Q.    Alright.  And in this e-mail, there appears to be

12   a spreadsheet.  There's also an attachment to this

13   spreadsheet that we'll show you next.  But in the spread-

14   sheet that is-- or the chart that is shown on the first

15   page of Exhibit 183, has, "PPV", and then, "YONO".  The

16   ONO is the One Night Only, correct?

17   A.    Correct.

18   Q.    And 135, do you know whether that that's the

19   amount of money that all of the One Night Only's were

20   expected to generate domestically?

21   A.    I don't know.  This was a sheet prepared by

22   Mr. Nordholm--

23   Q.    (Interposing) So I'm just-- sorry.  I'm going to

24   show you the attachment that we'll mark as Exhibit 184,

25   which is a spreadsheet.

1    EXHIBIT NO. 184:    A spreadsheet attached to the

2    exhibit.

3    Q.    I'm showing that to you now.  At the bottom of

4    this, you'll see a tab that says, "Salaries and wages".

5    I'm going to show that to you.

6    A.    Okay.

7    Q.    Do you have the salaries and wages tab before you?

8    A.    I do.

9    Q.    And if you look at row 26, it says, "Jeff Jarrett

10   leave, 33 percent, September 2017".  Do you see that?

11   A.    Leave at 33 percent.  Yes.

12   Q.    Alright.  And if you look at row "B".  Not row

13   "B", column "B", it says, "250,000".  So that was

14   Mr. Jarrett's salary, which was going to be reduced to

15   33 percent of that in September 2017.  Is that correct?

16   A.    I believe that's what they were looking at paying

17   him while he was on leave.  Is that the--

18   Q.    (Interposing) So as of the date of this e-mail

19   September 10th, 2017, at line 28, row-- or column "B", it

20   looks like you were being paid $84,000 a year in 2017.

21   Is that correct?

22   A.    That's what Mr. Nordholm estimated for-- for me to

23   stay on, isn't it?

24   Q.    And if you go to the left, where it says, "Column

25   "A", row 28", it says, "D'Amore, Scott, see dollar 250K

1    starting January 1st 2018". Does that mean that you were

2    being paid $250,000 starting January 1st, 2018?

3    A.    That, I believe, is something that Mr. Nordholm

4    had proposed to me.

5    Q.    Is that ultimately how much you were paid under a

6    consulting agreement, or under contract with Anthem

7    Wrestling for 2018?

8    A.    No, I was paid less, I believe. That's a Canadian

9    dollar figure, I believe? C250 "K", and I would assume

10   that would mean, Canadian 250. But ultimately what I

11   received was-- was considerably less.

12   Q.    By considerably less, what do you mean?

13   A.    I'd have to look at it. I think that-- I'd have

14   to look. I think it was subbed 200 Canadian Dollars--

15   Q.    (Interposing) So, my question for you is, why was

16   your salary increasing on January 1, 2018, if Mr. Jarrett

17   was going to come back?

18   A.    Well, I mean, I'm assuming if this is-- and this

19   is again, totally a chart prepared by Mr. Nordholm. So

20   to look at this one again, it's not my chart. I can't

21   even do a spreadsheet, but this-- what is-- is this?

22   What is this for? So this shows Mr. Jarrett through 2018

23   at 25,000. Is that a quarter? So it looks like a

24   reduced salary. I don't know if that's still his salary

25   while on-leave or what. And then, where am I? Bear with

1    me.  Where was I?  Oh, wait, sorry.  I'm on the wrong

2    line.  Oh, wait.  Does that show Jeff at 22?  Sorry.  My

3    apologies.  I'm not good with spreadsheets.  Okay.  So it

4    shows Mr. Jarrett at 22,479 per quarter.  Part of my

5    discussions with Mr. Nordholm at the time was that--

6    there's an echo.  Oh, it's gone.  Was, I had-- I had said

7    initially, when they met with me, that I would-- I would

8    commit to at least seeing through a transition team,

9    although I wasn't sure that I wanted to commit long term

10   to-- to providing services in that type of capacity to

11   Anthem.

12   Q.    Alright.  So I'm going to show you what we'll mark

13   as Exhibit 185, which is an e-mail from you to

14   Mr. Nordholm, dated September 11th, 2017, that responds

15   to this prior e-mail that I've shown you.

