# EXHIBIT B

1  The following is a rough draft and should not be duplicated.
2  It does have spelling and punctuation errors.  Formatting
3  changes will also alter the page and line numbers as concerns
4  the final transcript.

5

6           THE COURT:  All right.  Be seated.
7           We're back in on the record in 18-749 global
8  versus Anthem.  Plaintiff ready to proceed.
9           MR. MILLER:  We are, Your Honor.
10           THE COURT:  All right.
11           MS. MILLS:  Yes, Your Honor.
12           THE COURT:  Okay.  And who is your corporate
13  representative?
14           MS. MILLS:  Mr. Merchant has flown in from Canada
15  and he should be here any minute.  But -- but he was -- Your
16  Honor, you had said that he didn't have to be here until 9,
17  our corporate representative.
18           THE COURT:  Okay.
19           MS. MILLS:  That we were meeting at 8 to talk
20  about these jury instructions.
21           THE COURT:  Right.  So let me -- let's go ahead
22  and convene the charge conference.
23           Any -- any -- anything to discuss on the
24  plaintiff's side?
25           MR. MILLER:  Yes, Your Honor.  We have I think

 1  four points.  The simplest, if you don't mind, starting there
 2  is the verdict form.  The unjust enrichment, page 4, of the
 3  verdict form.
 4          It's missing the table at paragraph 8.  It just
 5  says do you find -- do you find that global has proved its
 6  claims for unjust enrichment on the following?  And the
 7  original version that the parties had submitted had the
 8  charge straight out of the pretrial order that said the
 9  original masters and then went through each -- each
10  trademark.
11          THE COURT:  Why don't we just stop it then and say
12  Global Force -- do you find that Global has proved it's claim
13  for unjust enrichment, period.
14          MR. MILLER:  Fair enough.  That's fine with us.
15          THE COURT:  Question mark.  Okay.  What's next?
16          MR. MILLER:  If you -- well, I'll go in order now.
17          On page 26, the sentence that begins with
18  therefore.
19          THE COURT:  Okay.
20          MR. MILLER:  That appears -- that section 1
21  through 3 appears to be inconsistent with the prime facia
22  evidence that a trademark -- a registered trademark is
23  entitled to a presumption of validity, ownership, exclusive
24  use, under 114, 15 U.S. C114.
25          THE COURT:  So what's your proposal?

1            MR. MILLER:  My proposal is that the registration

2    similar to the first language on page 24, to prove its claim,

3    GFE must establish the following facts by a preponderance of

4    the evidence.  GFE --

5            THE COURT:  I'm sorry.  On page what?  24.

6            MR. MILLER:  Page 24, Your Honor.  I'm sorry if

7    I'm going too fast.

8            THE COURT:  Go ahead.

9            MR. MILLER:  Our proposal is to take the second

10   paragraph, 1 and 2, and insert it on page 26 in place of 1,

11   2, and 3.  I'm sorry.  In place of -- yes.  That's right.  In

12   place of 1, 2, and 3.

13           THE COURT:  Why?

14           MR. MILLER:  Why?  Because we don't have to show

15   that it was used in commerce in connection with the sale or

16   offer of goods or services.  We're entitled to that

17   presumption, which is under 15 U.S.C. 1114 -- I believe it's

18   1114(a).  Where it says a registration shall be premium fast

19   evidence of ownership, validity and exclusive use in

20   commerce.

21           THE COURT:  Well, I think if you read page 24, 25,

22   and 26 and take them all together, I think that takes care of

23   your concern.

24           MR. MILLER:  Very well, Your Honor.

25           THE COURT:  All right.  Go ahead.

1          MR. MILLER:  The next is page 51.

2          THE COURT:  Go ahead.

3          MR. MILLER:  Second paragraph that begins in order

4    to find, second to last sentence of that paragraph.  We

5    believe the sentence shall say, if the completion of the

6    merger was not a condition of the implied license, Anthem

7    Wrestling's conduct may not constitute trademark infringement

8    or infringement of Mr. Jarrett's image or likeness because it

9    did not exceed the scope of the implied license.  We

10   previously submitted a brief on that.  And that is docket

11   231.

12          THE COURT:  I read it.  I'm going to keep it as it

13   is.

14          MR. MILLER:  We maintain our objection.

15          THE COURT:  All right.  I think it's a fair

16   statement of the law.

17          MR. MILLER:  All right.

18          That is it, Your Honor.

19          THE COURT:  Okay.  Ms. Mills.

20          MS. MILLS:  Your Honor, I just have a couple of

21   things.

22          On the verdict form, number 3 on counterfeiting

23   under federal law.  Are we -- are you there?

24          THE COURT:  Go ahead.

25          MS. MILLS:  Counterfeiting requires a federal

1   registration.  And only one of those marks, they are

2   proceeding under with a federal registration, which is the

3   second one, Global Force Wrestling.  So there should be no

4   GFW under that cause of action.

5           MR. MILLER:  We have no objection to that.

6           THE COURT:  Okay.

7           MS. MILLS:  And then on the validity of the

8   trademark --

9           THE COURT:  What page?

10          MS. MILLS:  I'm finding it right now.  On page 40.

11  The very last paragraph.

12          THE COURT:  Go ahead.

13          MS. MILLS:  Where it refers to an intent to use

14  applicant may rely on use by related company.  That -- we

15  submit should not be here because it really doesn't have

16  anything to do with this issue.  There's no question that a

17  related -- you can rely on a licensee's use, but that's not

18  what the issue is with respect to the validity of the

19  trademark.  The issue is the wrong party filed the

20  application and the company that filed the statement of use

21  was administratively dissolved.  So this isn't -- I'm afraid

22  this is confusing because it just doesn't relate to what

23  we're talking about.

24          THE COURT:  Do you want to respond, Mr. Miller.

25          MR. MILLER:  Yes, Your Honor.  And I appreciate

1  Ms. Mills bringing that to the Court's attention.  We believe
2  that that paragraph is correct except for what we asked for
3  in docket 230, which should solve Ms. Mills's issue.  Under
4  TCA -- TCA -- Tennessee Code Annotated 48-249-605C an
5  administratively dissolved company continues its existence to
6  liquidate its assets.  That should solve that problem.  We
7  believe that should have been there.  Sorry for not raising
8  that earlier.
9            THE COURT:  Do you agree with that, Ms. Mills.
10           MS. MILLS:  No, Your Honor.  I don't are.  Because
11 the statute he's referring to -- an administratively
12 dissolved company can do acts in furtherance of winding up.
13 But they can only transfer assets to members of the LLC.  And
14 that's not what happened here.  It's -- it's -- we cited that
15 in our brief.  The provision I'm talking about.  You can't --
16 that company is not allowed to do anything other than
17 liquidate and -- and move assets to members.  So I feel this
18 entire section just doesn't apply to the issue.
19           MR. MILLER:  Your Honor, respectfully, our
20 position is that analysis in the statute is flatly wrong.
21 They are allowed to liquidate their assets -- it doesn't make
22 any sense.  They are allowed to liquidate their assets to
23 creditors.  That is the purpose of it.  Under the statute,
24 liquidation has to go to creditors or has to go to other
25 companies before the members can take any distribution of the

1    assets of the company.

2              THE COURT:  All right.

3              MS. MILLS:  Your Honor, I have nothing further.

4              THE COURT:  All right, sir.  I want to look at

5    document 230.  Do you want to present your motion.

6              MS. MILLS:  Yes, sir.  On the directed verdict

7    motion.

8              Yes, Your Honor the defendants would like to move

9    for directed verdict on a number of claims in this case.  We

10   feel that the proof is beyond question and that a reasonable

11   jury could not find in favor of the plaintiff on these

12   claims.  First of all, we feel like the proof is absolutely

13   unassailable as a matter of law on the license defense.

14             Mr. Jarrett admitted on the stand that he gave

15   permission to use the *Amped* content.  He gave permission to

16   use the trademarks.  He gave permission to use his image and

17   likeness.  He gave his permission to use the mark Global

18   Wrestling Network.  He admitted he's the one who selected

19   green for use with it.  He admitted on the stand that he knew

20   when he gave permission to do those things that it meant

21   everything that flowed from that -- he said he agreed that by

22   many -- of his many years in the industry, that when you put

23   on a pay per view, there's going to be a DVD made.  And he

24   knew that.  And when you put on a DVD it's going to be

25   distributed to foreign licensees and to domestic licensees.

He knew all of that.  So he knew exactly what was going to happen.  He -- and he approved it.  And in account if a, instigated it.  And -- so he granted a license for the use of the property in all the ways it was used.  And he admitted that.  And he then admitted that he did not revoke that license.  He never told anyone they couldn't do those either things either before or after he was terminated.  Mr. Myers admitted the same thing.  He said that he had conversations after the -- after Mr. Jarrett was terminated, but he never told anybody they were not allowed to use the IP in the ways that was it used.  And we think on these facts and given that the IP was not used beyond the ways it was expected to be used when he gave permission, that's a license, and that's a license that Anthem did not go beyond.  And in light of the plaintiff's admissions on that I don't think a reasonable jury could conclude otherwise.  Now, Mr. Jarrett argues that the license that he granted was contingent upon the merger going through.  As we've argued before, Your Honor, in this case, for there to be a contingency to the contract, to the license, that contingency must be stated in clear express -- clearly expressed and unambiguous clear terms.  He admitted that he never told anyone that.  He agreed that the term sheet doesn't say that.  He agreed that he never told anyone that the license was contingent upon the merger going through.  Mr. Myers never told anyone that.  Every witness

1 that took the stand for the defendants said that they had
2 never been told or heard that the license was contingent on
3 the merger going through.
4 Under Tennessee law, condition precedents are
5 disfavored. The law -- and we've cited it in this brief and
6 in previous briefs is unless that contingency is clearly
7 expressed then there is no contingency. It's just a
8 contractual covenant. And the breach of a contractual
9 covenant is a breach of contract. It's not infringement and
10 here we have -- the evidence is overwhelming. There's no
11 evidence to the contrary that that condition was not clearly
12 expressed. So it must be a condition -- I mean, it must be a
13 contractual covenant and the breach of it, if there was one,
14 is a breach of contract. And that's a claim that wasn't
15 brought. We believe that given the plaintiff's admissions
16 there is a license that Anthem did not exceed the scope of,
17 and that license was not contingent upon the merger going
18 through. And in that case, that means all of those trademark
19 related claims fail as a matter of law because they --
20 because Anthem had permission to do it. Likewise, the image
21 and likeness claim fails as a matter of law because that
22 requires use without consent. As well as the unjust
23 enrichment claim. I forgot to mention that one. Because if
24 there's a license that's a contract. And under Tennessee law
25 if you've got an implied in fact contract, then you can't

1  have unjust enrichment.  So that license -- the existence of
2  it that is not continuing he want on the merger going through
3  is a straight up contract under Tennessee law.  It is -- it's
4  not a condition precedent.  And if it was breached, that's a
5  breach of contract, not infringement.  And so we believe that
6  on all of those contingent -- all of those infringement
7  related claims that we are entitled to a judgment as a matter
8  of law because of this license and because the plaintiff
9  by -- based on his own admissions cannot show that we
10  exceeded scope of it.
11          In addition, we believe that we are entitled to
12  judgment as a matter of law on all of those infringement
13  related claims because the plaintiff cannot show that there
14  was a likelihood of confusion.  The plaintiff admitted on the
15  stand that he participated in issuing that press release
16  announcing the merger to the wrestling world.  He
17  participated.  He put a quote in it.  His wife had a quote in
18  it.  And then he said that they wanted -- both parties --
19  wanted the wrestling consumers to believe there was a merger
20  happening.  That's what the intent of that was.  And he
21  further admitted that if consumers believed there was a
22  merger, they weren't confused because that's what they were
23  supposed to believe.  He then admitted that there was no
24  intent by Anthem to pass off any goods falsely, as the goods
25  of GFE, and vice versa.  There was no intent by GFE to

1  falsely pass off its goods as goods of Anthem.  So based on

2  those admissions, there's just no -- there's no evidence that

3  anybody was confused or could be confused.  Because if they

4  were confused, it was only because they thought a merger had

5  occurred but that's what the parties wanted them to believe.

6  Then, Your Honor, we heard from numerous witnesses that

7  cobranding of products and services in the wrestling industry

8  is a common thing.  Companies often will jointly put on an

9  event or jointly offer services, and it had both marks on

10  there.  In all cases it's got Anthem and it's got GFE.  And

11  since consumers are used to seeing that, there is no

12  confusion.  And nobody -- nobody appears to have been

13  confused.  So on those facts, we believe that the plaintiff

14  can't show a likelihood of confusion.  There's no --

15  obviously there's no surveys.  There's no marketing data,

16  there's no marketing expert.  There's nobody in this case to

17  come forward and say there's a likelihood of confusion other

18  than Mr. Jarrett's self-serving comments that he thinks there

19  is.  And we submit that is not enough to carry the burden in

20  light of the way the wrestling industry works, in light of

21  the fact that both marks were on these things.  There's no

22  confusion.  And the plaintiff -- inasmuch admitted that --

23  because he said that there was no intent for anybody to

24  confuse anyone.  So we believe that is a further basis to

25  dismiss all of those trademark infringement related claims.

1          THE COURT:  Hold on a second.

2          All right.  Anything else?

3          MS. MILLS:  Yes, Your Honor.

4          Next, we believe that it is appropriate to dismiss

5     the federal trademark registration claim and the counterfeit

6     registration claim because that federal registration is

7     invalid.  It was filed by the wrong party.  At the time that

8     filing was made, there was -- the owner of it was GFE and not

9     Global Force Wrestling, the entity that filed.  And we have

10    cited law for the Court that if the wrong owner files it's

11    void ab initio.  End of the story.  And that's what happened

12    here.  Even if you don't accept that was it void ab initio,

13    it was further voidable because Global Force Wrestling was

14    administratively dissolved in 2015.  They never corrected

15    that problem.  And that entity, Global Force Wrestling, filed

16    the statement of use while administratively dissolved.  That

17    is an invalid act.  They can only do acts in furtherance of

18    winding up and as we were just discussing, it's the -- it's

19    the defendant's position that not only can they only do acts

20    if furtherance of winding up.  They can only transfer

21    property to the members.  And clearly that's not what

22    happened here.  So that statement of use is invalid because

23    the -- Global Force Wrestling was administratively dissolved.

24          So on both of those bases, that federal

25    registration is invalid.  And if that registration is

1   invalid, as a matter of law, the plaintiff cannot proceed on

2   their federal trademark infringement claim and they can't

3   proceed on their counterfeiting claim.  And so we believe

4   we're entitled to judgment as a matter of law on those

5   claims.

6           In addition, we believe we are entitled to

7   judgment as a matter of law on their negligence claim.  That

8   negligence claim arises from the so-called destruction of the

9   raw footage from the original 16 episodes of Amped.

10          The -- Scot D'Amore, Mr. Nordholm, both testified

11  that as a matter of course, once the pay per view is put into

12  the final broadcast ready form, then the old footage is

13  deleted.  Because they've got something better.  They've got

14  it finished.  They've got voice over.  They've got graphics.

15  They've got postproduction work.  It's ready to go.  A lot of

16  money's been invested in it.  So it's done, it's finished.

17  It's better than before.  So they have that version and they

18  have a version that is editable of that, both safely

19  preserved.  And all of that footage winded up in those two

20  conversations.  And if that's the case, it would not be

21  foreseeable to Anthem as a matter of law that there would be

22  any problem in deleting that footage.  Secondly, the

23  plaintiff admitted that neither GFE, nor Mr. Jarrett, told

24  Anthem to preserve that -- those raw footage files.  So

25  therefore, for that reason, Anthem had no -- it was not

1    foreseeable that they should have.  And they had no duty to

2    absent someone asking.  Certainly -- you know, this is GFE's

3    claim.  And Anthem and GFE don't have a contractual

4    relationship.  GFE is not a party to the term sheet.  Anthem

5    has no duty that I can discern to preserve this -- these raw

6    footage files without an express request that they do so.

7              So it was not foreseeable.  And there was no

8    damage even if it occurred.  Therefore, we are entitled to

9    judgment as a matter of law on the negligence claim.  For

10   similar reasons, we're entitled to a judgment on the

11   conversion claims because they arise from that same set of

12   facts.  There's no damage because we've still got all of that

13   stuff safely preserved.  And so there's no -- with -- without

14   being able to show any damage, there should be no conversion

15   claim.

16             Also we're entitled to judgment on any claims for

17   statutory damages under the Lanham Act.  We've cited law

18   there for the Court that to be able to -- to seek statutory

19   damages, you have to have -- show some showing of actual

20   harm.  There's zero showing of actual harm.  Nobody has been

21   confused.  There's no -- no consumers came in here and said

22   they were confused.  There's no evidence of that.  Therefore

23   they should not be able to seek statutory damages and we're

24   entitled to a judgment on those claims.

25             And finally, we are entitled to a judgment on

1  their claims for punitive damages.  The Court has heard --

2  for some of the same reasons why there's no likelihood of

3  confusion, there can't be any willful infringement here

4  because Anthem believes -- and I think as a matter of law --

5  had a license to do what it did.  And not only did it have a

6  license, the plaintiff admitted that the purpose of combining

7  the marks and everything was for people to believe that the

8  companies had merged.  And so if that was the intent -- and

9  Mr. Jarrett participated in it, and that's what consumers

10  believed, then it can't be a willful infringement.  That --

11  they believed what the parties wanted them to believe:

12  There's a merger happening here.  Further, because Anthem's

13  marks were on all of this property, there can be no serious

14  argument that Anthem was trying to, you know, slide its

15  products by as GFE products.  They weren't.  The marks had

16  equal dignity on there and they look liked a cobranded thing.

17  And that's what it was.  So on these facts we believe that it

18  is -- that the plaintiff just simply cannot make the required

19  showing of recklessness and fraudulence and all of that sort

20  of thing that would entitled it to seek punitive damages.

21  And we ask the Court for a judgment on those claims as well.

22          THE COURT:  Thank you very much.  And here's what

23  I think.  I think the case comes down to whether or not --

24  how much weight the jury chooses to give to Mr. Jarrett,

25  Mr. Nordholm, and/or Scot D'Amore.  And depending on how they

1    judge that testimony, and how much weight they give that

2    testimony, how much credibility they give or believability

3    they give, plaintiff could win on one or more of their claims

4    or plaintiffs could lose on all of its claims.  It's not my

5    role to weigh the evidence.  That -- I cannot do it on this

6    motion.  So I've got to deny it.

7         Mr. Miller, on your request -- so you want to add

8    this one sentence an administratively dissolved company

9    continues its existence to liquidate its assets?

10        MR. MILLER:  Yes, Your Honor.  The appropriate

11   statute so --

12        THE COURT:  No.  No.  I'm with you.  That's the

13   one sentence you want to add?

14        MR. MILLER:  That is the one sentence.

15        THE COURT:  Okay.  I'll add that.

16        MR. MILLER:  Okay.

17        THE COURT:  Okay.  The jury's ready to come in --

18        MR. MILLER:  Your Honor, may I -- we ask for

19   directed verdict as well.

20        THE COURT:  Okay.  Well, you didn't file anything.

21   But go ahead.  Make it for the record.  I think your argument

22   is going to apply there too, but go ahead.

23        MR. MILLER:  No, Your Honor.  No -- no -- I mean

24   no disrespect, but it doesn't.