16   EXHIBIT NO. 185:     An e-mail from Mr. D'Amore to

17   Mr. Nordholm, dated September 11th, 2017, that responds

18   to the prior e-mail that was shown to Mr. D'Amore.

19   A.     Alright.

20   Q.    This is a true and correct copy of an e-mail to

21   you from Mr. Nordholm dated 9/11/2017, correct?

22   A.    This looks to be an e-mail from 9/11 of '17, from

23   me to Mr. Nordholm.

24   Q.    Alright.  In it you explained some questions, or

25   asked some--

1    A.      Sorry, I can--

2    Q.      --questions about--

3    A.      (Interposing) My apologies, Mr. Miller.  Can I

4    read this?

5    Q.    Sure.  Alright.

6    A.      Sorry, I just need one more--

7    Q.    So--

8    A.      (Interposing) Sorry, I just-- I just need one more

9    second.

10   Q.    Okay.

11   A.      Okay, I'm finished.

12   Q.    Alright.  In the middle of the first page, go down

13   to the second full paragraph.  You say, "Do we really

14   plan on paying J.J. all the way through 2018"?  J.J. is

15   Jeff Jarrett in that sense, right?

16   A.    Correct.

17   Q.    Why did you ask, "Do we really plan on paying J.J.

18   all the way through 2018"?

19   A.    Because I was engaged to look at how to make the

20   Impact Wrestling/Anthem Wrestling project be able to

21   self-sustain and live within its own revenue envelope.

22   And as I said, I knew that Mr. Jarrett, at some point in

23   time, was changing capacities, whether I knew that on

24   September 11th or not, but I make a lot of observations

25   here.  This is me as a consultant, asking for

1    clarification and understandings on various roles,

2    including Mr. Jarrett's.

3    Q.    So you had an understanding that Mr. Jarrett-- at

4    least as of September 11, 2017, you had an understanding

5    that Mr. Jarrett likely wasn't coming back, correct?

6    MR. LEE:     Objection to form.

7    A.    Well, it looks like-- that I have thought or had

8    been informed at some point that he's certainly being

9    reduced, and I'm asking questions.  I ask about his

10   compensation.  I ask about Abyss'; Gail's; different

11   agents.  I was tasked with taking a company that was

12   losing millions of dollars, and trying to find if there

13   was going to be a way for Anthem Wrestling to sustain

14   itself on the revenue that it had or anticipated having.

15   So I questioned all of these people, including

16   Mr. Jarrett.

17   Q.    Alright.  But your salary was going to increase in

18   2018, while at the same time, you were asking whether

19   they should continue to pay Mr. Jarrett in 2018, correct?

20   A.    My salary, which as I said, doesn't end up

21   reflecting what's in the spreadsheet, I don't believe.

22   It was certainly increasing because my time of work

23   commitments for Anthem Wrestling were-- were being

24   expanded.

25   Q.    And they were being expanded because you were

1   taking roles previously held by Mr. Jarrett, correct?

2   A.    I believe I was taking over duties that were--

3   were-- some were Mr. Jarrett's and some were other's.

4   And at this point in time too, I'm-- I'm not retained, I

5   don't believe, in September.  That's probably the

6   difference in the comp, and at this point, I'm-- I'm

7   committed to a transition.  Trying to help them do a--

8   seeing a transition through and trying to look for a way

9   for them to be viable long term.

10  Q.    Alright.  I'm now going to show you what we'll

11  mark as Exhibit 186.  This is a true and correct copy of

12  an e-mail-- let's try again.  Exhibit 186 is a true and

13  correct copy of an e-mail from you to Ed Nordholm, dated

14  September 11th, 2017, at 12:45 p.m., correct?

15  A.    It appears to be an e-mail from me to Mr. Nordholm

16  on September 11th, 2017.

17  EXHIBIT NO. 186:    An e-mail from Mr. D'Amore to Ed

18  Nordholm, dated September 11th, 2017, at 12:45 p.m.

19  Q.    Do you have any reason to believe this is not a

20  true and correct copy of that e-mail?

21  A.    Or is that-- sorry.  Is that-- is-- are these

22  dates month, date, year, or are they date, month, year?

23  Q.    It is our understanding that these are month,

24  date, year.  They are U.S.-set.