25        THE COURT:  Okay.

```
1          MR. MILLER:  The two -- we're moving on their
2     counterclaims.
3          THE COURT:  Okay.
4          MR. MILLER:  The issues are they haven't proven
5     anything for their breach of contract, duty of loyalty.  If
6     we show good faith, they don't have a basis for their breach
7     of duty.  They haven't shown any harm whatsoever.  And so we
8     think that claim should fail.  I'll make this short.  And
9     then on the unjust enrichment claims, they press two forward,
10    one against Mr. Jarrett.  The only basis they've asserted for
11    their unjust enrichment claim is the $40,000 that was paid by
12    Anthem on behalf of GFE to release the master recordings or
13    the master files.  There's nothing to show that that benefit
14    in any way was for Mr. Jarrett individually.  There's nothing
15    to show that he received any benefit whatsoever.  They never
16    paid him a cent.  The testimony was completely and
17    overwhelming that they never paid him a cent for anything for
18    that -- for that master file.  I'm not saying they didn't pay
19    him for his employment, but I'm saying for that master file.
20    And so the unjust enrichment has to fail.  When it comes
21    to -- when it comes to the unjust enrichment claims against
22    GFE, the $40,000 was on behalf of Anthem for its benefit.
23    They are the only person that benefited.  They have not paid
24    any money to GFE for use of the master files.  The master
25    files are gone.  I think we can argue all day whether they're
```

1  the same or different, but they're gone.  And the law is --

2  and we can submit a brief if Your Honor would like, that if

3  there was a voluntary decision to do something that is solely

4  for their benefit, they cannot claim that unjust enrichment

5  occurred because it was a voluntary act.  And so -- it's

6  equivalent -- and I believe the case was similar to a gift to

7  someone, and therefore it was a voluntary act.  I'm happy to

8  cite that for the Court.  I don't have the cite on me at this

9  moment, but we're happy to do that.  Actually, I may.  No,

10  Your Honor, I don't have that cite for you.

11          THE COURT:  I'm going it deny the motion.  I still

12  think your motion depends on how much weight the jury chooses

13  to give.  I will say if -- if the jury finds that while he

14  was a -- that when Mr. Jarrett was a corporate executive, he

15  engaged in this activity to the detriment of Anthem, then,

16  yeah, there's a basis for the breach of duty of loyalty

17  claim.  And I think I raised that during the pretrial

18  conference.  I think we're all going to have to do some

19  research if the jury were on to come back and find for both

20  of you on the unfair competition claim.  But I'm going to let

21  all of it go to the jury.

22          Now, a couple more things before I bring the jury

23  in.  So during your closing -- Mr. Miller, you asked for 30

24  minutes, doing a rebuttal for ten.  I'm sorry.  35 minutes

25  and a rebuttal for 10.

1          MR. MILLER:  Yes, Your Honor.

2          THE COURT:  And then you've got 45 minutes to use.

3          So there will be no reference to COVID-19.

4    Specifically, there will be no reference that the delay was

5    caused by COVID-19 or any issues about the defendant's

6    counsel possible exposure.  I'm going to tell the jury that I

7    appreciate their patience.  I appreciate -- I want them to

8    know that the delay was to make sure that the jury, the

9    parties, the counsel, the Court staff are all safe.  And

10   that's really all they need to know.  So there will be no

11   reference to COVID-19 in anybody's closing, the delay or

12   any -- any way -- that shouldn't be discussed at all.

13         Finally, Mr. Miller, you made a motion to strike

14   during --

15         MR. MILLER:  I'm trying to --

16         THE COURT:  The testimony -- do you remember that?

17         MR. MILLER:  Your Honor, I believe it was

18   Mr. D'Amore's testimony regarding yanking Mrs. Jarrett's arm?

19   Is that --

20         THE COURT:  No.  You made an objection -- I think

21   it's Mr. Nordholm's testimony where he said there is a talent

22   contract with Mr. Jarrett, as well as his days when he was

23   talent and predecessor.  And you moved to strike that.  And

24   I'm going to overrule that.

25         MR. MILLER:  All right.  Thank you, Your Honor.

1      THE COURT:  Okay.  So is there anything else in
2  the record that needs to be resolved, Mr. Miller?  I think
3  that -- I think I've covered everything.  Do you have
4  anything on your list?
5      MR. MILLER:  No, Your Honor.  We're ready to
6  proceed.
7      THE COURT:  Okay.
8      MS. MILLS:  No, Your Honor.
9      THE COURT:  Bring in the jury.
10      MS. MILLS:  Your Honor, can Mr. Merchant come sit
11  back here?
12      THE COURT:  Oh, is that him?
13      MS. MILLS:  Yes.
14      THE COURT:  Okay.  Sure.
15      MS. MILLS:  Okay.
16      THE COURT:  All right.  Bring in the jury.
17      Oh.  Hold on.
18      In your closing, you all cannot quote from the
19  jury charge.  You can say you anticipate that the Court may
20  charge you.  You can say words to that effect.  But you can't
21  quote from the charge itself.
22      MR. MILLER:  Your Honor, can we say the elements
23  will show. . .  and without going into the elements.
24      THE COURT:  You can say I believe the Court may
25  charge you.

1        MR. MILLER:  Fair enough.

2        THE COURT:  Go ahead.  Bring them in.

3        (Jury present.)

4        JUROR:  Good morning.

5        THE COURT:  Good morning.

6        All right.  Be seated.

7        Ladies and gentlemen of the jury, good morning.

8    And thank you for your patience, first of all.  I realize we

9    had a bit of a delay.  And I want you to know the delay was

10   my decision to make sure you're safe, to make sure the

11   lawyers are, the parties are safe, and that my court staff is

12   safe.  And I'm confident now that we all can proceed here.

13   So I appreciate your patience.  I appreciate each of you

14   being here.  I'm aware that you've got another life to live.

15   And I'm going to be very cognizant and sensitive of that --

16   commitments you have made to go forward.  So rest assured

17   we're all on the same page there.

18        So we're at the point in the trial where the

19   lawyers are allowed to make closing arguments.  This is their

20   opportunity to present and make their arguments about the

21   proof that you've heard.  Each side has 45 minutes.  And by

22   tradition, the plaintiff gets the first word and the last

23   word in argument.  So the plaintiff is going to use 35

24   minutes of its time initially.  Correct?

25        MR. MILLER:  Yes, Your Honor.

1    THE COURT:  And then save ten minutes for

2  rebuttal.  And then the defendant will use all of its 45

3  minutes.  When the lawyers have done their closing arguments,

4  we're going to take a break to refresh ourselves because then

5  you'll come back in the courtroom.  And on your chair will be

6  a copy of the jury charge.  So that's your copy.  And you can

7  mark on it.  You can do as you please with it.  But I found

8  that by having a copy for you to follow along it will help

9  you understand what the charge is telling you.

10    So you'll have that on your chair when you come

11  back.  And then I will present the charge to you.  At that

12  point, you'll then retire back to the jury assembly room.

13  The evidence, in the form of exhibits, will be back in that

14  room.  You need to choose one of your number to operate the

15  computer.  And the IT person will be there to help whoever

16  wants to do that.  I just suggest one just so one person's

17  touching the computer, the laptop, so you don't have to worry

18  about anything.  And as you already know, you have an

19  incredibly big room to spread out and deliberate on the case

20  and free access to the coffee and all the snacks you want.

21    Also, I'll just tell you, when you go back, I

22  would recommend you go ahead and make your lunch orders.  The

23  Court will -- now that you'll be deliberating, the Court is

24  allowed to furnish your lunch.  So I would make my lunch --

25  select your lunch -- make your lunch selections so we can get

 1   it and get it back here so you can enjoy it while you
 2   continue your deliberations.  So with that, we'll hear from
 3   the plaintiff.
 4            MR. MILLER:  Mr. Nordholm saw an opportunity to
 5   take advantage of my client.
 6            THE COURT:  Okay.  I'm going to interrupt you and
 7   tell you to turn on your microphone so we can hear you.
 8            MR. MILLER:  It is on, Your Honor.
 9            THE COURT:  Okay.  I would bring it up to your
10   mouth a little bit closer.
11            MR. MILLER:  How about now?
12            THE COURT:  Much better.
13            MR. MILLER:  Sorry.  That robbed us of the drama.
14            Mr. Nordholm saw an opportunity and took advantage
15   of Mr. Jarrett.  Although none of us would see one of our
16   friends passed out drunk, go through his pockets and steal
17   his wallet, that's what happened here.  When we started this
18   jury -- ladies and gentlemen of the jury, when we started
19   this trial three weeks ago, I told you three things.  One,
20   Anthem had a problem.  That problem was Mr. Nordholm, who is
21   not here today.  We proved that Mr. Nordholm was the problem.
22            THE COURT:  Okay.  Previously I had instructed the
23   lawyers make no reference to that.
24            MR. MILLER:  I'm sorry.
25            THE COURT:  So you -- Mr. Nordholm not being here

1  today is not something you should consider.  The fact of the

2  matter is that Anthem does have a corporate representative

3  that's been here throughout the entire trial.  Go ahead.

4        MR. MILLER:  I told you that the Court had -- or I

5  told you that Anthem had three problems.  The first was

6  Mr. Nordholm.  We proved that Mr. Nordholm was the problem.

7  He sat right there and told you all about it.  The second was

8  we showed that Anthem had no one with experience.

9  Mr. Nordholm had zero experience.  We proved, in

10  Mr. Nordholm's own words, that he had zero experience.  We

11  know that because he sat right there and told you all about

12  it.  Three, I told you that Anthem was hemorrhaging money.

13  Mr. Nordholm, as we proved through his own words, said that

14  Anthem was grossly over budget and hemorrhaging money.  We

15  know that because he sat right there and told you all about

16  it.  Everything I told you during that opening three weeks

17  ago we have proved.  Let's walk through the timeline, the

18  testimony, and the documents to show that, yes, Anthem is

19  liable to my clients.

20        When we began this trial, I told you Mr. Nordholm

21  saw Mr. Jarrett and his company as a fast and easy solution

22  to his problem.  We proved that was true.  We proved

23  Mr. Nordholm intended to solve his lack of experience and

24  money problems by begging Mr. Jarrett to help him and

25  promised a merger.  I told you about Mr. Jarrett's vast

1    experience.  We proved that Mr. Jarrett is a lauded member of

2    the WWE professional wrestling hall of fame, alongside the

3    most famous wrestlers and entertainers in the industry.

4    Mr. Jarrett testified that he has testified that he has over

5    three decades in the professional wrestling industry,

6    beginning with his first match in 1986.

7            Mr. Jarrett has wrestled under his real name, Jeff

8    Jarrett, since he entered the industry in 1986 including the

9    most recent Royal Rumble for the WWE in 2019.  He has founded

10   three separate wrestling entertainment companies.  First, he

11   founded TNA Entertainment, after which, you heard him

12   testify, that in 2014 went into such a decline -- that

13   Mr. Nordholm testified they foreclosed upon it and now Anthem

14   has the assets.  Second, we showed that Mr. Jarrett formed

15   Global Force Entertainment, Inc. That is one of the

16   plaintiffs in this case, along with Mr. Jarrett.  Third, we

17   showed that Mr. Jarrett formed Global Force Wrestling, LLC,

18   of which he owned 100 percent of all membership interest in

19   that company, and completely controlled every action of that

20   company.  That company was an intellectual property, a

21   trademark holding company, through which Anthem Force

22   Entertainment used the marks and after the registration

23   issued for Global Force Wrestling the marks were assigned to

24   Global Force Entertainment.

25            Mr. Nordholm testified Mr. Jarrett used his vast

experience to improve Anthem's story lines, even in the short time he was there.  I told you that Amped was a big investment and Mr. Nordholm knew access to it would save him a lot of money.  You heard Mr. Jarrett and Mr. Myers testify that Global spent important time, money, and favors creating Amped.  Nobody disputes that the 16 one-hour episodes of Amped were intended for a television series pilot.  You heard Mr. Jarrett tell you Global bet everything on Amped, and he cashed in every favor, every favor he could.  When we started the trial, I told you Mr. Jarrett was shopping the *Amped* content to some of the biggest media companies in the United States.  As you saw from the Arthur Smith contract, and heard from Mr. Jarrett, he was not messing around.  He was working with a titan in the industry, the producer of American Ninja Warrior and the Titan Games, that many of us saw last week on NBC.  He was shopping *Amped* to Viacom, Netflix and Fox, and it was going well.

When Anthem first approached Mr. Jarrett, Global had a hold agreement with Fox.  Mr. Nordholm, however, convinced Mr. Jarrett to stop shopping *Amped* and bring it to Anthem.

You may have noticed that Mr. Nordholm and Mr. D'Amore tried to testify that *Amped* was not important to Anthem.  We proved otherwise.  We proved Mr. Nordholm wanted the content so badly, as you can see above, that was he

1  willing to give Mr. Jarrett and the owners of Global Force

2  Entertainment an extra 26,881 shares of Anthem just to

3  include the 16 hours of Amped in the GFE brands.  We know

4  that because he told his boss and executives that in this

5  3/15/2017 email.  Why did Mr. Jarrett [sic] want the content?

6  He told you in 2017, when he approached Mr. Jarrett, Anthem

7  was, and I quote, grossly over budget.  The production costs

8  were, in reality, based on his testimony, over $100,000 per

9  hour of content.  That means just to produce the 12 hours of

10  content would have cost Anthem $1.2 million.  The benefit of

11  saving $1.2 million dollars was huge.

12          Anthem wants you to believe it could have replaced

13  the content for $25,000 an hour.  But they don't tell you how

14  they came to that number.  Mr. Nordholm told you he left out

15  paying for talent.  He told you he left out paying for

16  lighting.  He told you he left out paying for everything else

17  involved in creating new content.

18          MS. MILLS:  Your Honor, we're talking about

19  numbers.  And we object to that.

20          THE COURT:  Okay.  Noted.  This -- ladies and

21  gentlemen, this is closing argument.  It is not evidence.

22  And I'll give you further instructions on that when I give

23  you the jury charge.  Go ahead.

24          MR. MILLER:  Mr. D'Amore was not any better,

25  because he told you he doesn't have any explanation either.

1    The cheap number that they put forward, I guess relatively

2    cheap number, is simply a fantasy.  It's a made up number.

3            As you heard in Mr. Nordholm's testimony, Anthem's

4    cost to create was four times what Mr. Nordholm and what

5    Mr. D'Amore tried to tell you and is contrary to

6    Mr. Nordholm's testimony.

7            We proved that Anthem saved it a lot of money,

8    which was a massive benefit, and without which, they would

9    have been in even worse shape.

10           We also proved that Anthem wanted the content, but

11   also the GFE brands, too.  Although Mr. Nordholm and his

12   executives testified the GFE brand wasn't worth anything,

13   that's very different than Mr. Nordholm's email to his boss

14   Mr. Asper.  In his January 20th, 2017, email, right around

15   the time he sought out Mr. Jarrett, Mr. Nordholm admitted

16   that GFE had brand value that was hard to refute now that I

17   have been living it for a month.

18           Mr. Nordholm's claims using the content and

19   trademarks was not -- Mr. Nordholm claims the content and

20   trademarks was not contingent on the merger.  This is wrong.

21   The term sheet tells the truth.

22           When Mr. Nordholm and Mr. Jarrett signed the term

23   sheet everyone was clear.  We proved Anthem did not own the

24   *Amped* content until the merger happened.  It did not have a

25   license to the trademarks until the merger happened.  You can

1  see that in the term sheet where it says *Amped*, GFW *Amped*

2  will remain with GFE and be included in the merger, and

3  simultaneous to the closing of the GFE merger Anthem will

4  enter into a license agreement to use the names Global Force

5  Wrestling and *Amped* and related trademarks.  You can see it

6  right there in the term sheet.

7          You also can see that Anthem's getting access to

8  the content and the license at the merger was not free.

9  Remember the email between the executives that we just showed

10  giving Mr. Jarrett and the owners of GFE 26,881 shares just

11  for the content and the brands?  That's Exhibit 105.  The

12  term sheet sets out the shares to be given to Mr. Jarrett.

13  And it was to be at the conclusion of the merger.  And low

14  and behold, right there in the term sheet it gives

15  Mr. Jarrett the 26,881 shares effective upon the merger.  You

16  can see it right there.

17          So, now, we have conclusively proven by

18  Mr. Jarrett's testimony, Mr. Nordholm's own email prior to

19  the term sheet, and the term sheet itself that Mr. Jarrett

20  was to receive a large number of shares in exchange for the

21  *Amped* content and trademarks effective upon the merger.  The

22  merger never happened.  Anthem's use of the Amped Anthology

23  and trademarks were contingent on the merger.

24          Despite the merger not happening, you saw from

25  Mr. Jarrett holding up the DVD, which he did right there --

1  in fact, he held up all four of them -- that the covers --

2  the back covers Anthem claims it owns the *Amped* and GFE's

3  trademark anywhere.  You don't have to take my word for it.

4  All you have to do is look at the back of those four boxes

5  that are exhibits for you to view.

6           You heard Mr. Nordholm testify Anthem cut down the

7  16 hours of *Amped* content into four three-hour pay per views.

8  They called it the Amped Anthology.  Not only did Anthem save

9  a bunch of money, the Amped Anthology saved it from breaching

10 contracts.  We proved Anthem used the Amped Anthology to meet

11 its international contracts and pay per view needs.

12 Mr. Nordholm told you that without the Amped Anthology Anthem

13 would have breached its international distribution

14 agreements.  That's what he said.

15          Yet, unbelievably, despite all the money saved,

16 and the contracts they saved from breaching, Mr. Nordholm

17 told you the quality of GFE's *Amped* was no good.  And both he

18 and Mr. Nordholm told you that the Amped Anthology could have

19 been replaced with cheaper shows.

20          Here's what's shocking to me, and I am sure it is

21 shocking to you.  Remember when you realized that

22 Mr. Nordholm and Mr. D'Amore hadn't watched the GFE's *Amped*

23 or their own Amped Anthology?  With all Mr. Nordholm's

24 testimony and Mr. D'Amore with all his swagger, they didn't

25 view it.  How do we know that?  They told you that.  They sat

right there and they told you that.  Yet without seeing

either *Amped*, the Amped Anthology or the GFE *Amped*, they

claimed that their Saturday matinee content was better.  We

all know that that wasn't true and they have no facts to

prove that.

Now let's talk about the license.  There was a lot

of testimony regarding this alleged license.  If you could

talk to me, you would probably say, what license?  And I

would say, exactly.  There was no license.

There was no license because there was no merger.

It never happened.  As I told you when we started the trial,

the merger died when they suspended Mr. Jarrett, not when

they sent the termination email.  But you don't have to take

my word for that.  All you need to do is look at what

Mr. Nordholm said to Mr. Jarrett and what he did to his

friend behind his back.  That tells the true story.

Mr. Nordholm was not honest about his intent to

bring Mr. Jarrett back after the suspension.  In the

suspension notice, Mr. Nordholm falsely said it is my

intention to complete the GFE transaction as outlined in our

binding term sheet.  Mr. Nordholm showed his true intentions

just five days after the suspension.  We proved he sent an

email to Mr. Nordholm [sic] discussing distracting --

Mr. Jarrett -- if Mr. Jarrett was coming back, there would no

excuse, as you can see right there in the second paragraph,

1  to plan for his extractions just five days after his

2  suspension.

3          Now, let's remember when you first saw

4  Mr. D'Amore's graphic email about the lack of b-a-l-l-s and

5  the blowing brains up during the opening moments of trial.

6  It's hard not to forget, isn't it?

7          Although Mr. D'Amore claims he was exaggerating.

8  He wasn't.  He wanted Anthem to take advantage of

9  Mr. Jarrett.  In his own words, he said in the email,

10  Mr. Jarrett doesn't have the b-a-l-l-s to sue and if was

11  stupid enough to, let him blow his brains and his wallet up

12  fighting.  We can see in their emails Anthem intentionally

13  chose to go forward.  Even though both of them told you

14  Mr. Jarrett was their friend, they didn't care about what

15  happened to their friend.  Mr. Nordholm agreed with

16  Mr. D'Amore, and as the boss made the decision to take

17  advantage of his friend.  If they really wanted Mr. Jarrett

18  back, there was no need to worry about the lawsuit.  Then

19  Mr. Merchant sent the email where he instructed a subordinate

20  not to share a payroll projection with Anthem's Nashville

21  employees.  Why didn't he want it shared with Nashville's

22  employees?  Because it said to remove Mr. Jarrett from

23  payroll projections.  They didn't want anyone to see the plan

24  and tell Mr. Jarrett about it.  If Mr. Jarrett was coming

25  back, they would not have needed to hide the email and to

1  place "remove" next to Mr. Jarrett's name.

2          These emails prove that Anthem, Mr. Nordholm,

3  Mr. D'Amore knew Mr. Jarrett would never come back and the

4  merger was dead long before Mr. Nordholm sent the termination

5  email.

6          Mr. Jarrett's falling off the wagon in October

7  2017 was simply an excuse to cover up their plan.  We further

8  proved that his falling off the wagon was a false pretext for

9  firing him.  You heard from Mr. Lunberger that he couldn't

10 remember ck whether he had been intoxicated while working

11 and/or on screen.  We all know his lack of memory was really

12 a yes.  He didn't want to admit to being drunk on camera.