25  A.    Okay.

1    Q.    So they're in U.S. format.

2    A.    Oh, yeah.  Yeah.  It says, "September 11th", okay.

3    Q.    Do you have any reason to believe this is not a

4    true and correct copy of that e-mail?

5    A.    It is an e-mail that's produced and appears to be

6    from me to Mr. Nordholm.

7    Q.    On the third page...

8    A.    Sorry, I'm just reading through here.

9    Q.    Okay.  We'll give you a moment.  Alright.

10   A.    Sorry, I need another minute.

11   Q.    Alright.

12   A.    Okay.

13   Q.    Alright.  Turn to the second page.  There's an

14   e-mail from-- and I'll show this to you.

15   REPORTER:    Sorry, counsel.  Where was that?

16   MR. MILLER:    The second page.

17   Q.    The second page.  Page two of Exhibit 186, there's

18   an e-mail dated September 11th, 2017, from Mr. Nordholm.

19   At the bottom of that, he says, "Specifics in red below".

20   And if you go to the third page, which I will show you.

21   A.    Sorry, can I read the second page first?

22   Q.    Go ahead.

23   A.    How do I pull-- how do I pull up the second page?

24   Oh, thank you.

25   MR. PICKARD:    Here.

1    A.    Okay, we can move to page three, Mr. Miller.

2    Q.    If you go to the second paragraph, there's a

3    question from you that asks, "Do we really plan on paying

4    J.J. all the way through 2018"?  That's the question you

5    had asked in the previous exhibit.  Mr. Nordholm's

6    response is, "I'd rather assume so for the purpose of

7    illustration.  I don't know where we end up with him, but

8    we'd prefer a less disruptive path if it is available and

9    affordable.  I doubt we pay him that, but one way-- need

10   a provision in the plan to deal with his extraction".  Do

11   you know what Mr. Nordholm meant by a plan to deal with

12   Mr. Jarrett's extraction?

13   MR. LEE:    Objection to form, if that's the correct

14   objection.  If you're asking him what Mr. Nordholm meant,

15   you should ask Mr. Nordholm.

16   MR. MILLER:    I asked if he knows what Mr. Nordholm

17   meant.

18   A.    I didn't-- I do not.

19   Q.    Do you have any idea as to why Mr. Nordholm would

20   have referred to Mr. Jarrett's extraction?

21   A.    It would be speculative for me to speak on what

22   Mr. Nordholm thinks.  I read his-- his spreadsheet.  I'd

23   give my thoughts, and he answers them.

24   Q.    So, is it true that Mr. Nordholm had decided to

25   remove Mr. Jarrett from the Anthem Wrestling business in

1    September of 2017?

2    A.    I don't know.

3    MR. LEE:    Objection to form.

4    Q.    Alright.  I'm now going to show you what we'll

5    mark as-- you mentioned previously that you owned a

6    significant library of wrestling content, correct?

7    A.    Correct.

8    Q.    What is the going rate for one hour of wrestling

9    content on, say Fox right now, the Fox network?

10   A.    You can find that out from Fox.  I-- I know what I

11   pay for wrestling content.  They're apples and oranges.

12   Q.    What do you pay for wrestling content?

13   A.    Between 250 and 500 an hour.

14   Q.    Is that fairly typical for an hour of content?

15   A.    I mean, I think it varies greatly.  WWE was

16   paying-- we're talking archival content, to be clear?

17   Q.    Yes.

18   A.    If we're talking about archival content, yeah, I

19   think WWE at one point was paying 500 to 1,000, when--

20   when buying archival content.

21   Q.    Okay.

22   A.    And I know this because I bought a library for 500

23   U.S. that-- 'cause the gentleman selling it didn't want

24   it to go to WWE, so he showed me the-- their offer and

25   asked me to match it.

Case 3:18-cv-00749   Document 167-7   Filed 06/12/20   Page 85 of 105 PageID #: 2575

1    Q.     That was 500 total?

2    A.     Five hundred dollars per hour.

3    Q.     Five hundred dollars per hour.  And if it was

4    content that was going to be displayed on a network as

5    in recently recorded content, what is the market rate for

6    that?

7    A.     Varies greatly.  You have everything from people

8    that are providing their show with-- with not even barter

9    arrangements and just want it on air, to people that are

10   bartering where they get no money but they get some air

11   time, to you know, things as high as WWE, which is

12   clearly in a stratosphere all by itself.