13 His boss, after all, was sitting right there.  Despite being

14 intoxicated on camera, Mr. Lunberger is still employed.  They

15 even had him sit before you, right there, and testify on

16 behalf of Anthem.  However, Mr. Jarrett was fired, allegedly,

17 for being intoxicated at a small independent wrestling event

18 in a roadhouse like bar in Calgary that was not even being

19 broadcast on television.  This is not an excuse for

20 Mr. Jarrett being intoxicated, but it simply shows Anthem's

21 true intentions.

22          Now, let's talk about Anthem's defenses.  No one

23 here truly disputes that Mr. Jarrett was owed something.  You

24 saw in the termination email that Mr. Nordholm admitted that.

25 The single reason, the only reason, we are here is because

 1  Anthem thought it could get a free pass by publicly dragging
 2  my client through the mud for all to see.  And second, to
 3  claim that his actions gave them a free and forever license.
 4  Think about that:  A free and forever license to use the
 5  *Amped* content and trademarks.
 6          Even after over 800 days sober they continue
 7  kicking Mr. Jarrett as he tries to get up and rebuild his
 8  life and his company.  By continuing to distribute the *Amped*
 9  content Anthem has been pretending the merger happened.  Even
10  Mr. Nordholm -- even after Mr. Nordholm told you the merger
11  was dead they willfully kept going.  You can see it from the
12  DVD boxes created months after Mr. Jarrett left that were in
13  total control and authority of Mr. Nordholm.  That tells the
14  world that Anthem owns all of the content and all of the
15  trademarks.  There's no carve out.  There's no mention of
16  Mr. Jarrett or Global Force Entertainment.  There's no reason
17  for a consumer to think otherwise but to look at the back of
18  that box and believe that Anthem owns all of the content
19  every moment and every trademark on that DVD.
20          Anthem claims it has a free license to the *Amped*
21  content, the trademarks and Mr. Jarrett's name and likeness.
22  Again, free and forever.  Free and forever.
23          Without the merger, there was no forever license.
24  But you saw from Mr. Jarrett's suspension letter and the
25  termination email and heard from Mr. Nordholm, Anthem knows

 1  it owes Mr. Jarrett money.  He even admitted in the

 2  termination email that Anthem owed money for GFE's content

 3  that has been broadcast.  We proved through Mr. Nordholm and

 4  Mr. Asper's words they paid him nothing.  They simply kept

 5  going.  Even today they have paid him nothing.

 6          Despite Mr. Nordholm's emotional breakdown over

 7  losing his drinking buddy and friend, he never showed that

 8  emotional concern before he got here.  If he had, he would

 9  have done the right thing and paid his friend.

10          THE COURT:  All right.  Ladies and gentlemen, I'll

11  have you step out, please.

12          MR. MILLER:  What did I do wrong?

13          (Jury not present.)

14          THE COURT:  Just hold them in the hallway there.

15          All right.  Be seated.

16          Mr. Miller, you've gone too far.  This is on

17  liability only.  I gave you some leeway, but now you're

18  continuing to come back to the issue of what money is due.

19  Repeatedly.  Now, either I can clean it up or you can clean

20  it up, but it needs to be cleaned up.

21          MR. MILLER:  Your Honor, I'm --

22          THE COURT:  We're only on liability.  So there's

23  no need for your continued argument about what money is due.

24  It's just not.

25          MR. MILLER:  Your Honor, I -- I'm not sure how

 1  they can say that there is an agreement and a license --

 2          THE COURT:  But we're not on the issue of what

 3  money is due.

 4          MR. MILLER:  I won't use the word free and forever

 5  again.  I won't use the word --

 6          THE COURT:  But you already have.  So I need --

 7  how are you going to clean it up so I can bless it?

 8          MR. MILLER:  (Inaudible.)

 9          (Reporter interruption for clarification.)

10          THE COURT:  Turn your mic on.

11          MR. MILLER:  It is on.

12          I think we can fairly say that they're going to

13  claim there is an agreement --

14          THE COURT:  That is not my question.

15          MR. MILLER:  I just won't -- I won't talk about

16  the money any more, Your Honor.

17          THE COURT:  And how are we going to clean up what

18  you've already said?  How do you want to clean it up?

19          MR. MILLER:  I will tell them that they shouldn't

20  consider me saying it's free.  I'm willing to take that fall

21  on the sword.  And I won't talk about money any more.

22          I disagree, Your Honor, that it is about a money

23  issue in saying that it is free and that they didn't pay him.

24  That came out during the evidence in the liability portion of

25  this trial.  So did the money.  So did the 25,000.

1   THE COURT:  And I allowed that in.  But you're not
2   in the -- you're not in the damages phase now.  And you're
3   specifically and over and over again asking the jury to make
4   a decision on liability because they're due something.  We're
5   here only on the theories that you've put forth and whether
6   or not any of those theories have been established by
7   preponderance of the evidence.
8   MR. MILLER:  Your Honor, whether it is free
9   absolutely goes to the theory.  They're saying that there is --
10  THE COURT:  Whether it's free, Mr. Miller, is not
11  an element anywhere in my jury charge.  So it's no reason for
12  you to talk about it.  Now, what do you propose to say?
13  MR. MILLER:  Your Honor, I'll apologize to the
14  jury for bringing that up.
15  THE COURT:  I'm not sure that's what I want.
16  MR. MILLER:  Please, Your Honor, tell me what --
17  THE COURT:  Their sympathy for you and what you've
18  said, I'll tell them later, is not a point here.
19  What do you suggest, Ms. Mills.
20  MS. MILLS:  Your Honor, I feel like it goes beyond
21  just that free and forever license.  He talked about $1.2
22  million and valuations of the content and all of this stuff.
23  And out of respect, I wasn't objecting each time, but there
24  were numerous places where he went beyond what we're supposed
25  to talk about.  I feel like the Court needs to clear it up.

1  I don't think Mr. Miller's -- is going to do it to the extent
2  it needs to be done.
3         MR. MILLER:  Your Honor, as an element of the
4  claims in your jury instructions, I have to prove damage.  We
5  have proven damage by them saving money.  That's the benefit
6  they got.
7         THE COURT:  You need to prove liability.  We're
8  going to have a separate phrase on damages and what's
9  appropriate there --
10        (Overlapping speech.)
11        MR. MILLER:  If we don't --
12        THE COURT:  -- jury comes back.
13        MR. MILLER:  If we don't have to show that there
14 was any harm to my clients --
15        THE COURT:  You've done that on the -- now, I
16 allowed that on the unfair competition claim.  And you've
17 made that point using the language I think I suggested, that
18 they received a benefit.  But now you've quantified the
19 benefit.  And that went too far.
20        MR. MILLER:  Your Honor, there was no objection to
21 that testimony coming in during the liability phase and it
22 came in.
23        THE COURT:  Right.  But we're only on the
24 liability phase here for argument.  So what I want you to say
25 is that -- first, no more reference, under any of your

1  theories, anything regarding money.  We've had enough of

2  that.  Two -- I think you need so say words to the effect

3  that your reference to damages or money in this case is

4  premature because you anticipate the Court to ask each of you

5  to make a decision on the various theories of liability that

6  Mr. Jarrett presents.

7           MR. MILLER:  I'm sorry, Your Honor --

8           THE COURT:  On the various theories of liability,

9  on his several claims, on his multiple claims of liability.

10  And by referencing anything having to do with money puts the

11  cart before the horse.  And you can phrase that however you

12  want.  But you need to come back and argue liability.  Have

13  you established by preponderance of the evidence any of the

14  claims establish liability.

15           MS. MILLS:  Your Honor, I feel like if he says it

16  was premature that sends a signal to the jury that, oh, just

17  wait, you're going to get to decide that.  I think it should

18  be less --

19           THE COURT:  Go ahead.

20           MS. MILLS:  I think that's -- that it should be I

21  talked about numbers and that was inappropriate.  I'm sorry.

22           MR. MILLER:  I don't think I should have to

23  apologize, Your Honor.

24           THE COURT:  Well, you've heard what I've said.

25  How are you going to say it?

```
 1            MR. MILLER:  Your Honor, I want to be clear with
 2   the jury that I'm sticking only to liability.  And I will say
 3   to the jury from this point forward I am only going to stick
 4   to the liability questions.  I'm not going to talk about --
 5            THE COURT:  Well, they don't know what liability
 6   means.  You're assuming they're lawyers.  They're not.
 7            All right.  Just have them hold in the hallway.
 8            MR. MILLER:  I don't. . .
 9            Sorry?
10            (Recess.)
11            THE COURT:  Okay.  I'm going to tell the jury that
12   after arguments I'll give them instructions and you will
13   learn that the only issue before you is the issue of
14   liability.  You're not to be concerned with anything
15   regarding what either party -- because there are
16   counterclaims, may or may not be due.  You have to follow
17   those instructions, whether you agree with them or not.  And
18   to the extent the lawyers have talked about anything other
19   than liability, then that's not -- that is not something you
20   should consider.  Any objections to that, Mr. Miller?
21            MR. MILLER:  Your Honor, we'll abide by your
22   ruling, but I believe we are entitled to put on the proof
23   that is in the liability stage, and this goes to liability,
24   but I will abide by your instruction.
25            MS. MILLS:  Your Honor, we'll abide by that.  I
```

```
 1   feel like it's not enough, but I think at this point I don't
 2   know what else we do.  But we continue to register our
 3   objections to that -- that closing.
 4              THE COURT:  Okay.  Bring in the jury.
 5              (Jury present.)
 6              THE COURT:  All right.  Be seated.
 7              All right.  Ladies and gentlemen of the jury, I
 8   want to share with you that in the instructions that I'll
 9   give you, you will learn that the case right now is only on
10   the claims of the plaintiff against the defendant and the
11   defendant's claims against the plaintiff.  And that's the
12   decision that I'm going to ask you all to make.  Whether or
13   not the plaintiff or the defendant may or may not be entitled
14   to anything depends on your decision that -- that I'll give
15   you on the first stage of the case.  So, therefore, what the
16   lawyers are telling you now, first of all is, is not
17   evidence.  You've heard all the evidence.  And you'll be the
18   judges of how much weight to give to the evidence you've
19   heard.  And I'll give you instructions that you can consider
20   all of it, some of it, or none of it at all.  But what the
21   lawyers -- as I told you in the beginning say -- is not
22   evidence.  So they may make reference during their closing to
23   things that are not at issue here at this point.  And to that
24   extent you have to follow the instructions that I'll give
25   you, as I told you when you were selected, whether you agree
```

 1    with those instructions or not.  So with that, Mr. Miller,

 2    you have a few minutes left.

 3              MR. MILLER:  Thank you, Your Honor.  I believe

 4    about 20 minutes.  Is that correct?

 5              THE COURT:  You can proceed, Mr. Miller.

 6              MR. MILLER:  Thank you, Your Honor.

 7              Dispute Mr. Nordholm's emotional breakdown over

 8    losing his friend, he never showed that emotional concern

 9    before he got here.  If he had, he would have done the right

10    thing for his friend.  All he cared about was solving his

11    problem while taking advantage of Mr. Jarrett's problem.

12    Commonsense tells us you that the license alleged here is a

13    fiction.  The Mr. Jarrett testified that any right to use the

14    content or the trademarks required the merger to happen.

15    This is consistent with the term sheet.  This is clear from

16    Mr. Nordholm's testimony that Anthem owed Mr. Jarrett

17    something.  Now, you may have heard a lot of things that

18    Mr. Jarrett did or said.  Mr. Jarrett told you this upfront,

19    and said he did incredibly stupid things.  He doesn't dispute

20    that.  Mr. Jarrett told you that he was very regretful for

21    those things.  And you saw how his wife Karen Jarrett sat

22    through this trial during that difficult testimony.  His

23    profound remorse is obvious.  He sought treatment and has

24    attempted to make amends.  Regardless of Mr. Jarrett's

25    problems there's no excuse to steal his content and his

1  trademarks.  As I said before, none of us would see a friend

2  passed out drunk, go through his pockets and take out his

3  wallet.  Even -- we wouldn't even do that to a stranger.

4        Even after Mr. Jarrett entered rehab, Mr. Nordholm

5  had total control, dispute what they allege that Mr. Jarrett

6  had control of, which we obviously dispute from Mr. Jarrett's

7  testimony, Mr. Nordholm unequivocally told you he had total

8  control after the suspension.

9        Even though Anthem told you in the termination

10 letter that they would talk about something later, they aired

11 Part 4 -- Part 2, Part 3 and Part 4 of the Amped Anthology on

12 pay per view.  They gave the Amped Anthology to Fight Network

13 to broadcast throughout the world.  They made the Amped

14 Anthology available for streaming on Global Wrestling

15 Network.  Their only excuse is that Mr. Jarrett and Mr. Myers

16 never told them to stop.  Even though Anthem it was doing

17 something wrong, they never told them to stop doing something

18 that was wrong.  You heard Mr. Jarrett and Mr. Myers tell you

19 that they never dreamed Anthem would keep going because the

20 merger had never happened.  They didn't need to be told

21 because they knew it.  You saw Mr. D'Amore's email.

22 Mr. Nordholm told you he had the ultimate authority to make

23 that final decision.  Mr. Nordholm and Anthem simply kept

24 going with the content and trademarks.

25        Finally, and unbelievably, you heard Anthem's

1  witnesses testify they intended to manufacture and sell a

2  Jeff Jarrett toy action figure.  If all the bad things are

3  true about Mr. Jarrett and it was so bad that they had to

4  terminate him, you have to wonder why they plan to sell toys

5  with his name and likeness to children.

6          Now, let's walk through the claims you will see in

7  the verdict form.  I know it will seem like a lot of

8  questions.  My clients have 11 claims.  The reason we have so

9  many claims is my client's suffered a lot of harm.  But the

10 good news is you can check "yes" to all of my client's claims

11 and no to defendant's four counter claims.  There is a simple

12 way to breakdown the counterclaims -- or breakdown the

13 claims.

14         First, look at the trademark and unfair

15 competition claims.  The federal trademark infringement

16 counterfeiting claims are only for the Global Force Wrestling

17 trademark.  The rest of the counter -- the rest of the

18 trademark and unfair competition claims have to do with the

19 GFW, Global Force Wrestling, and the two related logos.  All

20 the trademark and unfair competition claims will have similar

21 elements.  The Court will instruct you on those elements.

22 But pay particular attention to these two facts.  One,

23 Anthem's DVDs state on the back that the marks and content

24 belong exclusively to Anthem, and how it would be impossible

25 for a consumer not to be confused by that statement, coupled

1  with the Global Force Wrestling and GFW marks all over the

2  content and promotions.  The GWN, the Global Force -- or the

3  Global Wrestling Network and GFW marks and logos are nearly

4  identical and are in the same fields for the same consumers.

5  These facts tell you that, yes, Anthem is liable for

6  trademark infringement and unfair competition and

7  counterfeiting to my clients.  Second, Global's claim for

8  violation of the Tennessee Consumer Protection Act is based

9  on two actions.  First, yes, Anthem's DVD covers, as we told

10  you, say -- say that Anthem owns every moment of the content

11  and trademarks.  This is clearly deceptive.  Yes, Anthem uses

12  the Global trademarks on the packaging and they are nearly

13  identical to the network.  Third -- and this is a really big

14  one for you -- we assert that, yes, defendants have benefited

15  from the use of Global's content and trademarks.  Defendants

16  should account for all the wrongful benefits they received.

17  Fourth, yes, Anthem stole, used and destroyed the *Amped*

18  content.  These intentional acts prove that Global -- and you

19  should find for Global and against Anthem for conversion.

20  You also should check yes for negligence, because it was

21  reckless, willful, and intelligent -- or intentional.

22          They knew they had the property.  They knew had to

23  maintain the content in the original masters.  They had an

24  opportunity not to delete that.  They could have paid for

25  more storage.  They chose not to.  Fifth, you should find in

1   favor of Mr. Jarrett for his privacy claim.  It is clear they

2   are using his name, image and likeness without a license.

3   And the only place you should check no on our claims is the

4   notion that Anthem engages in sports broadcast.  We saw --

5   Mr. Nordholm, Mr. Jarrett, Mr. D'Amore testify that it is

6   scripted and predetermined.  Everything there is scripted and

7   predetermined.  It is not as if you are on a field of play

8   and no one knows who is going to win.  The only person you

9   saw testify that it was a sport was Mr. Lunberger, and I've

10  explained to you why we can't trust his testimony.

11          Finally, you should find for my clients on

12  cancellation and registration of the Jeff Jarrett mark.

13  There was fraud on the front end.  TNA, Anthem's predecessor,

14  knew that Mr. Jarrett had always wrestled under Jeff Jarrett.

15  They knew they were not the exclusive user of it.  They were

16  not even the exclusive user of it when they filed the

17  application.  They knew that.  It was an intent to deceive to

18  get the registration.

19          On the back end there was abandonment.  You heard

20  Mr. Brewer, the trademark attorney for Anthem, testify that

21  Class 41 is for marks in the entertainment industry.  It's

22  not nor DVDs and digital media.  Mr. Jarrett has no intent to

23  wrestle for Anthem.  Anthem has no intent to hire Mr. Jarrett

24  to wrestle.  It simply is inapplicable.  They have abandoned

25  the mark.  When it comes to the two counterclaims -- let's

 1 cover those briefly.  First, they have not shown that
 2 Mr. Jarrett breached any duty.  He acted in good faith.  He
 3 improved the content.  He did the best he could, given his
 4 situation.  How Anthem can now claim he breached some duty as
 5 an officer simply doesn't make sense.  Their unjust
 6 enrichment claim fails, too.  Mr. Jarrett wasn't -- wasn't --
 7 Mr. Jarrett didn't owe the $40,000 to Mr. Sullivan himself.
 8 That was related to Global Force Entertainment.  The $40,000
 9 didn't benefit Global.  Nobody can really explain that but
10 Mr. Nordholm, and he can't explain it.  They simply used it
11 for their benefit voluntarily.
12          Finally, Mr. Nordholm saw an opportunity.  And
13 again took advantage of Mr. Jarrett.  None of us would see
14 that friend and take his wallet.  Realizing what he had done,
15 Mr. Nordholm and Mr. D'Amore knew Anthem might get sued.
16 They bet Mr. Jarrett didn't have the courage to fight for the
17 most valuable assets of Global.  Even knowing the merger was
18 dead and there was no license, at the time this started, and
19 certainly when Mr. Jarrett was suspended, Mr. Nordholm went
20 forward with the pay per views, international distribution,
21 streaming and DVDs.  He did knowing it was wrong.  You have
22 the opportunity to right this wrong.  You have the
23 opportunity to tell Mr. Nordholm, Mr. D'Amore, and their
24 cronies that it's not okay to do this.  Unfortunately, for
25 Mr. Nordholm, his friend, Mr. Jarrett, despite his problems,

 1  had the courage to stand up to Mr. Nordholm, Mr. D'Amore and

 2  Anthem.  In a nutshell, there is no defense to their actions.

 3  There is no license.  There was no merger.

 4            And so here we are.

 5            THE COURT:  All right.  Ms. Mills.

 6            MS. MILLS:  Ladies and gentlemen of the jury, I'd

 7  like to thank you so much for your patience and listening to

 8  this and helping us sort out these problems.  I know that

 9  it's been a long time that you've been involved in this, and

10  we really appreciate it.

11            THE COURT:  Is your mic on.

12            MS. MILLS:  Is that better?

13            THE COURT:  Yes.

14            MR. MILLER:  Your Honor, we object.  These

15  demonstratives were never shown to us before this.

16            MS. MILLS:  This is not a demonstrative.

17            THE COURT:  It's closing argument.  Go ahead.

18            MS. MILLS:  I -- as I've watched you folks listen

19  and sort through this this week, I would -- for myself, I

20  would have had the question, what exactly is this case about?

21  And -- so that's the ultimate question.  What is this case

22  about, and what are you going to be asked to decide?  So the

23  question here is did Mr. Jarrett -- when Mr. Jarrett did the

24  following four things while he was making $250,000 a year as

25  Anthem's Chief Creative Officer -- he's the big cheese, the

 1   guy in charge of all decisions about what the company puts

 2   out, what it looks like, what trademarks are used, how we

 3   market it.  He's the guy.  And he's being paid a lot of money

 4   to do that.  And so the evidence showed -- and it's really

 5   undisputed -- that Mr. Jarrett used GFE's *Amped* content to

 6   create the Amped Anthology pay per view.  He used his own

 7   image and likeness inside that *Amped* content that was

 8   included in the pay per view.  He used the trademarks GFW and

 9   Global Force Entertainment in connection with Anthem's marks

10   and IMPACT marks, put all those marks on the same product.