13   Q.     The WWE content, you said, "in a stratosphere".

14   What is WWE content worth per hour?

15   A.     Don't know.  You can look that up.  I think it's

16   public knowledge what their deals are.

17   Q.     Well, do you know?

18   A.     I don't off the top of my head.

19   Q.     Do you know how much a 52 week series running on

20   Fox would be worth for wrestling content?

21   A.     I do not.

22   Q.     So the content you're talking about buying for 500

23   to $1,000, is pretty old historic content.  Is that what

24   you're saying?

25   A.     I bought stuff that is both old-- I have stuff

1    dating back to the 40's and 50's, and I have stuff that's

2    certainly after turn of the millennia.  I mean, I really

3    stopped acquiring content, or be less active acquiring it

4    at least, other than when approached directly a handful

5    of years ago.  So I probably have content up through,

6    well into the 2000's.

7    Q.    So in your experience, putting together, as being

8    one of the people that was the go-guy, I guess.  Is that

9    how you refer to them?  Or the go-person for the Amp'd

10   content, the live productions, it wasn't expected at that

11   point in time that the content would be worth 500 to

12   $1,000 an hour, correct?

13   A.    I believe the hope was that-- and we-- we looked

14   at some-- some deals.  They were-- they were not 500,

15   although they weren't great money, which is one of the

16   reasons why we were trying to capture content on a-- on a

17   budget substantially lower than previous projects we had

18   done.  But as I said, ultimately, we didn't get anybody

19   to bite.

20   Q.    The One Night Only content aired while you were

21   involved with Anthem Wrestling.  That wasn't $500 to

22   $1,000 content, was it?

23   A.    It was content that was baked into international

24   agreements.

25   Q.    It was worth a whole lot more than 500 to $1,000

1    is my point.  Am I wrong?

2    A.    I think we were paying somewhere in the teens to

3    20's to produce a three hour show.

4    Q.    Alright.  And that was exclusive-- according to

5    Mr. Nordholm, anyways, that was exclusive of the actual

6    staging and set-up and lighting cost, right?

7    A.    The One Night Only events were staged and lit

8    using the already set-up staging, which we'd already

9    rented, 'cause you rent the sound stages by the day.  And

10   when you do production, if you're going to hang a light,

11   the bulk of your cost is-- is hanging and rigging a

12   light, or a piece of truss, or building a stage, or

13   building a video wall.  And the-- the extra cost per

14   day-- like the difference between using it for one day

15   and three or four, is-- is a pretty small gap when you

16   tack days on because the cost is mainly the cost of

17   putting it up and striking it or taking it down.  Now the

18   One Night Only events, as they were structured in 2017,

19   for the tapings that we did them at, while I was working

20   with Mr. Jarrett in Anthem, we didn't actually even use

21   additional days.  We were already paying for the sound

22   stage, and we were already-- had already hung everything

23   for a period of days.  So the concept was to go in and

24   shoot while we already have paid for everything, and the

25   additional costs, as I believe I stated earlier, was

1    mainly having to do an earlier crew call, and call

2    production crew in earlier, which means you hit overtime.

3    So it'd be the overtime charges on some of the production

4    crew, and we went pretty bare bones.  And for the day

5    rate people, talent-wise, it was-- it would-- there were

6    some that we would have to add to the shows talent-wise,

7    but that was pretty small.  Hence why I believe the

8    actual cost over and above what we were already paying

9    that was attributable specifically to One Night Only, was

10   in the teens or 20's, I believe.

11   Q.    Alright.  I'm going to move quickly.  I know we're

12   getting close to the end of the time here so I'm going to

13   move pretty quickly through.  I'm going to a new exhibit

14   now and I'm going to show you what we've marked as

15   Exhibit 187.  This is a true and correct copy of an e-

16   mail from Mr. Nordholm--

17   A.    (Interposing) Sorry, do I have to click on this?

18   Q.    No, it should be there.

19   A.    Oh, it's not.  Hey, I got it.

20   Q.    Alright.  So I--

21   A.    (Interposing) Okay, sorry, let me-- let me read

22   this quickly.