11   And they did that on certain of Anthem's content and the DVDs

12   that you've heard a lot about.  And Mr. Jarrett admitted that

13   he is the one who selected the mark Global Wrestling Network.

14   And he is the one who designed it to look like his other

15   marks for use on Anthem's streaming app.  So that's pretty

16   much undisputed.  And that's the conduct that 95 percent of

17   this case is about.

18           Now, GFE and Mr. Jarrett now claim that what he

19   did while he was employed for Anthem is wrong, and that he's

20   suing his employer over the very decisions he made while he

21   was being paid a lot of money to be Chief Creative Officer.

22           So in addition to the infringement related claims

23   that surround that conduct, there's a couple of other issues

24   that the plaintiff is asking you to decide.  You're being

25   asked whether Anthem did anything wrong when it deleted the

1  raw footage from the *Amped* content after it had the final

2  broadcast version ready to go and safely preserved.  The

3  evidence showed that everything that was in that raw footage

4  ended up in the final version.  So there's a final version

5  and then there's an editable version left.  The plaintiff

6  contends that that is wrongful and he's entitled to damages.

7  But that's one thing you're going to be asked to decide, is

8  did that harm anyone.  And finally, whether Anthem abandoned

9  the Jeff Jarrett trademark that it rightfully owns.

10        So these claims and this conduct I've just gone

11  over amounts to questions -- the causes of action that it's

12  going to amount to is did Anthem commit infringement when it

13  used the *Amped* content, Mr. Jarrett's image and likeness, the

14  trademarks, all three of them that are at issue, Global Force

15  Entertainment, GFE, and Global Wrestling Network, was that

16  infringement.  Two, was Anthem unjustly enriched.  That's a

17  term of art and it's a type of cause of action.  Was it

18  unjustly enriched when it used those things at Mr. Jarrett's

19  request?  Did Anthem commit conversion, or was it negligent,

20  when those old footage files were deleted once it had the

21  final broadcast ready version?  And has Anthem abandoned its

22  trademark for Jeff Jarrett?  So those are the way the claims

23  are going to show up on your verdict form, using that

24  terminology.  The answer to all of those questions is no.

25        Mr. Jarrett's theories were not supported by the

1    evidence in this case.  Mr. Jarrett's claim is that Anthem

2    lured him in to the company and promised him a merger that it

3    never intended to do, and all for the purpose of taking his

4    intellectual property and then kicking him to the curb once

5    it had that.  And that is not at all what happened.  And you

6    heard that from the stand as you sat here and watched this

7    case.

8            Here's what really happened.  Mr. Jarrett had been

9    kicked out of the previous company, TNA Entertainment, and he

10   had a beef with the previous owner, and coming back in to

11   Anthem after my client acquired it was a big deal for him.

12   He was going to be back on top and he was going to be in

13   charge and he was determined to be in charge and he was going

14   to show those folks before that he was back and he was a

15   force to be reckoned with.  But his own conduct destroyed any

16   possibility of the merger.  Now, Mr. Miller likes to minimize

17   his conduct.  But you heard, ladies and gentlemen, witness

18   after witness tell you that Mr. Jarrett was frequently drunk

19   at work; Mr. Jarrett was frequently abusive to employees;

20   that he ruled with an iron fist; that it was his way or the

21   highway.  He exposed himself to employees on more than one

22   occasion.  He beat an employee with his belt.  He shoved an

23   important business executive at an important event because he

24   lost his temper while drinking.  He appeared on behalf -- he

25   appeared at a wrestling event to wrestle, completely drunk,

1   and didn't show back up.  This is not conduct that can be

2   minimized.  This is such serious conduct -- and I think we

3   all know if we were in the workplace and somebody -- or the

4   big boss -- the chief creative officer was behaving this way,

5   it's a serious, serious problem.  So -- and that's why the

6   merger didn't go through.  I think it's pretty obvious that

7   if you've got a party you're getting ready to merge with and

8   this kind of conduct is going on, it would make anyone think

9   twice about merging and whether or not that's a possibility.

10          So you did hear some of the emotion on Anthem's

11  side of the case.  You heard Mr. -- Mr. D'Amore, who -- I

12  want to be sure that everyone gets this -- Mr. D'Amore is an

13  owner in the plaintiff.  Mr. D'Amore owns 5 percent of the

14  company.  He stands to gain if the plaintiff wins.  Okay?

15  Because he would get some portion of that judgment.

16  Nonetheless --

17          MR. MILLER:  Objection, Your Honor.  She can't --

18  brought in he gets some portion of it.

19          THE COURT:  Sustained.  Just move on.

20          MS. MILLS:  Nonetheless, he is here testifying for

21  Anthem.  That should give you some idea of which party you

22  ought to believe.  He's testifying against his own

23  self-interest in supporting Anthem's case.  He had been a

24  long-time friend of Mr. Jarrett.  They had worked together

25  for years.  And Mr. -- Mr. D'Amore had finally had enough.

He testified that he had cleaned up these messes long enough.
He had seen this conduct and he couldn't take it any more and
he was ready to quit.  And then Mr. Nordholm talked him in to
staying once they were going to put Mr. Jarrett on leave and
get some help.  And -- and the question came up to
Mr. D'Amore what do we do if he says we can't use all this
content that he has forced us to use.  And Mr. D'Amore said,
with some emotion, I can't believe he would be -- he would do
that.  That would be so unfair and so unreasonable after
putting us on this path that I don't believe he's going to do
that.  And that's the emotion you heard coming from
Mr. D'Amore.  You also heard a lot of emotion coming from
Mr. Nordholm.  Mr. Nordholm told you that he considered
Mr. Jarrett a dear friend.  They had spent more time together
building -- trying to build this company back and put these
fires out and turn it back to its former glory -- he had
spent more time doing that than he had with his own family.
And he also felt betrayed when Mr. Jarrett turned around and
made these outrageous claims that he's made.

Now -- so the real story is that it's not a
situation where you had your friend drunk and you're picking
his pockets.  What happened is it's the drunk friend that you
have carried on your back and taken care of and tried to get
straightened out and tried to get help, turning around and
holding you up for acts you did at their direction.  That's

1   what's going on here.  And our clients saw his acts in

2   bringing these claims as a big betrayal of this friendship.

3             We've talked a little bit about the witnesses.

4   The plaintiff's witnesses that support his version of events

5   is really Mr. Jarrett.  Mr. Jarrett told you, oh, I didn't

6   really control anything.  That was really Mr. Nordholm.  I --

7   you know, I just was there and then we had this other guy,

8   John Guboric ^ sp and he was in charge.  That's not at all

9   true.  And that's not what any other witness told you.  You

10  heard from those witnesses.  He was -- he was determined to

11  be in charge.  He negotiated for that power and that control

12  and he got it.  And Mr. Nordholm admits he doesn't know

13  anything about the wrestling business and wrestling content.

14  That's what he was hiring Mr. Jarrett for and paying him a

15  lot of money, to make those decisions.  And Mr. Jarrett did

16  make those decisions.

17            So Kurt Myers was the other witness that was --

18  that was here to testify about the plaintiff's version of

19  events.  Mr. Myers testified he wasn't really involved in the

20  negotiations so he doesn't know anything about that, but he

21  did tell you that he never, on behalf of Mr. Jarrett, revoked

22  the permission to use this stuff.  And he didn't know -- as

23  far as he knows, the plaintiff, Mr. Jarrett, never did that.

24  The rest of these witnesses are all for Anthem.  You heard

25  from Mr. Merchant, who is Anthem's financial officer.  He

told -- told you that Mr. Jarrett was the operational lead on the ground. He's the guy making decisions. He's the guy in charge in Nashville. You heard from Mr. D'Amore. I've already talked about that. Mr. D'Amore is a long-time friend. He's the one who supplied the money to make the *Amped* content. He's the one that would stand to benefit if GFE were to win here. But he believes that Anthem is correct in this case. We've talked about Mr. Nordholm relying on Mr. Jarrett, believing they were friends, looking to him to help save this company, and getting a knife in its back after Mr. Jarrett got sober. You heard from Mr. Matthews, who said Mr. Jarrett ruled with an iron fist. It was his way or the highway. Many employees wanted to leave. He berated employees publicly. He was drunk on the job. You heard all of that from the witnesses. So Anthem is not liable for infringement for three primary reasons. Number one, Anthem had a license or permission to do everything it did. Two, there's no likelihood of confusion caused by Anthem's use of this intellectual property. And, three, the plaintiff's trademark registration, the federal registration is not valid.

So Anthem is not liable for infringement because it had a license. And a license is a term of art in the intellectual property world, which is basically permission. It's a contract that gives permission to use the intellectual

1   property.  And a license -- because Mr. Jarrett gave his

2   permission to use the IP about which he's now complaining, it

3   can't be an infringing use unless Anthem exceeded that

4   permission given.

5           So Mr. Jarrett knew exactly what he was doing

6   here.  He is a sophisticated businessman with 30 years of

7   experience in the industry.  He testified he was represented

8   by national counsel, Nelson & Mullins, during all the

9   negotiations.  So he had his own -- access to his own

10  lawyers.  He was Chief Creative Officer and he carefully

11  negotiated that role so that he could be in charge and have

12  control.  He testified on cross-examination that he knew he

13  had the right to say no for the use of this IP.  And he knew

14  he had the right to say no both before and after he was

15  terminated.  And he testified he knew that there was a risk

16  that the merger would not go through when he agreed to let

17  the company -- or when he offered the company to use his

18  intellectual property.  He testified that he authorized the

19  use of the trademarks that are at issue in this case.  He

20  admitted that.  He testified that he authorized the use of

21  the *Amped* content for use as a pay per view and everything

22  that that entailed.  That would usually entail the DVD's, the

23  distribution to foreign licensees, all of that.  He testified

24  he knew that was going to happen when he gave permission.

25  And he testified that he authorized the use of his own image

1  and likeness.  He knew his image and likeness was in that

2  content, and he offered it up.

3         Now, when he offered that *Amped* content, that set

4  the company on a path that it could not deviate from.

5  Because there's -- the company has contractual obligations

6  to -- to give content to its licensees.  If Mr. Jarrett had

7  not offered the *Amped* content, they would have -- they had a

8  filming session set up to film that content.  Mr. Jarrett

9  said, oh, no, we don't need to do that.  Let's cancel that

10  and let's use *Amped*.  Once they cancelled that, there's no --

11  there's no going back because there's no content to take its

12  place.  So it set the process in motion, once Mr. Jarrett

13  cancelled that filming.

14         So he testified that he helped select the marks

15  that he put on this content.  He testified he chose the color

16  green to make it look like his other marks.  He testified

17  that he knew when he gave permission to use this that it was

18  going to be used on everything, social media, the website,

19  DVDss, et cetera.  He knew that.  He testified that he

20  offered Anthem the right to use all of GFE's social media

21  accounts.  He testified he knew he had the right to say no,

22  but he did not.  He never withdrew his permission to use the

23  IP, both before and after he was terminated.  Mr. Myers

24  testified he didn't withdraw the permission.  And neither

25  plaintiff ever withdrew their permission until this lawsuit

1  was filed.

2          Now, these acts constitute a legally binding

3  license, or a contract for use.  The license does not have to

4  be in writing.  There is no requirement for that.  It can be

5  oral.  A license can be implied from the parties's actions.

6  And that's what's going on here.  If somebody gives you the

7  intellectual property to use and says use this and they're

8  your boss and you use it, that is not -- that's an implied

9  license.  They're telling you can use it.  It's an agreement

10  to use it.  The key question in determining if that happened

11  is whether Mr. Jarrett intended the intellectual property to

12  be used in the way that it was used.  So if you find that

13  Mr. Jarrett granted a license, you can't find that Anthem is

14  liable for infringement unless Anthem exceeded that license.

15          Now, I should tell you, Judge Crenshaw is going to

16  instruct you on the law.  And you should you are follow those

17  instructions.  And you will follow those instructions.  I'm

18  telling you, as argument, what I understand the law to be and

19  what we feel the law is.  And they're completely in harmony

20  with these instructions you're going to receive.

21          And further, because GFE and Mr. Jarrett received

22  benefit from Anthem using this intellectual property, that

23  license is irrevocable.  And that doesn't mean that Anthem

24  can take this intellectual property and do whatever it wants

25  to.  That's not what it means that the license is

1  irrevocable.  It just means that anything that Anthem has
2  done in conformance with these instructions and with what was
3  going to flow from those instructions can't be deemed
4  infringement after the fact.  You can't tell somebody to do
5  something and then let them do it and then claim later, oh,
6  well, now that was wrongful.  You can't do that.  That's what
7  an implied license being irrevocable means.
8          Now, how do we know that Mr. Jarrett granted a
9  license to use this IP in the way it was used?  He said so.
10  He told you he knew it was going to be used for streaming
11  content.  He testified he knew it was going to be used on the
12  four pay per views.  He testified he knew that it was going
13  to be used for DVDs, for foreign licensees, and he knew his
14  image and likeness was included.  So that is a license.
15  That's exactly what an implied license is.  His actions tell
16  us that Anthem had the right to do these things because he's
17  the one that did it, as the big boss.
18          Now, he admitted in a public filing that the very
19  uses he complains about now in this case were actually
20  licensed uses.  You will see in your jury notebook, there's a
21  statement of use that was admitted in this case, in Anthem's
22  part of the case.  A statement of use is a document that a
23  trademark owner has to file at the trademark office to show
24  they've actually used a mark and how they've used it.  And
25  one they've used a mark, they can get a trademark

1  registration.  This statement of use is the one that

2  Mr. Jarrett filed.  And you'll see it in your notebook.  And

3  he signs it.  You can see his signature there at the bottom.

4  And what this thing swears under penalty of perjury is that

5  the uses that he's showing were done by a licensee.  Now,

6  these are the uses he claims were done by a licensee.

7  There's the *Amped* DVD.  And those arrows are pointing out for

8  you the IMPACT marks and the GFE marks.  This is exactly what

9  this case is about, these uses.  And this is what Mr. Jarrett

10  filed under penalty under perjury with the federal government

11  was done -- a licensed use done by a licensee.

12          He made this filing and swore this in March of

13  2018.  This is months after -- six months, almost, after he

14  was terminated.  So he believed he had licensed it, and he

15  knew that he had licensed it.  And he's relying on Anthem's

16  use to get a trademark.

17          So now Mr. Jarrett says, well, okay, even if I

18  licensed it, it was contingent on the merger going through.

19  But Judge Crenshaw is going to instruct you that a license

20  can only be contingent if that -- if Mr. Jarrett expressed

21  that to Anthem in clear, unambiguous terms.  So that was

22  never expressed to Anthem.  That's what the testimony showed.

23  The term sheet doesn't say that the IP is contingent -- the

24  use of the IP is contingent on the merger.  It doesn't

25  address it at all.  Plaintiff tries to argue that it says

1  that Anthem can't use it.  That's not what it says.  It

2  doesn't address this issue at all.  It doesn't prohibit Mr.

3  Jarrett from using the IP.  Mr. Jarrett admitted that he knew

4  when he allowed the IP to be used there was a chance the

5  merge was not going to go through.  He admitted he never told

6  anyone that his permission was contingent upon the merger

7  going through.  He admitted that.  And if you find that it

8  was even debatable whether he said that to someone, you must

9  find that the license wasn't contingent on the merger going

10 through.  And this makes sense, folks, because if you've been

11 granted the right to use it, and you use it, it can't later,

12 after the fact, become infringement.  If it was fine at the

13 time you did it, then it can't -- the license can't be

14 contingent upon the merger going through.

15         Secondly, all of those infringement claims should

16 be -- you should find in favor of Anthem because there's been

17 no likelihood of confusion.  Mr. Jarrett admitted that he put

18 out -- he contributed and helped put out that press release

19 that announced the merger in advance.  And he admitted that

20 the purpose of that press release was to make the consumers

21 believe that these parties were merging.  That's why they did

22 it.  And then he admitted that if consumers believed that the

23 parties were merging, they weren't confused.  Because that's

24 what they were supposed to think.  He admitted there was no

25 intent by Anthem to pass off its products as those belonging

1    to GFE or GFE products as belonging to Anthem, that he -- he

2    admitted that.  There was no intent to do that.  And he

3    admitted that this was just part of a cobranding effort to

4    make people believe that the parties had merged.  Both sets

5    of marks were on these products.  So no one was confused.

6    You heard testimony by Mr. D'Amore and Mr. Jarrett that

7    cobranding things in this industry is common and nobody is

8    confused by that.

9              So I also note that Mr. Jarrett did not bring any

10   witnesses in here to testify that they were confused.

11   There's no consumers that you heard from that said, oh, I

12   thought this was confusing and, you know, I almost bought one

13   product or the other because this was on there.  We didn't

14   hear from anyone like that.  Mr. Jarrett didn't bring any

15   survey experts or marketing experts or marketing data in here

16   that would show any confusion that anybody was confused.

17   Mr. Jarrett did not put on any evidence that Anthem intended

18   to pass off its products as GFE's.  There's no evidence that

19   consumers viewed this as anything other than a cobranding

20   effort or that -- or that anything happened here other than a

21   failed merger.

22             So the third reason some of thee infringement

23   claims fail is because the federal registration that Mr.

24   Jarrett is relying on is invalid.  The reason it's invalid is

25   because -- it's just a law, it's just a rule -- that the

1    owner of the mark has to file the trademark application.  In

2    this case, an entity called Global Force Wrestling filed the

3    trademark application, not the plaintiff, Global Force

4    Entertainment.  Because the owner did not file the trademark

5    registration, it was void at the beginning.  It was just

6    wrong from the get-go, and it's not valid.  Secondly, that

7    entity, Global Force Entertainment -- or Global Force

8    Wresting was administratively dissolved in 2015.  And what

9    that means is they didn't file what they were supposed to

10   file to keep that company active.  Once that happens, and

11   it's administratively dissolved, it's a nonentity.  It's a

12   nullity.  It doesn't really exist in the eyes of the law any

13   more.  So it can't perform acts that would have kept that

14   trademark valid.  And that's what happened.  They had to file

15   something, that statement of use that we were just talking

16   about earlier, but they filed it as a defunct company.  And

17   because they were defunct, that statement of use is no good,

18   which makes the registrations no good as well.

19          Now, because they don't have a valid federal

20   registration, two of those claims, federal trademark

21   infringement and counterfeiting cannot proceed.  You must

22   have a valid federal registration to even make those claims.

23   And because that registration was valid from the very get-go,

24   because the wrong company filed it, you must check, no, that

25   there's no federal trademark infringement or counterfeiting.

1    Likewise, Anthem isn't liable for conversion.

2  Conversion is the claim that arises from the idea that those

3  original files, the raw footage were deleted.  Now, GFE can't

4  prove that -- the first element:  Use in enjoying another's

5  property without the owner's content.  They can't prove that

6  because, as we've gone over, Anthem had Mr. Jarrett's consent

7  and GFE's consent.  He told them to do it.  He's the one who

8  caused it to be done.  So they can't make meet first that

9  element.  Second element, destruction of property of another

10 by excluding or defying the owner's rights.  Here's there's

11 been no destruction of property because the content of those

12 files is incorporated in what still exists.  There's a final

13 broadcast-ready version of it.  It's even more valuable than

14 the raw footage.  There's a version that's editable that can

15 be changed in any way that one would want to change it in.

16 So there's been no destruction or loss.  And withholding of

17 personal property from the owner is another element.  That

18 can't -- there's not even been an allegation that that

19 happened.  And Mr. Jarrett has never asked for these final

20 broadcast-ready masters.  So they can't meet that element.

21    Negligence.  That's a claim arising from that same

22 issue of the deleting of the original files.  To make out a

23 claim for negligence, they have to prove that Anthem owed GFE

24 a duty of care, Anthem fell below that duty of care, and that

25 caused loss or damage, and that Anthem's negligence was the

1  cause of that loss.

2         Now, Mr. D'Amore testified that it was completely

3  the normal course of business once you had that final

4  broadcast-ready version done, you deleted the original

5  footage.  The reason for that is it costs a ton of money to

6  store these humongous graphics files.  So once you've got it

7  ready and finished, you delete that raw footage.  If you want

8  the raw footage to be maintained, you have to tell the

9  company that.  And Mr. Jarrett knew that as -- and nobody

10 ever told Anthem, hey, you need to preserve this raw footage.