23   REPORTER:    Hold on.  What is it?  Go ahead, counsel.

24   Describe it again, please.

25   MR. PICKARD:    I believe it's Exhibit 187.

1    REPORTER:    Yes, but what is it?

2    MR. MILLER:    Exhibit 187 is an e-mail from Ed Nordholm

3    to Ariel Shnerer, S-H-N-E-R-E-R, and others, dated

4    9/19/2017.

5    EXHIBIT NO. 187:    An e-mail from Ed Nordholm to Ariel

6    Schnerer and others, dated 9/19/2017.

7    A.    Again, I've read the top e-mail, at least, if

8    that's what we're dealing with, the-- the correspondence

9    that appears to be from Mr. Nordholm to Ariel-- I'll

10   butcher his name, Schnerer.

11   Q.    Schnerer.

12   A.    Schnerer.

13   Q.    That's correct.  Do you have any reason to believe

14   this is not a true and correct copy of an e-mail from

15   Mr. Nordholm to Mr. Schnerer, dated 9/19/2017?

16   A.    Appears to be an e-mail from Mr. Nordholm to

17   Ariel.

18   Q.    Were you involved with the decision to stop using

19   the GFW branding?  Let me be more clear.  Were you

20   involved with Anthem Wrestling's decision to stop using

21   the GFW branding in September of 2017?

22   A.    I believe I was asked my thoughts, but I also

23   recall that it was-- it was something that sounded like

24   Anthem was looking to move away from with the-- as far as

25   for using the GWF (sic) branding overall.

1    Q.     Was it your understanding that Anthem Wrestling

2    decided to move away from the GFW branding in September

3    of 2017?

4    A.     I don't-- I don't recall the-- the time frame.

5    Q.     Do you recall when, not by month, but by quarter,

6    when they decided to move away from the GFW branding?

7    A.     I don't.  I mean, it would-- I think by process of

8    elimination, it would have to be some time after the

9    Triple Mania incident, which I think was late August,

10   and-- so I guess it would be late, in my best estimation.

11   The earliest it could be would be late in Q3, although

12   that seems quick.  Or it would be in the-- in Q4.

13   Q.     Let me ask you a different question then.  To your

14   knowledge, did Anthem Wrestling decide to move away from

15   the GFW branding before the decision was made to

16   terminate Mr. Jarrett?

17   A.     I don't recall.

18   Q.     Do you recall having any discussions with

19   Mr. Nordholm regarding moving on from the GFW branding?

20   A.     I'm-- I would think that we had discussions, but I

21   don't-- I don't recall them specifically at this time.

22   Q.     Do you know why the GFW branding was dropped or

23   moved away from?

24   A.     I'm sorry.  Please repeat the question.

25   Q.     Do you know why Anthem Wrestling moved away from

1    the GFW branding before Mr. Jarrett was terminated?

2    MR. LEE:      Objection.   Form of question.

3    A.     Yeah, I don't recall.

4    Q.     Alright.

5    MR. MILLER:      Counsel, if you don't mind, I'd like to

6    take a three minute break, put together my final

7    questions, and then we can go back on and try to close

8    this out.   Would that be okay with everyone?

9    MR. LEE:      Fine by me.

10   MR. MILLER:      Okay.   So we'll go off the record for no

11   more than five minutes, so that we can do some final

12   questions with Mr. D'Amore and then close the deposition.

13   MR. PICKARD:      Okay.

14   (OFF THE RECORD DISCUSSION)

15   EXAMINED BY MR. MILLER:

16   Q.     Alright.   We're now back on the record.   I'm going

17   to show you what we'll mark as Exhibit 188, and hopefully

18   this won't take much.   I just want to confirm that your

19   Twitter account is @scottdamore?

20   A.     Yes.

21   Q.     And what I'm showing you at 188, appears to be a

22   true and correct copy of at least your Twitter account as

23   it's shown to that.   Is that correct?

24   A.     It looks like my Twitter account.

25   EXHIBIT NO. 188:      A true and correct copy of at least

1      the Twitter account.

2      Q.      Okay.  And that's your picture-- you're the

3      gentleman on the right in the circle-- or on the left in

4      the circle?