11 So there was no duty that Anthem had to preserve it because

12 no one ever told them to do it.  And finally, because every

13 bit of that raw footage is incorporated into the final,

14 there's been no loss or damage there.  There's -- so if you

15 can't make out a showing of any harm, you can't make out that

16 claim.

17        Unjust enrichment, that is the claim that GFE

18 bestowed some benefits on Anthem by allowing -- you know,

19 giving the intellectual property to be used, that Anthem

20 accepted those benefits, and that it was under circumstances

21 that would be inequitable or unjust.  Now, as I've said,

22 Anthem strongly believes they have a license to do everything

23 they did because Mr. Jarrett gave them permission and told

24 them to do it.  Not just gave them permission.  He caused it

25 to be done.  If you've got a license, you can't be liable for

1    unjust enrichment because that's a contract.  And unjust

2    enrichment does not apply to -- to claims where you have a

3    contract.  So because this license exists, there can be no

4    unjust enrichment.  And finally, Anthem has not abandoned its

5    Jeff Jarrett trademark.  Anthem has a valid registration.  It

6    obtained it fair and square by paying for it.  And it has

7    maintained it like it was supposed to and filed everything it

8    needed to file.  And there's no evidence to the contrary.

9    The items that they had to file to maintain it are sworn

10   declarations that they are using it in the way that it has to

11   be used.  There's no evidence to the contrary.  And they

12   are -- they are currently out of toy action figures but there

13   was testimony from Mr. Matthews and Mr. D'Amore that they are

14   actively in conversations with toy makers to make a legend

15   series, one of which would be Mr. Jarrett.  So they cannot

16   show that Anthem has abandoned use of that mark or that they

17   intend not to resume use of that mark.  So if they can't show

18   that, they're not entitled to have that registration

19   cancelled.

20            Now, Anthem's counterclaims.  Anthem is claiming

21   that Mr. Jarrett breached his duty -- his fiduciary duty and

22   his duty of loyalty.

23            Now, Mr. Miller claims that Mr. Jarrett acted in

24   good faith.  Well, I just don't believe that we as people

25   that live and work in the -- in the business community

1 believe that an officer of the company can expose the company
2 to liability from employees by beating an employee with a
3 belt, exposing himself to employees, abusive behavior to
4 employees, exposing the company to liability from third
5 parties. He exposed himself to nonemployees in a bar. That
6 was what the testimony showed. He shoved an important
7 executive at an event. His substance abuse prevented him
8 from doing his job. He showed up drunk -- many times showed
9 up drunk at important meetings, showed up drunk at important
10 events. He caused -- he ran off employees -- or almost
11 did -- that would have left had he not gone on leave. He
12 exposed the company to terrible PR. So -- and if you were to
13 find that Mr. Jarrett didn't give a license, then all of
14 these things he did by letting -- by causing the company to
15 use IP that didn't belong to it, that's causes damage to the
16 company. So all of these items are -- this behavior is just
17 so appalling and egregious that it clearly caused harm to the
18 company and would have breached his duties of loyalty and
19 fiduciary duties to the company as an officer.
20          Now, an unjust enrichment, Anthem is claiming, and
21 the proof showed, that Anthem paid $40,000 to obtain release
22 of this *Amped* content so it could be used. That's amounts
23 that reduced the debt that GFE owed. It's a benefit GFE
24 received. And Anthem believes it's entitled to be reimbursed
25 for that.

1      Now, you're going to be asked to complete the

2  verdict form.  And it can be long and completed.  And there

3  are a bunch of claims on there.  And I just kind of want to

4  run through this verdict form very quickly.  The first thing

5  on your verdict form is the Lanham Act claims.  Those are the

6  trademark related claims under federal law.

7      So the verdict form is going to ask you on

8  Global's claims for trademark infringement under federal law,

9  as those elements are described in your jury instructions, do

10  you find that Global has proved infringement on the following

11  trademark?  And it's the Global Force Wrestling mark.  You're

12  going to check "no" there because of the reasons we've talked

13  about.  One, you can't prove infringement if there was a

14  license because the conduct was done with permission.  Two,

15  there's no likelihood of confusion.  Three, that trademark

16  registration right there is invalid because the wrong party

17  filed it.  And the company was defunct that filed the

18  maintenance documents.  So it's invalid, which means they

19  cannot meet their burden on that claim.

20      Second, unfair competition.  That's another

21  trademark infringement claim.  It's basically -- a lot of

22  these things are basically the same thing.  To succeed on

23  this claim, the plaintiff has got to show that the use was

24  without permission and that it caused a likelihood of

25  confusion.  For the reasons we've talked about, you should

1  check "no" there because the use was done with permission,

2  with Mr. Jarrett's permission, and there's no likelihood of

3  confusion.  Third, there's a claim in here for

4  counterfeiting.  Now, counterfeiting is another of these

5  trademark claims that requires you to have a valid federal

6  trademark registration.  And that's -- so they have to

7  show -- see that Global Force Wrestling U.S. trademark

8  registration number da, da, da, da.  That registration has to

9  be valid before they can make out that claim.  So for the

10 reasons I went over above, it's not valid, because the wrong

11 party filed it and the company was defunct when they filed

12 the maintenance documents.  So they can't make out that claim

13 as a matter of law.

14         Then you're going on to get questions like this:

15 If you answered yes to any box of question 3, do you find

16 that Anthem's acts were willful, as that term is defined in

17 the instructions?

18         Now, you're going to skip this because you

19 answered no.  You don't even have to deal with that.  But if

20 you want to answer it, you can check no.  And by willful, the

21 reason -- none of this conduct was willful or wrongful was

22 because Anthem believed it had the right to do it because the

23 plaintiff caused all this to happen and put it on this path

24 that they could not stop.

25         State trademark infringement claims, basically the

 1    same standard.  Is there a likelihood of confusion among

 2    consumers caused by the use of these marks.  And if it was

 3    done with permission or pursuant to a license, you can't make

 4    out that claim.  So you're going to check no on all of those

 5    marks because it was done by permission.

 6              On 6, Global's claims for unfair competition under

 7    Tennessee law.  Again, that's another way of saying the same

 8    thing.  It's a trademark infringement claim.  The plaintiff

 9    would have to prove that there was a likelihood of confusion

10    and that the use was done without permission.  Here, there's

11    a license.  So it was done with permission.  And there's no

12    likelihood of confusion.  So you're going on to check all the

13    way up and down there.  Check no.

14              All right.  Number 7.  Here we have another one of

15    these very similar claims.  The Tennessee Consumer Protection

16    Act violation.  That again requires that the use be done

17    without consent and that there was a likelihood of confusion

18    caused.  Because there was a license and because there was no

19    likelihood of confusion, you're going to check no to that one

20    as well.

21              And again, you get another one of these questions,

22    well, if you answered that yes, do you find that it was

23    willful.  If you answered no above, you don't even have to

24    address that.

25              And -- so an all of those that we just went

1  through, that whole bucket of claims are the infringement --

2  trademark infringement claims.  And the license would

3  encompass all of those if you find that Mr. Jarrett granted a

4  license.

5      All right.  This next claim is the unjust

6  enrichment claim.  And for the reasons we went over there's

7  been no unjust enrichment.  Because again there's a license.

8  And if you've got a contract, you can't have unjust

9  enrichment.  That's just Tennessee law.  You just can't make

10  it out.  So because there's a license, you check no there.

11      Ten, on the claims for conversion, you're going to

12  check no there because there's been no destruction or

13  destroying of anything by the deletion of those 16 raw

14  footage files because that raw footage file -- that raw

15  footage is incorporated into what's left in a better more,

16  marketable way.

17      And again, you've got the question, hey, if you

18  answered yes to the one above, do you think it was willful.

19  So if you answered no, you don't even have -- you can just

20  skip that, you don't even have to answer it.

21      Negligence, arising from that same deletion of

22  those files.  The reason there's no negligence is because

23  there was no duty to GFE.  GFE never asked Anthem to preserve

24  those files.  And so it wasn't foreseeable to Anthem that

25  this was going to be a problem.  This is the way it was

1  always done.  And besides, there's no damage because, again,
2  that final broadcast-ready master still exists, along with an
3  editable version of it.  So there's no harm.
4         You're going to get another question, hey, if you
5  answered yes above, do you find that Anthem's conduct was
6  willful?  If you answered no, you can skip that.
7         But again, if you do determine that you want to
8  check yes on one of these infringement claims, the
9  willfulness, that standard is extremely high.  And given that
10 Anthem believes it has a license and was doing all this at
11 Mr. Jarrett's direction, it can't be willful.
12         THE COURT:  You have five minutes left.
13         MS. MILLS:  On Mr. Jarrett's claims under the
14 Tennessee Personal Rights Protection Act, that's the claim
15 where he's saying, hey, you used my image and likeness in the
16 *Amped* content.  Again, that claim you should check no because
17 there was a license; it was done with permission.  And -- so
18 there's no -- there's no cause of action there.
19         You're also going to be asked whether Anthem
20 Wrestling provides a sports broadcast.  And the reason you're
21 asked that is that's an exception to that statute.  You heard
22 from Mr. Matthews who told you that he's the one that's in
23 charge of Anthem's talent, their wrestlers.  And there's
24 certain state laws -- certain laws -- certain states have all
25 these laws that apply to contact sports.  And these states

 1   include wrestling in those statues.  You have to have a, you
 2   know, medical professional on site and things like that.
 3   Because those statues treat professional wrestling as a
 4   sport, we assert it's a sport and it should be treated as
 5   that for these purposes.  So we would say do you find Anthem
 6   Wrestling provides a sports broadcast?  You should check yes.
 7          16, did Anthem discontinue use of the Jeff Jarrett
 8   mark?  And the answer there is no.  The testimony was we
 9   continued to use it.  We have filed the appropriate filings
10   that are sworn filings.  And the registration is valid.  And
11   we have a presumption that it's valid and that items are in
12   use.  So you're going to check no there.  Do you find that
13   Anthem failed to protect its rights with regard to Jeff
14   Jarrett's marks.  There's absolutely no evidence of any kind
15   that Anthem didn't protect its rights with respect to the
16   Jeff Jarrett mark.  So you're going to check no there again.
17          And finally, do you find that Anthem made a false
18   representation to the Patent and Trademark office in
19   connection with the application?  First of all, Anthem didn't
20   even file the trademark.  That was done years ago at TNA.
21   And there's zero evidence of any kind in this record that
22   TNA, much less Anthem, did anything fraudulent.  And they
23   didn't.  So you should you had check no here.
24          And 19, do you find that the federal registration
25   for the mark Jeff Jarrett should be canceled?  And again,

1   because this registration is valid and existing and has been
2   maintained and is in use and there's no intent to abandon it,
3   you should check no.
4           On Anthem's breach of fiduciary duty and loyalty
5   counterclaims, we believe that Mr. Jarrett's conduct was so
6   egregious as an officer of the company that it did violate a
7   duty of loyalty and a duty of -- a fiduciary duty.  So we
8   think he should check yes to 20 and 21.  And on the claim of
9   unjust enrichment, where Anthem actually paid for the release
10  of this content so that it could be used and it reduced the
11  debts of Mr. Jarrett and GFE, the answer there is, yes,
12  Anthem is entitled to that -- Anthem has proved that claim.
13  And then you're going to sign it.  And -- or the foreperson
14  will.  So that's the last step.
15          We ask that you -- you folks -- and I know you
16  will -- use your commonsense and everything you've learned
17  and seen and watched and -- and the relative believability of
18  these witnesses.  And we ask that you decide with your
19  commonsense what's fair.  Is it reasonable to hire a person
20  and pay them $250,000 to be in charge of something and they
21  come in and they -- let's suppose you hired somebody to be in
22  charge of your IT department, the website, and you bring this
23  person in and you're paying them a lot of money and they
24  happen to be a shutter bug and they like to take pictures an
25  and put their pictures all over your website, and then they

1  do some egregious conduct, some kind of egregious conduct

2  that gets themselves fired.  Can they turn around and sue you

3  for using those pictures that they themself put all our your

4  website?  No.  The reason they can't is because that's a

5  license.  When they do it and they put it on there, they are

6  licensing that stuff for the way it's being used.  And that

7  only makes sense.  That's commonsense.

8          THE COURT:  Ms. Mills, you've run out of time.

9          MS. MILLS:  So we ask that you return a verdict in

10  favor of Anthem on all claims.  Thank you.

11          THE COURT:  All right.  Mr. Miller, you've got 12

12  minutes.

13          MR. MILLER:  Thank you, Your Honor.

14          Sometimes the things you hear and don't hear are

15  really important.  Sometimes the things that you don't hear

16  are just as important as the things you do.

17          So you've heard today, several times -- I counted

18  at least five -- that the implied license is a contract.

19  It's an agreement.  So on one side Anthem gets to use the

20  content and trademarks for whatever it wants for as long as

21  it wants, however it wants forever.  On the other side, they

22  say there was no required merger on this side.  Right?  No

23  mention of that.  They just say it's not right.  So what's

24  not being said?  What is Mr. Jarrett getting for this

25  contract?  Where are the two sides here that are forming the

1  contract?  They say there's an implied license that's a

2  binding agreement, you can't do unjust enrichment, you can't

3  get give it to us.  But where is the contract?  We all know

4  when you buy a car there's two sides to that contract.  And

5  here, silence.  What you also didn't hear when they said

6  there's no passing off is any explanation how anyone could

7  look at the back of that DVD box, any of the four, and think

8  anything but that Anthem owns the content and the trademarks.

9  That's what it says.  There's no reason to believe otherwise.

10         When it comes to the cancellation and abandonment,

11 what didn't you hear?  You didn't hear that they were going

12 to hire back Mr. Jarrett.  How are they going to prove that

13 there is an entertainment service that's going on?  They're

14 not going to hire him back.  There was no mention of that.

15 You heard them reference to Mr. Jarrett as the big boss four

16 or five times.  There's no mention of Mr. Nordholm's

17 testimony that he was responsible for branding, that he was

18 responsible, he was the ultimate big boss.  There's really no

19 dispute to that.  He testified right there to that.

20         You didn't hear -- you didn't hear any reason why

21 Mr. Jarrett wouldn't be entitled to a judgment in his favor.

22 It's just smoke and mirrors.

23         When it comes to the administrative dissolution,

24 what you didn't hear is law that you'll see on the jury

25 instructions.  And I'm not here to instruct you on that.

1   That's His Honor's job.

2           You didn't hear that although Mr. D'Amore owns 5

3   percent of my client Global Force Entertainment, you didn't

4   hear how much he was getting paid when he took over the

5   position for Mr. Jarrett.  You didn't hear how once the

6   cupboard was bear of the content, and the trademarks had been

7   used by someone else, how he picked a side.  He picked the

8   side that was winning, the side that had taken the content.

9   And so because he was getting paid for that, it makes sense

10  why he switched sides.  But you didn't hear that.  You heard

11  that Mr. Jarrett was carried on the back of Mr. Nordholm and

12  the other employees.  There was no explanation as to why he

13  was being carried on their backs, why his content and his

14  trademarks were taken.  Did he tell them to take it because

15  you're carrying on the back, that we have an agreement?  No,

16  you didn't hear that.

17          Ladies and gentlemen of the jury, I would be

18  remiss if I didn't thank you for the hard work that you've

19  done.  You've been here a long time.  And I trust that you'll

20  do a lot of hard work as we go forward.

21          We believe that the evidence is clear.  We didn't

22  have any fancy power points.  We just showed you the

23  evidence.  The evidence shows you what you need.  And you

24  have everything to find for my clients.

25          Thank you for your time.

1          THE COURT:  All right.  So ladies and gentlemen,
2     we're going to take a break at this point, let you refresh
3     yourselves.  I estimate it will take the better part of an
4     hour for me to give you the jury instructions and then you
5     can retire back to begin your deliberations.
6          Thank you.
7          (Recess.)
8          THE COURT:  All right.  Be seated.
9          Bring in the jury.
10          (Jury present.)
11          THE COURT:  All right.  Be seated.
12          Members of the jury:
13          Now that you've heard the evidence and the
14     argument, it becomes my duty to give you the instructions of
15     the Court as to the law applicable to this case.
16          It is your duty as jurors to follow the law as I
17     shall state it to you and apply the law to the facts as you
18     find them from the evidence in this case.  You are not to
19     single out one instruction alone as stating the law but must
20     consider the instruction as a whole.  Neither are you to be
21     concerned with the wisdom of any rule of law stated by me.
22          The lawyers may have referred to some of the
23     governing rules of law in their arguments and witnesses may
24     have shared their opinion of the law.  There may also be
25     references to the law in exhibits admitted into evidence.  I

1  instruct you to ignore any such references.  You should only

2  apply the law that I instruct you about in these instructions

3  and the facts you find in the case.

4          Nothing I say in these instructions is to be taken

5  as an indication that I have any opinion about the facts of

6  the case, or what that opinion is.  It is not my if you won't

7  be to determine the facts, but yours.

8          Now, some of you may have didn't hear that.  You

9  heard the terms direct evidence and circumstantial evidence.

10         Direct evidence is simply evidence like the

11  testimony of an eyewitness which, if you believe it, directly

12  proves a fact.  If a witness testified that he or she saw it

13  raining outside, and you believed him or her, that would be

14  direct evidence that it was raining.

15         Circumstantial evidence is simply a chain of

16  circumstances that indirectly proves a fact.  If someone

17  walked into the courtroom wearing a rain coat covered with

18  drops of water and carrying a wet umbrella, that would be

19  circumstantial evidence from which you could conclude that it

20  was raining.

21         It is your job to decide how much weight to give

22  the direct and circumstantial evidence.  The law makes no

23  distinction between the weight that you should give to either

24  one and does not say that one is any better evidence than the

25  other.  You should consider all the evidence, both direct and

1  circumstantial, and give it whatever weight you believe it

2  deserves.

3          Certain testimony has been presented into evidence

4  from a deposition.  A deposition is testimony taken under

5  oath before the trial and preserved in writing.  You are to

6  consider that testimony as if it had been given in court.

7          During the course of the trial, you may have

8  didn't hear that.  You heard reference made to the word

9  interrogatory.  An interrogatory is a written question that

10 must be answered under oath in writing.  You are to consider

11 interrogatories and their answers as if the questions had

12 been asked and answered in court.

13         Another part of your job as jurors is to decide

14 how credible or believable each witness was.  This is your

15 job, not mine.  It is up to you to decide if a witness's

16 testimony was believable, how much weight you think it

17 serves.  You are free to believe everything that a witness

18 said, or only part of it, or none of it at all.  But you

19 should act reasonably and carefully in making these

20 decisions.

21         Let me suggest some things for you to consider in

22 evaluating each witness's testimony.

23         Ask yourself if the witness was able to clearly

24 see or hear the events.  Sometimes even an honest witness may

25 not have been able to see or hear what was happening, and may

1  make a mistake.

2          Ask yourself how good the witness's memory seemed

3  to be.  Did the witness seemed able to accurately remember

4  what happened?

5          Ask yourself if there was anything else that may

6  have interfered with the witness ambassador ability to

7  perceive or remember the events.

8          Ask yourself how the witness acted while

9  testifying.  Did the witness appear honest?  Or did the

10 witness appear to be lying?

11          Ask yourself if the witness had any relationship

12 to the plaintiff or the defendant, or anything to gain or

13 lose from the case that might influence the witness's

14 testimony.

15          Ask yourself if the witness had any bias, or

16 prejudice, or reason for testifying that might cause the

17 witness to lie or to slant the testimony in favor of one side

18 or the other.

19          And ask yourself how believable the witness's

20 testimony was in light of all the other evidence.  Was the

21 witness's testimony supposed supported or contradicted by

22 other evidence that you found believable?  If you believe

23 that witness's testimony was contradicted by other evidence,

24 remember that people sometimes forget things, and that even

25 two honest people who witness the same event may not describe

1    it exactly the same way.

2         These are only some of the things you may consider

3    in deciding how believable each witness was.  You may also

4    consider other things that you think shed some light on the

5    witness's believability.  Use your common sense and your

6    every day experience in dealing with other people.  And then

7    decide what testimony you believe, and how much weight you

8    think it deserves.