5      A.      Correct.

6      Q.      Okay.  I'm now showing you what was previously

7      marked as Exhibit 79-- or as 69.  I'm now showing you

8      what's marked as Exhibit 69, which is an e-mail from

9      Mr. Nordholm to you, dated 12/21/2017.  Do you have any

10     reason to believe this is not a true and correct copy of

11     an e-mail from Mr. Nordholm to you, dated 12/21/2017?

12     A.      It appears to be an e-mail from Mr. Nordholm to

13     myself at my Impact Wrestling account from December 21st,

14     2017.

15     Q.      Okay.  In the middle it has an e-mail from you

16     dated December 21st, 2017, at 6:20 p.m., were you say,

17     "As we scrub away the Jarrett, what's your thought on our

18     top championship"?  What did you mean by, "As we scrub

19     away the Jarrett"?

20     A.      So December 21, 6:20?

21     Q.      Correct.  But what did you mean by, "As we scrub

22     away the Jarrett"?

23     MR. PICKARD:      Well, maybe we let him read the entire

24     e-mail?

25     MR. MILLER:      Sure.

1    A.    God, I have a hard time moving this.  And then I

2    hit this for the next page?  Okay.  Go ahead, Mr. Miller.

3    Q.    What did you mean by, "As we scrub away the

4    Jarrett"?

5    A.    I think if you look at this e-mail exchange from

6    December, it looks like the decision is-- is made to be

7    Impact Wrestling.  I would think we-- I can't recall if

8    we did that before our November pay per view and tapings,

9    or if we were-- if we were still GFW or if we switched to

10   Impact then.  I know our ring was still six-sided, and

11   I believe from reading this, it looks like-- certainly

12   from the bottom of it, trying to differentiate Impact

13   Wrestling from GWN, which was the-- the App name, Global

14   Wrestling Netwood.  So I think there was discussions,

15   'cause the-- the concept for the OTT platform, that at

16   the time-- and I don't think it was launched at this

17   point.  I think it was still conceptual.  Was Global

18   Wrestling Network.  I'm not sure who came up with the

19   name, but it certainly was first heard by me in '17,

20   during the time when Mr. Jarrett was there.  And the idea

21   is that rather than do just an Impact Wrestling act with

22   just Impact wrestling content, the idea was to go out

23   and-- and pursue; foster; acquire, whether through barter

24   or such other promotions.  So there was a discussion

25   about calling.  'Cause one of the things was-- about

1    calling it the Impact Wrestling App, and it didn't make

2    sense.  So I think, because we talk about colour changes

3    and stuff.  It's trying to show the GWN App still had the

4    green in it, I believe.  Going to the blue was the Impact

5    Wrestling colours.  I believe in going to Impact

6    Wrestling, the idea was to differentiate Impact Wrestling

7    from the-- certainly the run respectfully in '17 with how

8    it wound up with all the chaos at the end with

9    Mr. Jarrett's departure.  The idea was to try to find a

10   way to come out of the blocks in '18 and say, "We're new.

11   We're different", because there had-- and I don't want to

12   just put this on Mr. Jarrett, but Impact Wrestling and

13   TNA had gone through so many issues.  It was part of a

14   branding exercise to say, "This is completely different.

15   This gives them what you watched in '17 or even '16 and

16   '15.  This is different.  This is fresh.  And we're

17   trying to get away from the term global, I think.  And I

18   think here I'm asking about the championship because

19   during Jeff's-- Mr. Jarrett's time in charge, he had

20   switched our championship from being the world

21   championship to the global championship to more match

22   the-- the Global Force Wrestling brand, and I think, as I

23   stay here and say, "Scrub away the Jarrett", it's just

24   really a term of saying, let's differentiate ourself

25   from the Jarrett regime, as we often refer to in-- in the

1   industry when people are in control of the company.

2   That's what I'm-- I'm basically saying here, and it's--

3   certainly comes at a time-- certainly after this, I was

4   still certainly friendly with Mr. Jarrett.  So I think

5   it's more just a common term saying, "The Jarret regime.

6   We've got to scrub away" because it was not-- there was

7   not a good feeling in fans and people in the industry's

8   mouths about what had happened in '17.  Coming on the

9   follies that predated it, there was hope in early '17

10  with the change in regimes, and 2017 did not exactly go

11  according to plan and it was-- it was a situation where

12  it was a-- a public relations issue, and we had to figure

13  out how to try to restore some luster to the brand.