9         In reaching your verdict, you are not to -- you

10   are to consider only the evidence in this case.  However, you

11   are not required to set aside your common sense, and you --

12   and you have the right to weigh the evidence in the light of

13   your own observations and experiences.  Do not decide the

14   case based on implicit biases which are hidden thoughts which

15   can IMPACT what we see and hear, how we remember what we see

16   and hear, and how we make important decisions.  As we

17   discussed in jury selection, everyone, including me, has

18   feelings, assumption, perceptions, fears, and serotypes, that

19   is, implicit biases that we may not be aware of.  Because you

20   are making very important decisions in this case, I strongly

21   encourage you to evaluate the evidence carefully and to

22   resist jumping to conclusions based on personal likes or

23   dislikes, generalizations, gut feelings, prejudices,

24   sympathies, stereotypes, or biases.  The law demands that you

25   return a just verdict based solely on the evidence, your

individual evaluation of that evidence, your reason and common sense, and these instructions. Our system of justice is counting on you to render a fair decision based on the evidence, not on biases.

Throughout the trial, you may have seen documents that have been redacted. These documents may have been redacted fire variety of reasons. They may contain information individuals or entities not involved in this case. They may contain information that is confidential. You are not to make any inferences concerning the redactions. You should ignore the redactions completely. It is a normal part of the process and the dominance are properly redacted pursuant to this Court's order.

A stipulation is an agreement. The parties have stipulated that certain matters of fact are true. They are found by this agreement and your consideration of the evidence, you are to treat these facts as proven.

The parties have stipulated to the following: 1, the plaintiff Global Force Entertainment, Inc., GFE, is a Tennessee corporation having its principal place of business in Goodlettsville, Tennessee.

Plaintiff Jeffrey Jarrett, Jeff Jarrett, is a resident of Hendersonville, Tennessee. He has been a professional wrestler for over 25 years. Mr. Jarrett is a member of the Hall of Fame of World Wrestling Entertainment,

1    Inc., commonly known as the WWE.

2          3, Mr. Jarrett is the majority owner of GFE.

3          4, in addition to his ownership of GFE,

4    Mr. Jarrett was the sole member and manager of Global Force

5    Wrestling LLC, a Tennessee limited liability company that was

6    formed on January 8, 2014.

7          5, in April 2014, Jeff Jarrett formed GFE.

8          6, on July 24, August 21, and October 23, 2015,

9    GFE filmed a series of professional wrestling events under

10    the name *Amped* in Las Vegas, Nevada at the Orleans Arena.

11          7, in or around December 2015, GFE hired Kevin

12    Sullivan for post-production work on the *Amped* event to

13    create 16 episodes of a pilot-television professional

14    wrestling show called *Amped*.

15          8, Mr. Sullivan's post-production work involved

16    editing the video and audio taken by multiple cameras in

17    multiple locations during and after the events in the Orleans

18    Arena to create the 16 episodes.

19         The, Anthem Wrestling is a Delaware limited like

20    the company that develops and distributes professional

21    wrestling content.

22         10, Ed Nordholm is the President of Anthem

23    Wrestling and on its board of manager.

24         11, on June 21, 2017, Anthem Wrestling and

25    Mr. Jarrett signed a document titled, quote, Jeff Jarrett

1  executive engagement and acquisition of GFE, end quote.  The

2  document set forth the terms of the proposed merger between

3  Anthem Wrestling and GFE.  The document is commonly referred

4  to in this lawsuit as the term sheet.

5            12, Exhibit 1 is way copy of the term sheet.

6            13, the term sheet identifies Mr. Jarrett's

7  position as Anthem Wrestling's Chief Creative Officer.

8            14, on August 11, 2017, Anthem Wrestling released

9  Part 1 of the Amped Anthology on pay per view.

10            15, on September 15th, 2017, Anthem Wrestling

11  released Part Two of the Amped Anthology on pay per view.

12            16, on October 13, 2017, Anthem Wrestling released

13  Part Three of the Amped Anthology on pay per view.

14            17, on December 8, 2017, Anthem Wrestling released

15  Part Four of the Amped Anthology on pay per view.

16            Discrepancies in a witness's testimony or between

17  his testimony and that of others do not necessarily mean that

18  the witness should be discredited.  Failure of recollection

19  is a common experience, and innocent mistakes recalling

20  certain facts are not uncommon.  Two persons witnessing the

21  same incident or transaction often will see or hear it

22  differently.  Whether a discrepancy pertains to a fact of

23  importance or only to a trivial detail should be considered

24  in wage its significance.

25            A witness may be discredited or impeached by

1 contradictory evidence, or by evidence that at some other

2 time the witness has said or done something, ors had a failed

3 to say or do something, which is inconsistent with the

4 witness's present testimony.

5 If you believe any witness has been impeached and

6 thus discredited, you may give the witness -- you may give

7 the testimony of that witness such credibility, if any, as

8 you may think it deserves.

9 If a witness has shown knowingly to have testified

10 falsely concerning any material matter, you have a right to

11 distrust that witness's testimony in other particulars, and

12 you may reject all of the testimony of that witness or give

13 it such credibility as you may think it deserves.

14 An act or omission is done knowingly if

15 voluntarily and intentionally, and not because of a mistake

16 or accident or other innocent reason.

17 During the course of the trial I have admitted

18 some evidence for a limited purpose. An exhibit, or

19 testimony, can be admissible for one, but not for other. To

20 the concepts that it is relevant, you play consider any such

21 evidence only for the purpose for which it was admitted, such

22 as to show the speaker's mental state, or to establish that a

23 complaint was made. Such evidence should not be considered

24 by you as proof of the truthfulness of specific factual

25 matters.

1    In this days the following it'll be were submitted
2  for a limited purpose.  Exhibit 25 was admitted only for the
3  limited purpose of showing Mr. Jarrett signed pages 22
4  through 24.  Exhibit 155 was admitted only for the limited
5  purpose of showing the unredacted apportion of the document.
6  The Exhibit 201 was admitted only for the purpose of showing
7  the word removed next to Mr. Jarrett's name on the salaries
8  and IC comp page 1 of the unredacted portion of the document.
9  Exhibit 267 was admitted only for the limited purpose of
10  showing interrogatory number 2 and the response to
11  interrogatory number 2.
12    Evidence does not include certainly things that
13  you have didn't hear that.  You heard in the courtroom.
14  Evidence does not include any statement of the attorneys
15  during the trial, including their closing arguments.  You
16  must decide for yourself whether you believe the facts show
17  what the attorneys have argued they show.
18    Evidence does not include answers, statements, or
19  comments made by the attorneys that I ordered stricken.  You
20  are to treat anything that I ordered stricken as if you had
21  never didn't hear that.  You heard it.
22    Finally, evidence does not include any objections
23  raised by the attorneys.  You must not speculate why I
24  sustained or overruled any objection, nor are you permitted
25  to guess what the answer might have been to any question I

did not allow.  You may not draw any inference or speculate on the truth of any suggestion included in a question was that not answered.

One more point about witnesses.  Sometimes jurors wonder if the number of witnesses who testified makes any difference.

Do not me any decisions based only on the number of witnesses who testified.  What is more important is how believable the witnesses were, and how much weight you think their testimony deserves.  Concentrate on that, not on the numbers.

Sympathy or prejudice must not enter into your deliberation as jurors, no matter what your sympathy or prejudice may lead you to think.  Sympathy or prejudice has no place in the trial of a lawsuit, or in the making up of your minds as to what your verdict shall be.  Do not permit any such emotional considerations to enter into your deliberations at all.  The law demands of you a just verdict, unaffected by anything except the evidence, your common sense, and the law as the Court gives it to you.

The fact that a corporation is a party must not influence you in your deliberations or in your verdict.

Corporations and persons are equal in the eyes of the law.  Both are entitled to the same fair and impartial treatment and to justice by the same legal standards.

1     There is no evidence before you that any party has
2  or does not have insurance.  Whether or not insurance exists
3  has no bearing upon any issue in this case.  You may not
4  discuss insurance or speculate about insurance, based on your
5  general knowledge.
6     There are sound reasons for this rule.  A party is
7  no more or less likely to be negligent because a party does
8  or does not have insurance.  Injuries and damages, if any,
9  are not increased or decreased because a party does on or
10 about does not have insurance.
11    Under certain circumstances you may consider the
12 absence of a witness.  You Macon clued that the testimony of
13 the witness would be adverse to the party who failed to offer
14 it only if you find all of the following elements:
15    1, that it was within the power of a party to
16 produce a witness on an issue in this case, but that party
17 has failed to produce the witness; and.
18    2, the witness was uniquely under the control of
19 the party and could have rusted -- could have been produced
20 by the exercise of reasonable diligence; and.
21    3, the witness was not equally available to an
22 adverse party or the witness was likely to be biased against
23 an adverse party because of a relationship to the party who
24 would be expected to produce the witness; and.
25    4, the witness's testimony would not be merely

1    cumulative; and.

2            5, a reasonable person under the same or similar

3    circumstances would have produced the witness if the

4    testimony would be favorable; and.

5            6, no reasonable excuse for the failure has been

6    shown.

7            You must find all of these elements before you can

8    conclude that the testimony of a witness would be adverse to

9    a party.

10           The party with the burden of proof on any given

11   issue has the burden of proving every disputed element of his

12   or her claim to you by preponderance of the evidence.  If you

13   conclude that the party bearing the burden of proof has

14   failed to establish his or her claim by preponderance of the

15   evidence, you must decide against that party on the issue you

16   are considering.

17           What does a preponderance of the evidence mean?

18   To establish a fact by a preponderance of the evidence means

19   to prove that the fact is more likely true than not true.  In

20   determining whether a claim has been proved by a

21   preponderance of the evidence, you may consider the relevant

22   testimony of all the witnesses, regardless of who may have

23   called them, and all the relevant exhibits he received in

24   evidence, regardless of who may have produced them.

25           If you find that the credible evidence on a given

issue is evenly divided between the parties-that is equally
probable that one side is right as it is that the other side
is right-then you must decide that that issue -- that issue
against the party having the burden of proof.  That is
because the party bearing the burden must prove more than
simple equality of evidence.  On the other hand, the party
with the burden of proof need prove no more than a
preponderance.  So long as you find that the scale tips,
however slightly, in favor of the party with this burden of
proof, then that element will have been proved by a
preponderance of the evidence.

Some of you may have heard of proof beyond a
reasonable doubt, which is the proper standard of proof in a
criminal case.  That requirement does not apply to a civil
case such as this case, and you should put it out of your
mind.

I am now going to turn to the substantive law in
this case.  This is the law that you will apply to the facts,
as you determine, to decide whether plaintiffs, Global Force
Entertainment, Inc., and Jeffrey Jarrett, have proven one or
more of their claims by the preponderance of the evidence
and/or whether defendant/counterclaim plaintiff Anthem
Wrestling Exhibitions, Inc. Has proven one or more of its
counterclaims by a preponderance of the evidence.

GFE asserts claims against Anthem Wrestling for,

one, trademark infringement and unfair competition in
violation of the federal Lanham Act and state law; 2,
counterfeiting in violation of the Lanham Act; 3, violations
of the Tennessee Consumer Protection Act; 4,
conversion/trover understate law; and 5, negligence under
Tennessee law.  In addition, Mr. Jarrett brings a claim
against Anthem Wrestling for violation of the Tennessee
Personal Rights Protection Act.  Finally, both GFE and
Mr. Jarrett jointly seek cancellation of Anthem Wrestling's
ferm trademark registration of Jeff Jarrett.

Anthem Wrestling asserts a counter claim against
Mr. Jarrett for breach of fiduciary duty and the duty of
loyalty.  Additionally, Anthem asserts a counterclaim for
unjust enrichment against both GFE and Mr. Jarrett.

Even though there are two plaintiffs, GFE and
Mr. Jarrett, and counterclaim plaintiff, Anthem Wrestling, in
this laws lawsuit, the case of each is separate and
independent.  Unless you are instructed to the contrary, the
instructions apply to the facts of each parties's case.  You
will decide each parties's case separately, as if you are
deciding different lawsuits.

I will begin by giving you the law surrounding
plaintiffs' claims against the defendant.  Next I will
discuss defendant's defenses to plaintiff's claims, then I
will give you the law surrounding Defendants' counterclaims.

1   GFE claims that Anthem Wrestling has infringed its

2  registered trademark Global Force Wrestling.  A trademark is

3  any word, name, symbol, device, or any intention there of,

4  used by a person to identify and distinguish that person's

5  goods from those of others and to indicate the source of the

6  goods.  A person who unlawfully uses the of another may be

7  libel for damages.

8   To prove its claim, GFE must establish the

9  following facts by a preponderance of the evidence.

10   1, GFE owns a trademark that is entitled to

11  protection; and paragraph 2, Anthem Wrestling used that

12  trademark without consent in a manner that is likely to cause

13  confusion among consumers as to the source, sponsorship,

14  affiliation, or approval of goods or services.

15   You must first find that GFE owns a federal

16  registration of the trademark at issue in this case.  To do

17  this, you must find that the trademark is covered by a

18  registration on the principal register of the U.S. Patent and

19  Trademark Office.  Such a registration shall be prime face

20  evidence of the validity of the registered mark and of the

21  registration of the mark, of the registrant's ownership of

22  the mark, and of the registrant's exclusive right to use the

23  registered mark in commerce on or in connection with goods or

24  services specified in the registration, but shall not

25  preclude another person from proving any legal or equitable

defense or defect.  Anthem Wrestling asserts that the federal

registrations are invalid, and it is Anthem's burden to prove

that the trademarks are invalid.

If you find GFE's trademark is covered by a

federal registration, GFE enjoys what is known as

constructive nationwide priority in its trademark, whether or

not GFE use the trademark on a nationwide basis.  GFE is

presumed to have started using the trademark nationwide as of

its filing date, even if it only used it in a limited area.

When a trademark is covered by a federal registration, the

owner enjoys nationwide priority of rights dating back to the

filing date of the application, and others are deemed to have

knowledge of the registration and of the rights claimed in

the registration.  This is known as constructive notice, and

others cannot claim that they adopted the trademark without

knowledge of the trademark.

If you have determined that GFE own a trademark

that is entitled to protection, you must next consider

whether Anthem Wrestling infringed GFE's trademark.  The test

for infringement is whether Anthem Wrestling's use is likely

to cause confusion with GFE's trademark.  That is, you must

determine if Anthem Wrestling, without GFE's consent, used

the same or a similar trademark in connection with the sale

of, or the offer to sell, goods or services in a manner that

is likely to cause confusion among consumers as to the

source, affiliation, approval, or sponsorship of the goods or services.

Source, origin, affiliation, approval, or sponsorship means that the public believes that Anthem Wrestling's goods or services come from, are affiliated with, are approved by, or sponsored by GFE. It is not necessary that the trademark used by Anthem Wrestling be an exact copy of GFE's trademark. Instead, GFE must demonstrate, by a preponderance of the evidence, that Anthem Wrestling use of its trademark is, when views in its entirety, likely to cause confusion as to the source, origin, affiliation, approval, or sponsorship of the goods or services in question.

Therefore, to succeed on its trademark infringement claim, GFE must show by preponderance of the evidence that Anthem Wrestling:

1, used the trademark in convex with the sale or offer to sell goods or services;

2, used the trademark in commerce; and.

3, used the trademark in a manner that is likely to cause confusion, mistake, or deception as to the source, origin, affiliation, approval or sponsorship of Anthem Wrestling's goods or services.

There are eight factors you can use to determine whether a likelihood of confusion exists. No single factor or consideration controls, and GFE is not required to prove

1　all, or even most, of the factors are present in any

2　particular case, and you may consider other factors as well.

3　You should weigh all of the relevant evidence in determining

4　whether a likelihood of confusion exists.  The eight factors

5　are as follows:

6　　　　　　Strength of GFE's trademark.

7　　　　　　The first factor is the type and strength of the

8　trademark.  Trademarks come in different types or categories,

9　namely generic, descriptive, suggestive, arbitrary, and

10　fanciful or coined.  The type of a claimed trademark is

11　relevant to the trademark's strength.  Some trademarks are

12　stronger than others.  The stronger the trademark, the more

13　protection should be given to it.  I will now describe each

14　type of trademark in the order of their general relative

15　strength.

16　　　　　　Generic.

17　　　　　　A claimed trademark is generic if it is the word,

18　name, symbol, device, or any combination there of, by which

19　the good commonly is known.  An example of a generic

20　trademark is escalator for moving stairs.  Whether a claimed

21　trademark is generic does not depend on the term itself, but

22　on use of the term.  A word may be generic of some things but

23　not of others.  For example, ivory is generic for elephant

24　tusks, but it is not generic for soap.  Whether a claimed

25　trademark is a generic term is viewed from the perspective of

a member of the public evaluating the trademark.  Claimed generic trademarks are not protectable as marks.  They cannot be registered with the U.S. Patent and Trademark Office.

B, descriptive.

A descriptive trademark only describes an ingredient, quality, characteristics, function, feature, purpose, or use of the good provided under it.  An example of a descriptive trademark would be Vision Center for an eyeglass store.  Descriptive trademarks are eligible for registration with the U.S. Patent and Trademark Office if the trademark was acquired -- has acquired "secondary meaning".  A trademark has acquired secondary meaning if the primary significant of the trademark in the minds of the consuming public is not the associated good itself, but instead the source or producer of the good.

There are four factors you may use in determining whether secondary meaning exists:

1, the length and nature of the trademark's use;

The nature and extent of advertising and promotion of the trademark;

3, the efforts of the trademark owner to promote a conscience connection between the trademark and its business; and.

1910 the degree to which the public recognizes GFE's goods or services by the trademark.

1          Suggestive:

2          A suggestive trademark suggests, rather than

3    describes, qualities of the underlying good.  If a consumer's

4    imagination is necessary to make the connection between the

5    trademark and the goods then the trademark suggests the

6    features of the did.  An example of a suggestive trademark is

7    iceberg for a refrigerator.  Suggestive trademarks are

8    eligible to be registered in the U.S. Patent and Trademark

9    Office without proof of secondary meaning.

10          Arbitrary and fanciful or coined.

11          An arbitrary trademark is a real word but has no

12   logical relationship, to the underlying good.  For example,

13   an example of an arbitrary trademark is domino, for sugar.  A

14   fanciful or coined trademark is a trademark created solely to

15   function as a trademark but which has no meaning beyond the

16   trademark itself.  An example of a fanciful or coined

17   trademark is Exxon on for gasoline.  Arbitrary and fanciful

18   or coined trademarks are eligible to be registered in the

19   U.S. Patent and Trademark Office without proof of secondary

20   meaning.

21          Additional considerations relating to trademark

22   strength:

23          When evaluating the strength of GFE's trademark,

24   you may also consider the extent of any use by third parties

25   of similar trademarks, GFE's promotional expenditures, the

1  volume of GFE's sales under the trademark, and whether GFE's

2  registration has achieved incontestable status.

3          Relatedness of good or services.

4          This factor considers not only whether the

5  consumer public can readily distinguish between the parties's

6  good, but also whether the goods at issue are of a kind that

7  the public attributes to a single source.

8          Similarity of the trademark.

9          In evaluating whether trademarks are similar, you

10  may consider the "overall impression" that GFE's and Anthem

11  Wrestling's trademarks create, including the sound,

12  appearance, and manner in which they are used.  You may look

13  at the trademarks as a whole rather than simply comparing

14  their individual features.

15          Evidence of actual confusion.

16          Because the preference of actual confusion usually

17  is difficult to show, a finding of actual confusion is not

18  required to find trademark infringement.  Alternatively, the

19  absence of actual confusion does not necessarily mean Anthem

20  Wrestling is not libel for trademark infringement.

21          Marketing channelled.

22          This factor looks to each party's method of add

23  tiding.  It is not a requirement that GFE and Anthem

24  Wrestling ties in the same magazines, publications, or other

25  advertising outlets.  The issue is whether the parties use

1  the same forums and media outlets to advertise, leading to

2  possible confusion.

3  Likely degree of purchaser care.

4  This factor looks to care used by the typical

5  buyer exercising ordinary caution.  Generally, in assessing

6  the likelihood of confusion to the public, the standard used

7  by the courts is the typical buyer exercising ordinary

8  caution.  However, when a buyer has expertise or is otherwise

9  more sophisticated with respect to the purchase of the

10  services at issue, a higher standard is proper.  Similarly,

11  when services are expensive or unusual, the buyer can be

12  expected to exercise greater care in her purchases.

13  Anthem Wrestling's intent in selecting the

14  trademarks.