14  Q.    So is it your testimony that the public associated

15  that colour green with Global Force Entertainment or

16  Global Wrestling, Global Force Wrestling?

17  A.    No.  What I'm saying, is the Global-- I mean,

18  GFW's ropes were green and its logo had green in it, but

19  it's certainly not the only company that's-- that's used

20  green, but it certainly-- the thought process, I think,

21  as I try to recall, was historically TNA Wrestling, which

22  was the original company, had been red in a lot of its

23  colour designs, and its ropes, and its accents.  Impact

24  Wrestling had been blue, and Global Force Wrestling, when

25  Jeff came in and brought it in and put it on television

1    on the-- on the Impact television show when he brought in

2    the-- the GFW idea.  Which the idea was, the show was

3    still Impact Wrestling, but the governing body, with

4    Jeff's intent, was going to be GWF.  So the titles were

5    more from the GWF titles even though the show would be

6    Impact Wrestling.  The idea at the time, was to

7    differentiate ourselves and try to recall-- twofold.

8    Recall a happier time with the blue, which was not a

9    period I had been here for-- or been involved with

10   wrestling for, but I was told that-- had maybe-- we might

11   make a good shift from the green and show a change.  And

12   also looking because the GWN colour remained green.  So

13   the idea was, that Impact Wrestling itself was accented

14   in blue, and the GWN was accented in green, and that that

15   would be part of a differentiater-- if that's the right

16   word, or if that's even a word-- for Impact Wrestling as

17   opposed to GWN, which would continue to-- to be

18   independent.  It would feature multiple companies in

19   addition to Impact.

20   Q.    Alright.  I'm now going to show you what we'll

21   mark as the last exhibit, and I simply want to know if

22   this is the true and correct copy of this exhibit.  So,

23   I'm now showing you what we've marked as Exhibit 189.  It

24   is an e-mail from Mr. Adam McKeown, M-c-K-E-O-W-N, to

25   Mr. Nordholm and others, dated January 10th, 2018.

1    EXHIBIT NO. 189:     An e-mail from Mr. Adam McKeown to

2    Mr. Nordholm and others, dated January 10th, 2018.

3    Q.    Mr. D'Amore, do you have any reason to believe

4    this is not a true and correct copy of an e-mail from

5    Mr. McKeown to Mr. Nordholm and others, dated January

6    10th, 2018?

7    A.    I don't know who-- I'm not sure who Adam McKeown

8    is.  This appears to be an e-mail from an Adam McKeown to

9    Mr. Nordholm, with cc's to a bunch of people, including

10   myself.  So if I can just have a minute to read this.

11   Q.    Sure.  I'm not going to ask you any questions

12   about it other than that.  So if you-- that's the

13   questions that I have.  Mr. D'Amore, thank you for your

14   time today.  Obviously, we reserve our right to re-direct

15   if Mr. Lee or Mr. Pickard have questions, but I thank you

16   for making time for us.  And at this point, I pass the

17   witness.

18   MR. LEE:     Thank you.  I just have a couple of follow-

19   up questions.  Ryan Lee, attorney for Anthem Wrestling

20   Exhibitions, LLC.

21   EXAMINED BY MR. LEE:

22   Q.    Mr. D'Amore, I just wanted to-- you had previously

23   testified that you were and currently are an owner of

24   Global Force Entertainment, is that correct?

25   A.    I certainly have an agreement that says that I

1   would be issued shares.  I don't recall per se, if the

2   shares were issued, but I-- I don't-- I don't think that

3   Mr. Jarrett has ever-- has ever disputed that-- that I--

4   he always referred to it as partner, but that I had-- I

5   have shares or membership units, or whatever you would

6   say in-- in Global Force Entertainment.

7   Q.    And in 2017, did you have shares or ownership

8   interest in Global Force Entertainment?

9   A.    Yes, I did.  I-- I still do, to this day.

10  Q.    And during 2017, did you ever tell anyone at

11  Anthem Wrestling that they could not air the GFW and

12  content?