15  You may also consider whether Anthem Wrestling

16  intended to infringe on GFE's trademark.  That is, did Anthem

17  Wrestling adopt its trademark with the intention of deriving

18  a benefit from GFE's reputation?  If you determine that

19  Anthem Wrestling intentionally ignored the potential for

20  infringement, you may impede to Anthem Wrestling an intent to

21  infringe.  You may also consider Anthem Wrestling's belief

22  that it had an implied license to use the trademark at issue

23  in assessing its intent, and in this regard should consider

24  the Court's instructions relating to an implied license.

25  Likelihood of expansion of product lines.

1    This factor looks to whether anchorage party will
2  expand its business to compete with the other.
3    If you find that Anthem Wrestling has infringed
4  GFE's trademark, you next consider Anthem Wrestling's
5  affirmative defenses, specifically that it had a license to
6  use the trademarks and that GFE abandoned the trademarks.  I
7  will instruct you on those two subjects later.
8    Either without trademark registration, a party may
9  own trademarks but the party does not have the presume shuns
10  granted by a registration.  Under the Lanham Act, a party may
11  file a claim of unfair competition to stop others from using
12  unregistered trademarks and obtain damages as a result of
13  such use.  Think of Federal Unfair Competition as trademark
14  infringement of unregistered trademarks.
15    The statutory basis for the federal tort of
16  infringement of unregistered trademarks is section 43A of the
17  Lanham Act, 15 U.S.C. section 1125B, which proscribes the use
18  in commerce "by any person" of:
19    Any word, term, symbol or device, or any
20  combination there of. . .  Which is likely to cause
21  confusion, or to cause mistake or to deceive as to the
22  affiliation, connection, or association of such person with
23  another person, or as to the origin, sponsorship, or approval
24  of his or her goods, services, or commercial activities by
25  another person.

1    15 U.S.C., section 1125C.  This language has long

2  been recognized as creating a cause of action against the

3  violation of rights to unregistered trademarks substantively

4  equivalent to the federal trademark infringement cause of

5  action, which is reserved to owners of trademarks that have

6  been federally registered.

7    In keeping with the conventional practice, these

8  instructions refer to unfair competition under federal law

9  grounded in the alleged misappropriation of a trademark as

10  "infringement".  To put it simply, the previous instruction

11  for federal "trademark infringement" applies to registered

12  trademarks.  This instruction for "Federal Unfair

13  Competition" applies to infringement of unregistered

14  trademarks.

15    Global Force Entertainment, Inc., claims that

16  Anthem Wrestling Exhibitions LLC has unfairly competed using,

17  infringe, the Global Force Wrestling, word, and GFW, word,

18  trademarks, and the following logo trademarks:  Global Force

19  Wrestling, GFW.

20    If you find the registrations for Global Force

21  Wrestling, word, and GFW, word, trademarks are invalid, you

22  may consider them for infringement under unfair competition

23  under the Lanham Act.

24    To establish a federal claim of unfair

25  competition, Global Force Entertainment must show:

1                    1, ownership of the above trademarks, and.

2                    2, Anthem Wrestling Exhibitions LLC's use of the

3       disputed mark is likely to cause confusion among consumers

4       regarding the origin of the goods offered by the parties.

5                    In determining whether Anthem Wrestling

6       Exhibitions LLC's use of the disputed mark is likely to cause

7       confusion, you should you should apply the same likelihood of

8       confusion standard as found in the prior Federal Trademark

9       Infringement instruction.

10                   Although Global Force Entertainment, Inc. Is

11      asserting that the above two unregistered trademarks have

12      been infringed, you must apply the law and consider each

13      individually.  You do not need to find infringement of both

14      unregistered trademark for a finding of unfair competition.

15      You only have to find that one of the trademarks was

16      infringed.

17                   GFE claims that Anthem Wrestling has infringed its

18      trademark Global Force Wrestling, GFW, and logos in violation

19      of Tennessee common law.  In determining whether such

20      infringement occurred, you should apply the same legal

21      standard as that applied to GFE's federal trademark

22      infringement claim.  You should you shall also consider

23      Anthem Wrestling's defenses.  As with the federal trademark

24      infringement and federal unfair competition claims, you do

25      not need to find that Anthem Wrestling infringed all of the

1  trademarks.  One or more trademarks may be infringed.

2       GFE claims that Anthem Wrestling committed

3  counterfeiting by unlawfully using Global Force Wrestling

4  trademark registration number 5392147 in the sale, offer to

5  sell, distribution, or advertising of goods without GFE's

6  authorization.  To prove a claim for counterfeiting, GFE must

7  prove the following facts by response of the evidence:

8       The trademark used by Anthem Wrestling is a copy

9  that is identical or substantially indistinguishable from

10  GFE's trademark that is registered on the Principal Register

11  of the United States Patent and Trademark Office.

12       Anthem Wrestling's trademark was affixed without

13  GFE's permission; and.

14       Anthem Wrestling used GFE's trademark in the sale,

15  offering for sale, distribution, or advertising of goods that

16  are covered by GFE's trademark registration.

17       When the infringing products are count fits, the

18  likelihood of confusion may be presumed.

19       If you find that Anthem Wrestling was operating

20  under an implied license from either plaintiff, you may not

21  find it libel for counterfeiting, even if you believe Anthem

22  Wrestling went outside the terms of the implied license.

23       If Anthem Wrestling has a registered trademark in

24  the Jeff Jarrett mark that is presumed to be valid, and that

25  Anthem Wrestling enjoys nationwide priority of rights and

1    indigestion wide constructive notice of its rights, then you

2    must consider GFE's claim that Anthem Wrestling's

3    registration is invalid.  Plaintiffs assert the registration

4    was abandoned, which plaintiff's must prove by preponderance

5    of the evidence.  Plaintiff's also assert the regular station

6    was obtained from, or has been maintained in, the United

7    States Patent and Trademark Office through a false or

8    fraudulent filing with intent to deceive the Patent and

9    Trademark Office, which they must prove through clear and

10   convincing evidence.

11          Clear and convincing evidence is a different and

12   higher standard than preponderance of the evidence.  It means

13   that the defendant's wrong, if any, must be so clearly shown

14   that there is no serious or substantial doubt about the

15   correctness of the conclusions drawn from the evidence.

16          The right to a particular trademark grows out of

17   the trademark's use.  Use is sufficient to establish rights

18   if it is public enough that it identifies the goods in

19   question as those of the person using the trademark.  It is

20   sufficient to establish valid rights if the trademark is used

21   in genuine commercial transactions and the use is consistent

22   and continuous.  Mere "token use" of the trademark-use made

23   solely to reserve rights in the trademark-is not enough to

24   establish valid rights.  Wide public recognition of the

25   trademark is not required, but secret or undisclosed use is

1    not adequate.

2           A trademark is used in commerce and in connection

3    with goods or services if the registration when it is placed

4    on:

5           1, the goods or their containers or the associated

6    displays paragraph 2, the tags or labels affixed to the goods

7    or their container.

8           3, the documents associated with the goods or

9    their sale, and.

10          4, the good are sold or transported in commerce in

11   more than one state, or in the United States state and a

12   foreign country.

13          Abandonment of a trademark is a ground for the

14   cancellation of a trademark registration.  To prove

15   abandonment, GFE must prove by a preponderance of the

16   evidence that:

17          1, Anthem Wrestling discontinued the bona fide use

18   of the trademark, and did so with intent to not resume its

19   use in the reasonably foreseeable future.  If you find that

20   Anthem Wrestling has not used the trademark for three

21   consecutive years, you may presume that Anthem Wrestling did

22   not intend to resume use of the trademark, but Anthem

23   Wrestling can rebut that presumption by producing evidence

24   that it intended to resume use; or.

25          2, Anthem Wrestling acted or failed to act, and as

1   ray result, Anthem Wrestling's trademark no longer identifies

2   the source of Anthem Wrestling's goods and has become a

3   generic term for the associated goods.

4        If Anthem Wrestling's registration was obtained

5   from, or has been maintained in, the U.S. Patent and

6   Trademark Office through a false or fraudulent filing, the

7   registration may be canceled. To succeed on this ground for

8   cancellation, GFE must prove by clear and convincing evidence

9   that:

10        1, Anthem Wrestling, or its predecessor in

11   interest, TNA, knowingly made a false representation ever

12   fact to the U.S. Patent and Trademark Office.

13        2, the false representation was made with an

14   intent to deceive; and.

15        3, the false representation was material in the

16   sense that the U.S. patent and trademark office would not

17   have issued or taken attained Anthem Wrestling's registration

18   in the absence of the false representation.

19        Cancellation of a registration on this ground does

20   not necessarily mean that Anthem Wrestling does not enjoy

21   valid rights to the covered trademark. If you find that

22   Anthem Wrestling's registration should be canceled on this

23   ground, you must determine whether Anthem Wrestling has

24   rights to its claimed trademark independent of its

25   registration.

1    Although you will be asked to make the foregoing
2    factual determinations, cancellation is ultimately a
3    determinations by the Court.
4    Certain of Global Force Entertainment, Inc.'s
5    claims require that it have a valid federal trademark
6    registration in order to assert the claim.  A valid federal
7    trademark is required to assert the following of GFE's
8    claims:
9    Trademark infringement under 15 U.S.C. Section
10   1114;
11   And counterfeiting under 15 U.S.C., Section 1114.
12   In this case, it is Anthem Wrestling's burden to
13   prove the registration is invalid.
14   A trademark registration may be invalid because
15   statutory requirements in obtaining it were not met.  One
16   such statutory requirement is that the entity that filed the
17   application for registration must be the true owner of the
18   mark at the time of filing.  If the entity filing the
19   application was not the owner of the mark as of the filing
20   date, the registration is void.  This rule applies to both
21   use-based and Intent to Use applications.
22   Likewise, if you find any documents necessary to
23   obtain the registration were not properly filed at the U.S.
24   Patent and Trademark Office by the owner of the mark, you may
25   also find that the registration is invalid.

1        An intent to use applicant may rely upon the use

2   by a related company for the application to become a

3   registration.  A "related company" means any person whose use

4   of a mark is controlled by the owner of the mark with respect

5   to the nature and quality of the goods or services on or in

6   connection with which the mark is used.  An intent-to use

7   applicant cannot be assigned until a registration is

8   completed.

9        An administratively dissolved company continues

10  its existence to liquidate its assets.

11       The owner or assignee of a trademark cannot

12  exclude others from using the trademark if it has been

13  abandoned.  GFE contends that the Jeff Jarrett trademark has

14  become unenforceable because the owner or assignee abandoned

15  it.  GFE has the burden of proving abandonment by

16  preponderance of the evidence.

17       The owner or assignee of a trademark abandons the

18  right to exclusion I have use of the trademark when the owner

19  or assignee.

20       1, discontinues its use in the ordinary course of

21  trade, intending not to resume using it;

22       2, acts or fails to act so that the trademark's

23  primary significance or meaning to prospective consumers has

24  become the product or service itself and not the producer or

25  of the product or provider of the service; or

1    3 fails to exercise adequate quality control over

2  the goods or services sold under the trademark by a licensee.

3    If Anthem Wrestling has the filed all appropriate

4  maintenance documents with respect to the Jeff Jarrett

5  trademark with the United States Patent and Trademark Office,

6  Anthem Wrestling is entitled to a presume shun that the

7  trademark is valid, enforceable, and incontestable.

8    To find that the Jeff Jarrett trademark has been

9  abandoned, you must find that there were acts indicating a

10  practical abandonment and an actual intent to abandon.  The

11  party claiming that a trademark was abandoned bears the

12  burden of proof to show both of these elements, by a

13  preponderance of the evidence.

14    GFE claims that Anthem Wrestling violated the

15  Tennessee Consumer Protection Act.  The Tennessee Consumer

16  Protection Act allows GFE to recover actual damages for a

17  loss of money, property, or thing of value as a result of

18  Anthem Wrestling's use of an unfair or sketch active act or

19  practice.  Anthem Wrestling denies that it violated the Act,

20  asserting that it had an implied license for all the actions

21  about which the plaintiff complains.

22    To recover on this claim, GFE must prove by

23  preponderance of the evidence:

24    That 1, Anthem Wrestling's act or practice is

25  unfair or deceptive;

1   2, GFE suffered a loss of money, property or thing

2   of value as a rule of the unfair or deceptive practice, but

3   the amount of loss, if any, is not before you for

4   consideration at this time.

5   Certain practices are by law unfair and or

6   deceptive.  In this case, GFE alleges that Anthem Wrestling

7   engaged in conduct that the law has determined to be unfair

8   or deceptive;

9   A, representing that goods or services have

10  sponsorship, approval, characteristics, ingredients, uses,

11  benefits, or quantities that they do not or that a person has

12  a sponsorship approval, status, affiliation or connection

13  that such person does not have, and/or

14  B, using statements or illustrations in any

15  advertisement which create a false impression of the grade,

16  quality, quantity, make, value, age, size, color, usability

17  Oregon again of the goods or services offered, or which may

18  otherwise misrepresent the goods or services in such a manner

19  that later, on -- that such a matter that later on disclosure

20  of the true facts, there is a likelihood that the buyer may

21  be switched from the advertised goods or services to other

22  goods or services.

23  GFE has the burden of proving by preponderance of

24  the evidence that Anthem Wrestling engaged in conduct that

25  the law has determined to be unfair or deceptive.

1    The law also provides a jury with the right to

2  determine whether the conduct of Anthem Wrestling is

3  deceptive or unfair.  A deceptive act or practice is one that

4  tends to deceive, that causes a consumer to believe what is

5  false, or that miss leads or tends to mislead a consumer as

6  to a matter of fact.  Deceptive acts or practices by

7  merchants may consist of statements, silence or action.

8    On the other hand, unfair conduct is even broader

9  than the concept of deceptiveness.  It is conduct that causes

10  or is likely to cause substantial injury to consumers which

11  is not reasonably avoidable by consumers themselves and is

12  not outweighed by benefits to consumers or competition.

13    "Substantial" injury must be more than trivial or

14  speculative, and may be found if a relatively small harm of

15  any type is inflicted on a large number of consumers or if a

16  greater harm of any type is inflicted on a relatively small

17  number of consumers.

18    Plaintiff's GFE asserts that Anthem Wrestling was

19  unjustly enriched for use of the original masters's and GFE's

20  trademark.  Unjust enrichment is a quasi-contracted theory or

21  contract implied in law in which a contractual obligation may

22  be imposed where one does not exist.  Such contracts are not

23  based upon the intentions of the parties but are obligations

24  created by law.

25    GFE establishes unjust enrichment when it shows by

preponderance of the evidence.

GFE conferred a benefit upon Anthem Wrestling;

Anthem Wrestling appreciated such benefit; and.

Anthem Wrestling's acceptance of such benefit under the circumstances would be inequitable or unjust without payment of the value there of.

A benefit is any form of advantage that has a measurable value including the advantage of being saved from an expense or loss.

If you find that GFE granted Anthem Wrestling an implied license to use the trademarks at issue, you may find that Anthem Wrestling is not libel for unjust enrichment unless you find that Anthem Wrestling exceeded the scope of the license.

GFE has asserted a claim of conversion against Anthem Wrestling regarding the original master recordings of the 16 one-hour episodes.  A conversion is any assumption of control over property that is inconsistent with the rights of the owner.  Anthem Wrestling denies that it is libel for conversion.

A conversion may consist of:

The use and enjoyment of personal property of another without the owner's consent; or

Destruction or dominion over property of another by excluding or defying the owner's right; or

1    Withholding of personal property from the owner

2  under a claim of title, inconsistent with the owner's claim

3  of title.

4    It is not necessary for someone to actually steel

5  property for a finding of conversion.  The tort of conversion

6  exists even when Anthem Wrestling's rightfully obtained

7  possession of the property.  Further, Anthem Wrestling's

8  intention does not have to be a conscious wrongdoing; it can

9  merely be an exercise of dominion or control over the

10  property in such a way that would be inconsistent with the

11  owner's rights and which results in injury to the owner.

12    If personal property that has been entrusted to

13  another is used in a different manner, or for a different

14  purpose, or for a longer time than was agreed upon by the

15  parties, the person who received the personal property is

16  guilty of conversion.

17    Plaintiffs allege that Anthem Wrestling was in the

18  negligent in regards to the master recordings.  Negligence is

19  the failure to use ordinary or reasonable care.  It is either

20  doing something that a reasonably careful person would not

21  do, or the failure to do something that a reasonably careful

22  person would on do, under all the circumstances in the case.

23  The mere happening of an injury or accident does not in and

24  of itself prove negligence.  A person may assume that every

25  other person will use reasonable care, unless a reasonably

1    careful person has cause for thinking otherwise.  In order to

2    prevail in a negligence suit, I plaintiff must prove that the

3    defendant owed the plaintiff a duty of care; that defendant's

4    conduct fell below the standard of care amounting to a breach

5    of that duty; injury or loss; causation in fact; and

6    proximate or legal cause.  GFE has the burden of proving by

7    preponderance of the evidence that:

8                Anthem Wrestling was in the beginning oxygenate;

9    and.

10                That the negligence was a cause in fact and legal

11   cause of injury to GFE.

12                Negligence is a "legal cause" of injury or damage

13   if it played any part, no matter how small, in bringing about

14   or actual causing the injury or damage.

15                If you find that Anthem Wrestling did not owe

16   plaintiff a duty to keep the footage of the 16 one-hour

17   episodes on Anthem Wrestling's servers after it was converted

18   to the Amped Anthology masters, you cannot find Anthem

19   Wrestling libel for negligence.  On the other hand, if you

20   find that Anthem Wrestling owed plaintiffs a duty to keep the

21   episodes on its servers after it has converted, and if you

22   find that Anthem Wrestling breached that duty, which in turn

23   caused injury and damages to the plaintiffs, then you can

24   find for plaintiffs on this claim.

25                Now that I've instructed you on the law

1  surrounding Plaintiffs' claim, I will turn to Anthem
2  Wrestling defenses to those claims and then its county
3  claims.
4          As a defense, Anthem Wrestling, contends that
5  global and/or Mr. Jarrett granted a license to use the
6  trademarks and Mr. Jarrett's name, image and license
7  likeness.  A license is when an owner of a trademark enters
8  into an agreement or permits another person to use the
9  trademark or provides consent for the use of a trademark.
10         A trademark license does not have to be in
11 writing.
12         A license can be express or implied.  An "implied
13 license" is an unwritten license to use intellectual property
14 that you may find from the circumstances and from the conduct
15 between the parties.
16         The existence of an express or implied license may
17 be a defense to the infringement claims.  However, you may
18 conclude that it does not apply to every infringement claim,
19 if any.
20         The key question in determining whether an implied
21 license was granted to Anthem Wrestling is whether the
22 totality of the circumstances indicate that Jeff Jarrett or
23 GFE intended that the trademarks were used in a manner -- in
24 the manner in which they were used.  Based on the totality of
25 the circumstances of the case, which includes the limits of

1  an implied license that I will explain to you in these

2  instructions, and whether the evidence supports the notion

3  that the parties, in essence, made an agreement permitting

4  Anthem Wrestling to use the work, consistent with certain

5  understandings or terms.

6          If you find that GFE or Jeffrey Jarrett granted

7  Anthem Wrestling an implied license to use the trademarks at

8  issue, you cannot fine Anthem Wrestling liable for trademark

9  infringement unless you find that Anthem Wrestling acted

10 yonder the terms of the implied license or exceeded the scope

11 of the implied license.

12         The existence of an implied license to use

13 intellectual property for a particular purpose may preclude a

14 finding of infringement.  However, if GFE demonstrates that

15 Anthem Wrestling exceeded the scope of the license, you may

16 find that an is libel for infringement.  Based on your

17 understanding of the terms of the license, if one exists, you

18 may determine whether Anthem Wrestling's conduct exceeds the

19 scope of the license, you must determine whether Mr. Jarrett

20 or GFE made the license contingent upon the parties's merger

21 going through to completion.

22         In order to find that the implied license was

23 contingent upon the completion of the merger, you must find

24 that Mr. Jarrett or GFE expressed this contingency in clear,

25 unambiguous language to Anthem Wrestling prior to allowing

1    the use of the trademarks, the *Amped* cottons an Mr. Jarrett's

2    image and likeness.  If neither plaintiff expressed this

3    limitation on the implied license in clear and unambiguous

4    terms, the completion of the merger cannot be a condition of

5    the implied license.  If the completion of the merger was not

6    a condition of the implied license, Anthem Wrestling's

7    conduct cannot constitute trademark infringement or

8    infringement of Mr. Jarrett's image and likeness because it

9    did not exceed the scope of the implied license.