13  A.    I did not and-- nor would I have the-- the

14  authority to.  Because as I stated previously, although

15  I was-- and my Twitter handle, and my Facebook, I think

16  both said I was the vice president of Global Force

17  Entertainment and Global Forse Wrestling.  I was not

18  actually a dually elected officer, and my understanding,

19  and as Mr. Miller pointed out, I have no law degree, but

20  my common business understanding is that my shareholding

21  or membership units, or whatever they are, doesn't give

22  me the right to speak on behalf of the company any

23  different than any other of my investments give me the

24  right to speak on behalf of those companies.

25  Q.    As an owner of Global Force Entertainment, you

1    could potentially-- let me strike that.  You had a

2    monetary interest in the Global-- in the GFW Amp'd

3    content, is that correct?

4    MR. MILLER:     Objection to form.

5    A.    I'm sorry.  Can you repeat the question?

6    Q.    Sure.  You had--

7    REPORTER:     Hold on.  Hold on.

8    MR. LEE:     Sure.

9    A.    Sorry, sir.  I've been trying to hold off on

10   coughing all through this.  Go ahead.

11   Q.    Okay.  You had-- and we'll say in 2017, a monetary

12   interest in the GFW Amp'd content, is that correct?

13   MR. MILLER:     Objection to form.  Mr. Miller.

14   A.    I-- I did through 2017, have shares or some type

15   of ownership interest in-- in Global Force Entertainment.

16   I was given that or purchased that, whatever the

17   arrangement was.  I provided funding to-- to Mr. Jarrett

18   for-- for Global Force Entertainment.  I think I provided

19   the-- the bulk of the funding for it to try to see if we

20   could get the project off the ground, 'cause obviously,

21   we knew it was a long shot, and you know, we wanted to go

22   out there and take our best efforts, and-- and we did.

23   So yeah, I provided both the funding and acquired my

24   shareholding or ownership interest or whatever in Global

25   Force Entertainment through that, and then continued to

1    carry that through '17, and-- and still to this day.

2    MR. LEE:     No further questions.

3    MR. MILLER:      Mr. Pickard?

4    MR. PICKARD:     I have no questions.

5    MR. MILLER:      Alright.  This is Mr. Miller.  Thank you,

6    Mr. D'Amore, for your time today.  I believe we are right

7    on the nose with the three hours, so we appreciate you

8    giving us that leaway as we took breaks and so forth.  At

9    this point, the deposition is concluded.  Thank you.

10                   ......................

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I hereby certify the foregoing to be

2          the Deposition of Scott D'Amore, a

3          witnesses herein, taken before me on

4          the 18th day of December 2019.

5

6          CERTIFIED CORRECT:

7

8          _____

9          Sandy L. Breitenstein

10         Court Reporter

11

12         CERTIFIED CORRECT:

13

14         _____

15         Sharon L. Masse

16         EBM - Court Reporting

17

18         Photocopies of this transcript are not

19         certified and have not been paid for

20         unless they bear the original signature

21         of the reporter named herein and - EBM

22         Court Reporting and accordingly are in

23         direct violation of Ontario Regulation

24         587/91, Courts of Justice Act, January

25         1, 1990.

E. Beryl MacMillan-Court Reporting
267 Pelissier Street, Eighth Floor
Windsor, Ontario N9A 4K4
(519) 252-1134

1

2

3                      CERTIFICATE

4

5            I, SCOTT D'AMORE, do hereby

6     certify that I have read the foregoing transcript

7     of my testimony, and further certify that said

8     transcript is a true and accurate record of said

9     testimony.

10

11

12            Dated at

13

14            _____, this _____ day of

15            _____, 2019

16

17

18            _____

19            SCOTT D'AMORE

20

21            Signed under the pains and

22            penalties of perjury.

23

24

25

E. Beryl MacMillan-Court Reporting
267 Pelissier Street, Eighth Floor
Windsor, Ontario N9A 4K4
(519) 252-1134

1                          ERRATA SHEET

2     PAGE NUMBER        LINE NUMBER      REASON FOR CORRECTION

3     _____

4     _____

5     _____

6     _____

7     _____

8     _____

9     _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    DATE:              SIGNATURE:

E. Beryl MacMillan-Court Reporting
267 Pelissier Street, Eighth Floor
Windsor, Ontario N9A 4K4
(519) 252-1134

1

2

3

4

5

E. Beryl MacMillan-Court Reporting
267 Pelissier Street, Eighth Floor
Windsor, Ontario N9A 4K4
(519) 252-1134