10             If you do find that Mr. Jarrett or GFE stated or

11   conveyed in express in unambiguous terms to Anthem Wrestling

12   that the implied license was conditional upon the completion

13   of the merger, then you may find that Anthem Wrestling's

14   conduct exceeded the scope of the implied license and

15   potentially constitutes infringement.  If you find that it is

16   debatable whether either plaintiff communicated that the

17   implied license was conditioned upon the completion of the

18   merger, you must find that the condition was not conveyed and

19   does not limit the implied license.

20             You must make all your findings by preponderance

21   of the evidence.

22             Mr. Jarrett claims that Anthem Wrestling violated

23   his personal rights to his name, photograph and likeness.  To

24   establish this claim, Mr. Jarrett must prove the following:

25             That Anthem Wrestling knowingly used Mr. Jarrett's

1  name, photograph and or likeness on products, merchandise,

2  goods or services or to ties or sell products, merchandise,

3  goods or services.

4         That Anthem Wrestling did not have Mr. Jarrett's

5  consent;

6         That Anthem Wrestling's use of Mr. Jarrett's name,

7  photograph and or likeness was used for purposes of

8  advertising products, merchandise, goods or services or for

9  purposes of fund raising solicitation of don't nations,

10 purchases of products, merchandise, goods, or services;

11        That Mr. Jarrett was harmed; and.

12        That Anthem Wrestling's conduct was a substantial

13 factor in causing Mr. Jarrett harm.

14        It is deemed a fair use and no violation of an

15 individual's right should be found under the Tennessee

16 Personal Rights Protection Act if the use of a name,

17 photograph, or likeness is in connection with any news,

18 public affairs, or sports broadcast or account.

19        To find Anthem Wrestling be exhibits Lionel to

20 Mr. Jarrett for his Tennessee Personal Rights Protection Act

21 claim, you must determine whether Anthem Wrestling

22 Exhibitions LLC has proved by a preponderance of the evidence

23 that the Amped Anthology parts 1, 2, 3, and 4 and any other

24 Anthem Wrestling Exhibitions LLC broadcast are sports

25 broadcasts rather than entertainment broadcasts.

1    If you find Amped Anthology parts 1, 2, 3, and 4

2  and any other Anthem Wrestling Exhibitions LLC broadcast are

3  entertainment broadcasts, the defense does not bar a finding

4  of liability on Mr. Jarrett's Tennessee Personal Rights

5  Protection Act claim.

6    "Sport" includes all forms of competitive physical

7  activity or games that require or depend upon physical

8  ability and skills in order to participate in the activity

9  and to succeed.

10    "Entertainment" includes all forms of competitive

11 physical activity or games that are scripted, rehearsed, or

12 otherwise planned and may have a specific outcome not

13 determined by chance or kill or ability.

14    If you find that a professional wrestling

15 broadcast constitutes a "sports broadcast" instead of an

16 "entertain broadcast" you must find that Anthem Wrestling did

17 not violate the Tennessee Personal Rights Protection Act.

18    Anthem Wrestling asserts that if it is found libel

19 in this action it is because Jeffrey Jarrett breached his

20 fiduciary duty to Anthem Wrestling as its officer and is

21 responsible for any damages that know from this conduct.

22 Jeffrey Jarrett denies that he breached his fiduciary duty to

23 Anthem Wrestling.  In order to recover for breach of

24 fiduciary duty against Mr. Jarrett, Anthem Wrestling must

25 establish..

1    A fiduciary relationship.

2    Breach of the resulting fiduciary duty.

3    Injury to Anthem Wrestling or benefit to

4  Mr. Jarrett as a result of that breach.

5    Mr. Jarrett, as Chief Creative Officer, of Anthem

6  Wrestling did not breach his fiduciary duties if you find

7  that his duties were discharged in good faith, with the fair

8  of an ordinary prudent person in a like position would

9  exercise under similar circumstances; and.

10    In a manner the officer reasonably believes to be

11  in the best interests of the LLC.

12    Anthem Wrestling asserts that it is unjust for

13  Global Force Entertainment and Jeffrey Jarrett to retain the

14  benefits that Anthem Wrestling conferred upon it when it paid

15  for the completion of the Amped Anthology masters.  Global

16  Force Entertainment and Jeffrey Jarrett deny that they have

17  been unjustly enriched.  Unjust enrichment is a

18  quasi-contractual theory or contract implied in law in which

19  a contractual obligation may be imposed where one does not

20  exist.  Such contracts are not based upon the intention of

21  the parties but are obligations created by law.

22    Anthem Wrestling establishes unjust enrichment

23  when it shows:

24    11 Anthem Wrestling confers a benefit upon GFE or

25  Mr. Jarrett.

2, GFE or Mr. Jarrett appreciates such benefit; and.

3 GFE's or Mr. Jarrett's acceptance of such benefit under circumstances that it would be inequitable or unjust for them to retain the benefit without payment of the value there of.

A benefit is any form of advantage that has a measurable value including the vagina of being saved from an expense or loss.

Anthem Wrestling's unjust enrichment claims against GFE and Mr. Jarrett must be considered individually.

If you find that Anthem Wrestling is libel for trademark infringement under Tennessee law, unfair competition under Tennessee law, conversion and/or negligence, you must determine whether Anthem Wrestling acted either, one, intentionally, two, fraudulently, three, maliciously, or, 4, recklessly.

A person acts intentionally when it is the person's conscious objective or desire to engage in the conduct or cause the result.

A person acts fraudulently when, one, the person intentionally miss represents an existing, material fact or produces a false impression, in order to mislead another or to obtain an undue advantage, and, two, another is injured because of reasonable reliance upon that representation.

1     A person acts maliciously when the person is
2 motivated by ill will, hate tread, or personal spite.
3     A person acts recklessly when the person is aware
4 of, but consciously disregards a substantial and unjust
5 identifiable risk of such a nature that its disregard
6 constitutes a gross deviation from the standard of care that
7 an ordinary person would exercise under all the
8 circumstances.
9     Plaintiff must prove the defendant's intentional,
10 fraudulent, malicious, or reckless conduct by clear and
11 convincing evidence.
12     The Court has given you instructions embodying
13 various rules of law to help guide you to a just and lawful
14 verdict.  Whether some of these instructions will apply will
15 depend upon what you find to be the facts.  That I have
16 instructed you on various subjects in this case must not be
17 taken as indicating an opinion of the Court on what you
18 should find the facts to be or on which party is entitled to
19 your verdict.
20     The verdict must represent the considered judgment
21 of each juror.  In order to return a verdict, it is necessary
22 that each juror agree.  Your verdict must be unanimous.
23     It is your duty as jurors to consult with one
24 another, and to deliberate with a view to reaching an
25 agreement, if you can do so without violence to individual

judgment.  You must each decide the case for yourself, but only after an impartial consideration of the evidence in the case with your fellow jurors.  In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion, if convinced, it is in error.  But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

Remember at all times you are not partisans.  You are judges -- judges of the facts.  Your sole interest is to seek the truth from the evidence in the case.

The attitude and conduct of jurors at the beginning of their deliberations are very important.  It is rarely productive or good for a juror, upon entering the jury room, to make an emphatic expression of his or her opinion on the case or to announce a determination to stand for a certain verdict.  When a juror does that, his or her sense of pride may be aroused and he or she may be hesitant to recede from an announced position if shown that it is wrong.  Remember that you are not part is ans or advocates in this matter, but judges.

Some of you may have taken notes during the trial.  Once you retire to the jury room, you may refer to your notes, but only to refresh your own memory.  Your notes are not evidence.  You may not read from your notes to your

1   fellow jurors or otherwise inform them of what you have

2   written. The notes may contain errors or they may be

3   misunderstood or taken out of context the notes may only

4   pertain to part of the testimony and may not be an exact

5   account of what was said by a witness. You are free to

6   discuss the testimony of the witnesses with your fellow

7   jurors but each juror must rely on his or her own memory as

8   to what a witness did or did not say.

9        During your deliberation you must not communicate

10   with or provide any information to anyone by any means about

11   this case. You may not use any electronic advice or media,

12   such as telephone, cell phone, smart phone, iPhone,

13   Blackberry or computer; the itinerary net, any Internet

14   service, or any text or instant messaging or; or any Internet

15   chat room, belong or website, such as Facebook, gravamen,

16   LinkedIn, YouTube, or Twitter, to communicate to anyone any

17   information about this case or to conduct any research about

18   this case until I accept your verdict.

19        Upon retiring to the jury room, you will select

20   one of your number to act as your foreperson. The foreperson

21   will preside over your deliberations, and will be your

22   spokesperson here in court. A form of the verdict has been

23   prepared for your convenience. The first page of the form

24   verdict is being shown to you. And that verdict form will be

25   given to you when you retire. It consists of 11 pages. You

will take this form to the jury room, and when you have
reached unanimous agreement to see your verdict, you will
have the foreperson film in the date, sign the form which
sets forth the verdict upon which you unanimously agree.  You
will then return with your verdict to the courtroom.

It is proper to add a caution that nothing said
this these instruction and nothing in any form of verdict
prepared for your convenience is it meant to suggest or con
Tay in any way or manner any intimation as to what verdict I
think you should find.  What the verdict be is your sole and
exclusive duty and responsibility.

If it becomes necessary during your deliberations
to communicate with the Court, you may send a note by the
Court security officer, signed by your foreperson or by one
or more members of the jury.  No member of the jury should
even attempt to communicate with the Court by any means other
than a signed writing, and the Court will never communicate
with any member of the jury on any subject touching the
merits of the case other than a writing, or orally here in
open court.

Bear in mind also that you are never to reveal to
any person -- not even to the Court -- how the jury stands
numerically or otherwise on the questions before you, until
you -- until after you have reached a union Nan muss verdict.

So ladies and gentlemen of the jury, you may now

1    retire to the jury room assembly room where you will be able
2    to maintain social dancing during your verdict.  You should
3    find in there -- are the exhibits in there.
4                COURT DEPUTY:  Yes.
5                THE COURT:  The exhibits will be in the jury room.
6    As I mentioned on a laptop.  There are some hard exhibits.
7    The court officer will bring over with you as you return now
8    to the jury assembly room.  I think university ordered your
9    lunch.  I'm going to request there you all decide if you want
10   to take a short break and eat or is it an to deliberate.
11   That's totally up to you.  So please retire to the jury
12   assembly room.
13               MR. MILLER:  Your Honor, before we they retire may
14   I approach?
15               THE COURT:  No.
16               You may retire to the jury room.
17               (Jury not present.)
18               THE COURT:  All right.  Do you have any objections
19   to the charge as given?
20               MR. MILLER:  Your Honor, there was one only one
21   error.  And we said that the term sheet was Exhibit 1.  It's
22   actually Exhibit 112.
23               THE COURT:  I think they'll figure it out.
24               Any objections to the charge as given?
25               MR. MILLER:  No, Your Honor.

```
1              THE COURT:  Any objections to the charges given?

2              MS. MILLS:  No, Your Honor.

3              THE COURT:  All right.  Are you all going to stay

4    here in the courtroom -- -- well, you can stay in the

5    courtroom.  You can stay in the courthouse.  There's an

6    attorney room that you can relax in.  But you do need to stay

7    around in case there are questions that we need to address.

8              MS. BAKER:  Your Honor, if I may -- I'm sorry.

9    Ms. Baker here.  You had given us permission to create nine

10   binders of ten exhibits each.  And we have prepared those

11   with defendants.  We have put them together.

12             THE COURT:  No one told me this.  I didn't hear

13   that.  You heard it referenced, but you didn't tell the

14   courtroom deputy and I asked have they -- where are the nine

15   binders and what's in them and where is my copy?

16             MS. BAKER:  Your Honor, I think they're in this

17   white box.; is that right.

18             MR. MILLER:  It's in defendant's possession.

19             THE COURT:  You can be seated.  I don't need the

20   box.  I do need -- I need a copy.  I hope you got ten.  I

21   need to see what you all are is doing.  Have you all -- has

22   the plaintiff inspected the notebooks.

23             MS. BAKER:  Yes, Your Honor.

24             THE COURT:  Are they -- is the notebooks in order?

25             MS. BAKER:  Yes, Your Honor.
```

1           THE COURT:  And the defendant apparently created
2    the notebooks.
3           MS. MILLS:  We put it together.  They gave us what
4    exhibits they wanted and we added it to there.
5           THE COURT:  And everything in here are exhibits?
6           MS. BAKER:  Yes, Your Honor.
7           THE COURT:  Labeled by trial exhibit number?
8           Okay.  All right.  All right.  Neither side has an
9    objection, then -- will you take the box?
10          COURT OFFICER:  Yes, sir.
11          THE COURT:  Do you have an extra?
12          MS. MILLS:  I think there's just nine, Your Honor.
13   I'm sorry.
14          MS. BAKER:  We have one copy of our ten if you
15   guys happen to have an extra ten of your exhibits we could
16   kind combined it for the judge.
17          THE COURT:  Just make me a copy so I know what the
18   jury has.
19          MS. MILLS:  And we could run get you a copy.
20          THE COURT:  Okay.  You need this one, too.  All
21   right.  Anything else.
22          MS. BAKER:  No, Your Honor.  Thank you.
23          (Recess.)
24          THE COURT:  All right.  Be seated.  So I've gotten
25   a note.  I'm not sure what it means.  We'll -- well, it just

1    says Judge Crenshaw, we have concluded our deliberations.  It

2    doesn't say they have a verdict.  So let's find out.  Bring

3    them in.

4            (Jury present.)

5            THE COURT:  All right.  Be seated.  So ladies and

6    gentlemen of the jury, I received your note signed by Mr.

7    Christian.

8            JUROR:  Yes, Your Honor.

9            THE COURT:  Okay.  And it says we have concluded

10   our deliberations.  Have you reached a verdict?

11           JUROR:  Yes, Your Honor.

12           THE COURT:  Okay.  Can you pass it to me.

13           Okay.  So I'm going to hand back your verdict

14   because it's not complete.  And maybe you all should go

15   back -- and point your attention to question 2 and 5.  And

16   ask you to complete that.  Do you all want to go back to the

17   jury room and then you can all look at it.  So let's do that

18   for a minute.  Thank you.

19           THE COURT:  2 and 5.  Take a look at that.

20           (Jury not present.)

21           All right.  Be seated.  The verdict for the record

22   to be clear, the verdict that the jury gave me did not answer

23   in question 2 yes or no regarding the Global Force Wrestling

24   mark.  It had nothing there.  And same thing for number 5.

25   It did not answer yes or no for the Global Force Wrestling.

1   So it's not complete and they need to complete it.  So why

2   don't you all just hold tight.

3           (Recess.)

4           THE COURT:  All right.  Bring them in.

5           All right.  Be seated.  ///////////////, if you'll

6   pass up the verdict form now.

7           Okay.  So ///////////////, I'm going to pass the

8   verdict back to you and ask you to publish your verdict.

9           Why don't you identify the question, question

10  number 1, and what your verdict is.  And ask every -- then I

11  will poll the jury.  Okay.

12          So you don't have to read the whole thing.  Go

13  ahead.

14          JUROR:  The answer to question number 1 was yes.

15          THE COURT:  And then why don't you read the

16  trademark it refers to.

17          JUROR:  Global Force Wrestling U.S. trademark

18  register number 5,392,147.

19          THE COURT:  Good.  Go ahead.

20          JUROR:  Question number 2.  GFW -- the first GFW

21  was no.  Global Force Wrestling was no.  And GFW logo was

22  yes.  Global Force Wrestling no.

23          THE COURT:  Go ahead.

24          JUROR:  Question number 3, no.

25          Question number 4 was a --

```
 1                THE COURT:  Right.
 2                JUROR:  So we'll go to question number 5.
 3                THE COURT:  Correct.
 4                JUROR:  GFW, no.  Global Force Wrestling, no.  GFW
 5     logo yes.
 6                THE COURT:  Okay.
 7                JUROR:  Global Force Wrestling, no.
 8                THE COURT:  All right.
 9                JUROR:  Question number 6, yes.
10                Question number 7, yes.
11                Question number 8, yes.
12                Question number 9, yes.
13                Question number 10, yes.
14                Question number 11, yes.
15                Question number 12, yes.
16                Question number 13, yes.
17                Question number 14, no.
18                Question number 15, no.
19                Question number 16, no.
20                Question number 17, no.
21                Question number 19, yes.
22                THE COURT:  18.
23                JUROR:  18 was a -- after --
24                THE COURT:  Right.  Okay.  That's correct.  Good.
25                JUROR:  Question number 19 was yes.
```

```
 1            Question number 20 was yes.
 2            Question number 21 was no.
 3            Question number 22 was no.
 4            THE COURT:  All right.
 5            All right.  Thank you.  So ////////////, is that
 6   your verdict?
 7            JUROR:  Yes.
 8            THE COURT:  ////////////, is that your verdict?
 9            JUROR:  Yes.
10            THE COURT:  I need you to verbalize.
11            JUROR:  Yes.
12            THE COURT:  //////////////////, is that your verdict?
13            JUROR:  Yes.
14            THE COURT:  ////////////, is that your verdict?
15            JUROR:  Yes.
16            THE COURT:  ////////////, is that your verdict?
17            JUROR:  Yes.
18            THE COURT:  //////////////, is that your verdict?
19            JUROR:  Yes.
20            THE COURT:  ////////////, is that your verdict?
21            JUROR:  Yes.
22            THE COURT:  //////////////, is that your verdict?
23            JUROR:  Yes, Your Honor.
24            THE COURT:  And ////////////, is that your verdict?
25            JUROR:  Yes.
```

1    THE COURT:  All right.  You can be seated.  Thank

2  you.  So the court officer will take the verdict form and

3  deliver it to the deputy.

4    So ladies and gentlemen, thank you for your

5  service.  That's going to conclude today's court.  I

6  understand that one of your number has a medical issue

7  tomorrow.  So we will not be here tomorrow for court.  And I

8  will ask you to return Wednesday at 9:00.  Until that time,

9  again, you still can't talk about the case.  You can't talk

10  about your verdict.  You can't put it on your Facebook page

11  or tweet it or otherwise do anything about it because you --

12  we still have things and issues for you to look at.  So I

13  would ask you again, put the case out of your mind until

14  Wednesday at 9 and then report to the jury assembly room in

15  the normal fashion.

16    Thanks very much.  And be safe.

17    (Jury not present.)

18    THE COURT:  All right.  Be seated.  I would assume

19  that you all want to digest the verdict.  And what I would

20  suggest, I think, is -- why don't we get together tomorrow

21  let's say at 10.  That will give you all a chance to digest

22  the verdict.  As you could probably tell, plaintiff won on

23  some claims, defendant won on counterclaim, which creates

24  some interesting issues.

25    So why don't you all think about that as the Court

1    does.  I do think it's obvious, now that you have the verdict

2    on liability, whether or not it doesn't make some sense for

3    you all to talk -- go back and talk to Aelix Fardon, because

4    now you know more than you did when you talked to him last.

5    So I'm going to ask you both, Ms. Mills and Mr. Miller, to

6    reach out to Mr. Fardon ^ ck.  And I would like to see you

7    all meet with him at some point tomorrow, as well.  Maybe

8    after we meet at 10.

9             All right.  Mr. Miller, what do you think?

10            MR. MILLER:  For once, Your Honor, I have nothing.

11            THE COURT:  I'm sorry?

12            MR. MILLER:  I said for once, Your Honor, I have

13    nothing.

14            THE COURT:  Ms. Mills?

15            MS. MILLS:  Your Honor, is it possible for us to

16    get the a copy of the verdict form?

17            THE COURT:  Yeah.  It will need to be a redacted

18    copy because the name of the foreperson has to be protected.

19            All right.  Anything else.

20            MS. MILLS:  No, Your Honor.

21            THE COURT:  All right.  So you all are going to

22    digest the verdict.  You're going to reach out to Mr. Fardon.

23    I'll let him know you're going to give him a call.  You're

24    going to plan on meeting with him sometime tomorrow

25    afternoon, and we'll get together at 10.

1          MR. MILLER:  Your Honor, I guess one last thing.
2    Do you want our clients here at 10 a.m. or just the lawyers?
3          THE COURT:  No.  Just the lawyers.
4          MR. MILLER:  Okay.  Thank you.
5          THE COURT:  Although, I think he's going to
6    need -- Mr. Fardon is going to need the clients when you all
7    meet with him.  Okay.
8          Oh, and Mr. Nordholm will need to be here on
9    Wednesday.
10          (Court adjourned.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25